# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **NEW CENTURY FOUNDATION and** | ) | |
| **SAMUEL JARED TAYLOR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-00839** |
| | ) | **Judge Aleta A. Trauger** |
| **MICHAEL ROBERTSON, in his** | ) | |
| **official capacity as director of** | ) | |
| **Tennessee Department of Environment** | ) | |
| **and Conservation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiffs New Century Foundation and Samuel Jared Taylor have filed a Verified Complaint (Doc. No. 1) seeking preliminary and permanent injunctive relief against the defendant, Michael Robertson, in his official capacity as the director of the Tennessee State Park Operations ("Parks Department") at the Tennessee Department of Environment and Conservation ("TDEC"), under 42 U.S.C. § 1983. The plaintiffs allege that the defendant's decision to require the plaintiffs to pay the costs of hiring law enforcement officers to ensure public safety and to pay to repair damages caused by protesters, if plaintiffs elect to host a conference at a facility owned and operated by the State of Tennessee, violates their rights under the First Amendment.

Now before the court is the plaintiffs' Emergency Motion for a Preliminary Injunction, filed with a supporting Brief. (Doc. No. 13.) In their motion, the plaintiffs ask the court to order the defendant to make the conference facility available to them without requiring them to be responsible for those costs. The defendant filed a Response in opposition to the motion (Doc. No.

19), and the plaintiffs filed a Reply (Doc. No. 20). Both parties have submitted affidavits in support of their respective positions. The court also conducted an evidentiary hearing on October 4, 2018.

In addition to responding to the plaintiff's preliminary injunction motion, the defendant filed a Motion to Dismiss and supporting Memorandum (Doc. Nos. 21, 22) in which he reiterates the arguments raised in opposition to the plaintiff's motion. In general, the defendant maintains that the conference facility is a nonpublic forum, that the contractual provisions—insofar as they regulate speech at all—are reasonable and viewpoint-neutral, and that the plaintiffs cannot use the courts to force the defendant to enter into a contract.

Having considered the parties' arguments, the evidence in the record, and the governing law, the court will grant the Emergency Motion for Preliminary Injunction, for the reasons expressed herein. Having concluded that the plaintiffs state a colorable claim for relief, the court will deny the defendant's Motion to Dismiss.

## I.      Factual Allegations

The plaintiffs elected not to present testimony at the evidentiary hearing and instead rely on their pleadings. According to the allegations in the Verified Complaint, plaintiff New Century Foundation ("NCF") is an organization that publishes "materials about European heritage, culture, and interests." (Doc. No. 1 ¶ 3.) Its president, Samuel Jared Taylor, is a frequent speaker at public and private events about "issues concerning European heritage, culture, and interests." (*Id.* ¶ 1.) The plaintiffs' allegations concern their efforts to reserve the entirety of the Montgomery Bell Inn & Conference Center ("MBICC")—including the inn rooms for lodging and the meeting rooms that make up the conference center—for an annual conference to be held in May 2019. The MBICC is part of Montgomery Bell State Park ("Montgomery Bell" or "the Park"), a park owned and operated by the State of Tennessee. The plaintiffs specifically object to some of the terms of the

contract ("Proposed Contract") offered by the Parks Department to secure their reservation. The plaintiffs have rented out the MBICC for their annual conference every year for the past five years.

According to the plaintiffs, "[d]ue to the subject matter of the speech and the viewpoint espoused by Plaintiffs, people who disagree with the content and viewpoint of Plaintiffs' conferences protest them." (*Id.* ¶ 10.) In the past, the state has provided police protection to help maintain order at the plaintiffs' conferences. (*Id.*) This year, however, the Proposed Contract contains new terms that were not present in previous contracts.

Specifically, the Proposed Contract, a copy of which is appended as an exhibit to the Verified Complaint, requires a security deposit, as follows:

> Refundable Security Deposit: . . . a cash, check, or credit card deposit equal to 10% of the expected balance, including any anticipated catering costs and fees, is required for group reservations. This deposit is due at least 30 days prior to the reservation arrival date and is intended to cover expenses that TDEC may reasonably incur because of the group's reservation and use of or attendance at the state park. The park will hold this deposit as a security deposit to be applied toward: 1) any damage-repair costs or ancillary fees and charges assessed to the group or its members or affiliates due to issues related to the use of the park or its equipment and/or facilities, including park restoration following the group's use; 2) reasonably required state staff expenses that exceed typical staffing expenses for the facility, including event monitoring, set-up, take-down, or security to ensure public safety; 3) use of additional facilities; and/or 4) any other costs above normal operating expenses reasonably resulting from the group's use or attendance at the state park.
>
> The parties agree that the Park may assess reasonable fees or charges above the security deposit, should the security deposit be insufficient to cover the expenses listed above.

(Doc. No. 1-1, at 3.)

The plaintiffs specifically object to being required to cover the cost of "security to ensure public safety" and the cost of repairing any damages caused by others not affiliated with their group. Prior to filing suit, the plaintiffs asked the defendant not to require the plaintiffs to be responsible for these costs, but the defendant refused. (Doc. No. 1 ¶ 15.)

The plaintiffs also submitted the Affidavit of Rick Tyler. Tyler attests that he is "involved with" the American Freedom Party, a political party that, like NCF, "promotes the interests of European-Americans." (Doc. No. 13-2, at 2.) The American Freedom Party contracted with TDEC to host a conference at Montgomery Bell in June 2018. Tyler alleges that people who disagree with the political viewpoint of the American Freedom Party protest during its events, which "necessitates police protection even though the American Freedom Party and its speakers and members are overwhelmingly law-abiding." (*Id.* at 3.) Following the June 2018 event, the American Freedom Party received an invoice totaling $21,057.69 to cover the costs incurred by TDEC to provide police protection to "protect the attendees of the June 2018 American Freedom Party conference from hostile protesters." (*Id.*) Tyler states that this sum is "not insignificant and will have a chilling effect on the American Freedom Party's ability to have future conferences at Montgomery Bell State Park." (*Id.*)

The defendant called Michael Robertson to testify at the hearing and introduced his Affidavit as an exhibit.[1] Robertson testified that he is the Director of the Parks Department. He has worked for the Parks Department for thirty-four years, most of that time as a park ranger. Park rangers are law enforcement officers commissioned by the State. Among many other functions, park rangers are tasked with law enforcement within the Tennessee state parks.

Robertson became Director of the Parks Department in 2012. As Director, he is responsible for the budget and staffing for all fifty-six Tennessee state parks. Robertson testified that Montgomery Bell is one of six "resort parks" in Tennessee. It covers 4,000 acres and encompasses three lakes and other water resources, hiking trails, picnic areas, campgrounds, a group lodge,

---

[1] The Affidavit was also filed as an exhibit to the defendant's Response to the Motion for Preliminary Injunction. (Doc. No. 19-1.)

group campground, cabins, a golf course, and the MBICC. The MBICC has an 80-100% occupancy rate during weekends in the spring months. It has a staff of approximately ninety, which varies seasonally.

In April 2018, the last time NCF hosted its conference at the MBICC, the plaintiffs rented every guest room at the inn and occupied all the meeting rooms in the conference center for the weekend of the event. At the same time, the campground and picnic shelters were occupied by people not affiliated with NCF, and over 200 people were staying at the group campsite. The park was also hosting a golf tournament and a triathlon the same weekend.

Regarding the MBICC, Robertson testified that it was not common for one group to rent the entire facility, but the Park is willing to work with those who choose to do so. And, once the conference center is rented by a single group, the reserving party sets the parameters for its use. The facility is not open to the public unless the public is invited by the group to attend its events. The Park does not set any limitations upon the types of groups that are permitted to use the conference center to host meetings and conferences. Robertson testified specifically that anyone can rent the MBICC, and the Parks Department does not place restrictions on what they talk about.

When NCF rents the conference center, its event is not open to the public. Rather, NCF maintains a list of approved attendees. Its practice has been to staff a table at the entrance to the conference center to verify that each person coming into the conference center is on the list of registered attendees and has either prepaid or pays at the door to attend. Park staff stands by to escort off the site any person who attempts to enter without the plaintiffs' approval. Only those media outlets pre-approved by NCF are allowed to enter. Part of the agreement between NCF and the Park is that attendees are not allowed to bring weapons into the premises, and Park staff enforces that policy as well.

NCF has hosted a conference at the MBICC every year since 2011. It has rented the entire facility for the duration of its event for the past two years. Initially, only very limited security was required. Over time, however, the group's security needs have changed, as larger protests have developed. By 2015, a significant number of protesters showed up unexpectedly and were handled solely by the park rangers who were already on staff at Montgomery Bell. The event ended with a conflict between event attendees and protesters, as a result of which individuals from both groups were arrested. This incident heightened the Parks Department's concern about the availability of resources for dealing with conflicts of this type.

For the plaintiffs' May 2018 conference, therefore, the Parks Department enlisted help from other state agencies, including the Tennessee Highway Patrol, Tennessee Bureau of Investigation, and even the Tennessee Department of Correction. It obtained "intel" assistance from the Federal Bureau of Investigation. Only five uniformed park rangers are on staff at Montgomery Bell, so the Park brought in twenty-five park rangers from other parks across the state. Robertson testified that the cost of providing agents from other departments is absorbed by those departments, but the Parks Department paid to bring in park rangers from other parks across the state.

The Parks Department reserved a parking area exclusively for conference attendees and designated another zone within the Park specifically for the use of protest groups. It set aside a separate "neutral" parking area for security personnel. No major incidents occurred at the 2018 conference. Exhibit 4, introduced by the defendant at the hearing, consists of emails from plaintiff Taylor to a Parks Department representative, expressing his gratitude for the "measures the State of Tennessee took to ensure that [they] had a safe and productive conference" and recognizing that "it must have been very expensive to mobilize a force of that size." (May 1, 2018 and May 3, 2018

emails from J. Taylor to P. Wright, Def.'s Hr'g Ex. 4.)

The defendant introduced into evidence at the hearing what it contends to be a blank form version of the Parks Department's revised group contract ("Group Contract"). (TDEC Tenn. State Parks Group Contract, Def.'s Hr'g Ex. 2.) Although the defendant failed to point out this fact during the hearing and, in fact, did not appear to be aware of it, the Form Contract is different from the Proposed Contract filed with the Verified Complaint, most notably insofar as it omits any reference to the cost of "security to ensure public safety." (*Compare* Doc. No. 1-1, at 3 with Def.'s Hr'g Ex. 2.) The defendant appeared to believe that the Group Contract includes this requirement, implicitly if not explicitly, as indicated by the discussion of his testimony, *infra*. In any event, he clearly anticipated that the Parks Department will recover the cost of "security to ensure the public safety" from the plaintiffs if they reserve the MBICC for their event. Moreover, the parties also apparently presume that the terms of the actual Proposed Contract offered to the plaintiffs would govern the terms of their relationship.[2]

Robertson testified that Tennessee's state parks are supposed to be revenue generating. In fact, by legislative mandate, revenue-generating facilities at state parks, including such facilities as the MBICC, are to be financially self-sufficient. Tenn. Code. Ann. § 11-3-305. He claimed that the Parks Department conducted a review of its contracts and determined that the cost recovery language in the former version of the group contract was not sufficiently strong and that the changes to the contract reflected in the amended Group Contract were solely intended to assist the

---

[2] The Proposed Contract was signed by a Parks Department representative and dated July 24, 2018. It is tailored to the plaintiffs and Montgomery Bell State Park specifically, as the MBICC is identified as the facility being reserved; NCF is identified as the reserving party, and plaintiff Taylor is identified as one of the contacts for NCF. The actual dates of the anticipated reservation and the rates for reserving the guestrooms and meeting rooms are all specified in the Proposed Contract. These items are all blank in the form Group Contract introduced into evidence by the defendant at the hearing.

Parks Department in recovering its own costs. He stated that the Group Contract is the same for every park in the Tennessee State Park system and is used for all group reservations. The court notes again that Robertson did not acknowledge at the hearing the discrepancies between the Group Contract and the Proposed Contract offered to the plaintiffs. Plaintiffs' counsel—who may not have noticed the differences, not having seen the form Group Contract until it was introduced at the hearing—did not ask Robertson why the plaintiffs were offered a different contract that expressly permits recoupment of the cost of "security to ensure public safety." However, the fact that the Proposed Contract, but not the form Group Contract, contains a reference to the cost of "security to ensure public safety" gives rise to an inference that the Parks Department does *not* use the same contract for all groups.

Robertson stated that the security costs assessed by the Parks Department would not include those incurred by outside state agencies who contributed personnel, as those agencies would absorb their own costs. Rather, the costs intended to be covered by the Group Contract would include only the cost of bringing in additional park rangers employed by the Parks Department at other state parks. He also clarified that he understands the Group Contract to mean that the recovery of damages to the park would be limited to those damages actually caused by members of the group that signed the contract, and not by, for example, protesters not affiliated with the group. He stated that, if damages are caused to park facilities by others—that is, by individuals not associated with the group conference—those damages would not be assessed against the group. In addition, if his Department is unable to verify who caused the damages, they would not be assessed against anyone.

According to Robertson, his department has worked closely with plaintiff Taylor in the past to reasonably estimate how much and what type of security would be necessary, based on

information gleaned from social media and other sources as to how many protesters would be present. Taylor has worked closely with the Park manager about safety issues, including the safety of both conference attendees and the public. Robertson stated that the criteria for determining the staffing level at a group event include: (1) the facility or facilities reserved; (2) the time of year (i.e., high season or low, weather conditions, whether the event will be indoors or out, etc.); (3) the duration of the event and time of day; (4) the impact on other revenue-generating areas of the affected park; (5) the need to secure the safety of park staff; (6) the estimated number of participants in the group event; and (7) the estimated number of protesters and outside media. In the event that the Parks Department overestimates the degree of staffing necessary for a given event, park rangers would likely be the last staffing element to leave, as opposed to personnel associated with other state agencies. Generally, the staffing decisions are "fluid," based on what happens at the event.

On cross-examination, Robertson agreed that the modified Group Contract went into effect in May 2018, shortly after the plaintiffs' last conference in April 2018. He does not have any strong feelings about the plaintiffs' speech or political position. He stated that the Parks Department had been looking at the issue of cost recovery for "a while," in light of the legislative requirement for financial self-sufficiency. The plaintiffs' conference served to make the issue more urgent, as the number of protesters and the resources required to provide adequate security imposed significant costs on the Parks Department.

Robertson stated that the level of security provided during any given event was typically agreed upon in advance by the event planners and the Parks Department. Robertson is responsible for determining the level of state park resources required, while other state agencies decide how they can help. According to Robertson, each event is assessed individually, and the question of

whether there will be a significant number of protesters affects the analysis.

When the American Freedom Party's event took place in June 2018, the Parks Department had already adopted the revised Group Contract. However, when that group reserved the meeting space at the MBICC in September 2017, the amended Group Contract had not yet gone into effect, so the contract signed by that group did not require a separate "Refundable Security Deposit." (*See* Doc. No. 13-2, at 4–6.) Instead, the contract required a 20% deposit that was intended both to "book and hold the reservation" and as a "security deposit to be applied toward any damage costs or ancillary fees and charges assessed to the group . . . due to issues, state staff expenses, additional facilities, or damage reasonably related to the group's use of the park or its facilities."[3] (*Id.* at 5.) According to Robertson, this broad and open-ended provision permitted the MBICC to assess the security costs incurred by the Parks Department in providing security for that group's event, even though the contract did not refer specifically to the cost of "security to ensure public safety." The group paid a total of approximately $32,000 for rooms, catering, and the use of the conference room facilities. It was later assessed an additional $21,000 for security provided by the Parks Department during the event.

Robertson conceded that the conference attendees at the American Freedom Party conference did not cause any damages. Rather, the costs assessed against it were associated with the provision of staffing and associated resources necessary to ensure the safety of event attendees, park staff, and the public. Essentially, the bill was for three days of round-the-clock security services. He agreed that, if there had been fewer protesters, the security needs and the costs would have been reduced.

---

[3] The form Group Contract is more similar to the contract attached to Tyler's Affidavit than it is to the Proposed Contract submitted with the Verified Complaint.

Robertson claimed, somewhat equivocally, that, if the American Freedom Party had not asked for additional security, the Parks Department would not have provided extra security personnel and would, instead, have provided the "normal" level of security. In that event, if more protesters had shown up than anticipated, the Parks Department would have responded as necessary to protect park resources, employees, and the public, but additional law enforcement officers might not have been available. Robertson also stated that, generally, if the Parks Department knows how many protesters to expect, based on social media and other sources, it will arrange for the number of security staff it believes will be necessary. In other words, according to his testimony, the level of security provided by the Parks Department is not entirely dependent upon the wishes of the organization renting the space.

Other group events have required and been charged for enhanced security, including a food and music festival, a New Year's Eve event, and some smaller events. But no other groups have required the same amount and type of security as the plaintiffs and the American Freedom Party.

In his Affidavit, Robertson averred that the MBICC has not received any requests for group reservations for the weekend at issue (May 17–19, 2019) and does not anticipate any at this time. (Doc. No. 19-1 ¶ 3.) He testified that, even if individuals reserve rooms at the inn that conflict with the dates designated by the plaintiffs for their conference, the inn can cancel those reservations and lease to the plaintiffs instead, if necessary.

## II.    Standard for Issuing a Preliminary Injunction

When determining the appropriateness of a preliminary injunction, a court must examine four factors. First, the court must determine "whether the plaintiff has established a substantial likelihood or probability of success on the merits." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (internal quotation marks omitted). Second, the court must determine "whether the

[plaintiff] would suffer irreparable injury" if a preliminary injunction does not issue. *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012) (citation omitted). Third, the court determines "whether the injunction would cause substantial harm to others." *Id.* at 819. And finally, the court must consider "whether the public interest would be served" by granting the requested injunction. *Id.*

Each of these factors "[should] be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000). The Sixth Circuit has recognized, however, that the balancing of these factors typically is "skewed toward an emphasis on the first factor" in the context of a First Amendment claim. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). That court has repeatedly noted that,

> [w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor. With regard to the factor of irreparable injury, for example, it is well-settled that "loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury."

*Id.* (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality)). Likewise, "[t]he determination of where the public interest lies . . . is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* Similarly, in a typical First Amendment case, the element of harm to the parties cannot be addressed without first determining if there is a constitutional violation. *See Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991) (finding that, because either party would suffer irreparable injury if the court ruled against it, the court's decision "must turn on the likelihood of success on the merits).

**III.    Analysis**

    **A.    Likelihood of Success on the Merits**

Generally, when determining whether a First Amendment violation has occurred, courts evaluate: (1) whether the speech is protected; (2) the nature of the forum; and (3) whether the government's action is justified under the requisite standard. *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015). The level of scrutiny applied depends on the type of forum involved. *Cornelius*, 473 U.S. at 797.

In this case, the defendant concedes that the plaintiffs' speech is protected but maintains that the security-deposit requirement does not actually encroach upon the plaintiffs' speech or, consequently, their First Amendment rights. The parties also dispute the nature of the forum at issue and the degree of court scrutiny to be applied to the restrictions imposed by the government entity.

        *1.    The Nature of the Forum at Issue*

            *a. Classes of Government Fora*

The Supreme Court has identified three categories of government fora to "inform an evaluation of the First Amendment's mandates." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992) (citations omitted). These are (1) the traditional public forum; (2) the designated or limited public forum; and (3) the nonpublic forum. *Id.*

Traditional public fora include parades, public assemblies, and such spaces as public sidewalks and parks, municipal festivals, and so forth. *See, e.g.*, *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (characterizing parades and assemblies as "the archetype of a traditional public forum"). "In public fora, the government's rights to 'limit expressive activity

are sharply circumscribed.'" *Bible Believers*, 805 F.3d at 246–47 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Thus, a time, place, and manner restriction on speech in a public forum is valid only if it is content-neutral, narrowly tailored to serve a significant governmental interest, and leaves open adequate alternative channels for speech. *See, e.g., United States v. Grace*, 461 U.S. 171, 177 (1983); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

The second type of recognized forum, the "designated public forum," is created when a state actor opens a place or channel of communication for use by the public at large for assembly and speech. *Perry Educ. Ass'n*, 460 U.S. at 45–46 & n.7; *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) ("[S]chool facilities may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public' or by some segment of the public, such as student organizations." (quoting *Perry*, 460 U.S. at 47)). Public meeting rooms in libraries, senior citizen centers, and community centers that are open to the public have typically been deemed designated public fora. *See, e.g., Concerned Women for Am. v. Lafayette Cty.*, 883 F.2d 32, 34 (5th Cir. 1989) (holding that a library "created a public forum by allowing diverse groups to use its auditorium"); *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1278 (10th Cir. 1996) (finding that a city-owned senior center that had been "opened to the public for discussive purposes" constituted a designated public forum); *Juzwick v. Borough of Dormont, Pennsylvania*, No. CIV.A. 01-310, 2001 WL 34369467, at *2 (W.D. Pa. Dec. 12, 2001) (finding a town had created a designated public forum by "open[ing] its community room to both residents and non-residents for use by the public at large"). Where the regulations governing the use of a designated public forum directly affect the First Amendment rights engaged by the forum, courts apply strict scrutiny to the government action.

*See, e.g.*, *Nat'l Ass'n for Advancement of Colored People v. City of Philadelphia* ("*NAACP*"), 834 F.3d 435, 441 (3d Cir. 2016) ("As with traditional public forums, content-based restrictions [in designated public forums] get strict scrutiny.").

Thus, in many cases, the question of whether a forum is a traditional public forum or a designated public forum is academic, since the standard of review applied to the government action will be the same. However, in the context of a so-called "limited public forum," a subset of the designated public forum, if the regulations in question are content- and viewpoint-neutral and do not actually limit the First Amendment activities specifically authorized in the limited or designated public forum, a reasonableness standard applies. For instance, in *Kreimer*, *supra*, the court upheld regulations promulgated by a public library governing personal hygiene and prohibiting any patron from interfering with library staff's performance of their jobs or with other patrons' use and enjoyment of the library. The court found the library to be a limited public forum, based on the city's intent to provide it as a place for assembly and for patrons to receive or access information. As such, the library was "obligated only to permit the public to exercise rights that are consistent with the nature of the Library and consistent with the government's intent in designating the Library as a public forum." 958 F.2d at 1262. Because the regulations challenged by the plaintiff did not actually limit the First Amendment activities specifically permitted by the government in the limited public forum, the court reviewed them under a "reasonableness" standard, rather than under strict scrutiny. *See id.* ("The Supreme Court has indicated that restrictions that do not limit those First Amendment activities the government has specifically permitted in the designated public forum need only be 'reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." (quoting *United States v. Kokinda*, 497 U.S. 720, 721 (1990)); *accord Neinast v. Bd. of Trustees of Columbus Metro.*

*Library*, 346 F.3d 585, 591 (6th Cir. 2003) (finding public library to be a limited public forum and applying reasonableness standard to library regulation requiring patrons to wear shoes).

The third class of government forum, the nonpublic forum, is government property that is not by tradition or designation a forum for public communication. *Perry*, 460 U.S. at 46. In other words, the mere fact that a government entity owns property does not make that property a public forum. "Even protected speech is not equally permissible in all places and at all times. Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799–800. Thus, "the Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 800 (internal quotation marks and citations omitted). "Access to a nonpublic forum . . . can be restricted as long as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker' s view." *Id.* (internal quotation marks and citation omitted).

That is, "[e]ven in limited public and nonpublic forums, First Amendment protections still exist." *NAACP*, 834 F.3d at 443 (citing *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 n.7 (1981) ("The First Amendment['s] . . . ramifications are not confined to the public forum.")). For instance, although airport terminals are considered to be nonpublic fora, the Supreme Court has held that a complete ban on the distribution of literature in the form of leaflets in airport terminals is invalid under the First Amendment. *Lee v. Int'l Soc. for Krishna Consciousness, Inc.*, 505 U.S. 830, 831 (1992) (per curiam). Likewise, in *NAACP*, the Third Circuit held that a complete ban on noncommercial advertising in the places designated for

advertising within a city-owned airport terminal, a nonpublic forum, was unreasonable and therefore unenforceable. *NAACP*, 834 F.3d at 441–42. Noting that the Supreme Court had not explicitly addressed this issue, the Third Circuit also concluded that, when a First Amendment challenge involves a nonpublic forum, the government, rather than the plaintiff, bears the burden of establishing the reasonableness of the challenged government action. *Id.* at 443.

*b. What Is the Forum Here?*

Applying these principles to the case at bar is not a straightforward proposition. Both parties seem to assume that the relevant venue, for purposes of the forum analysis, is the conference center, and not the Park itself or the hotel/inn associated with the MBICC. The defendant argues that the conference center is neither a public forum nor a designated public forum but, as a commercial enterprise operated as a private venue, a nonpublic forum. The plaintiffs maintain that the conference center is either a public forum or a designated public forum, because it is open to the public to rent and use for events.

While Montgomery Bell itself, simply by virtue of being a state park, clearly qualifies as a public forum, *see Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009) (observing that public parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" (quoting Perry, 460 U.S. at 45)), the status of the conference center, a dedicated zone within the Park, is not dependent on the status of the Park itself. *See, e.g.*, *Cornelius*, 473 U.S. at 801 (applying tailored approach to identification of the forum based on the access sought by the speaker, thus finding that the "[Combined Federal Campaign], rather than the federal workplace, [was] the forum"). The plaintiffs' arguments notwithstanding, the conference

center, unlike the Park, is not a traditional public forum.[4]

The question is whether the conference center qualifies as a nonpublic forum or a designated public forum. The court finds, based on *Chicago Acorn v. Metropolitan Pier & Exposition Authority*, 150 F.3d 695 (7th Cir. 1998), that it is a nonpublic forum. In that case, the court was called upon to consider the status of the Navy Pier, an area on Lake Michigan originally used as a shipping pier and acquired in 1989 by the Metropolitan Pier & Exposition Authority ("MPEA"), a municipal entity, to be transformed into a "recreational and commercial center—part park, part meeting and exhibition facility, part shopping emporium, part amusement park." *Id.* at 698. In addressing the plaintiff's First Amendment challenge, the Seventh Circuit characterized each element of the pier separately, as the area encompassed outdoor strolling areas, a small amusement park, an indoor shopping mall, and "large meeting rooms suitable for trade and other conventions . . . and exhibitions." *Id.* at 698. Specifically regarding the latter, the court held that "[t]he meeting facilities at Navy Pier fall into the residual category of 'nonpublic forums.' These are facilities that are not open to the general public although they are sites usable and sometimes used for discussion and other expressive activities. [However,] Navy Pier's meeting rooms are rented to organizations for use by their members and guests rather than by the public at large unless the lessee decides to admit the public." *Id.* at 700 (internal citations omitted). The court noted that "[s]electivity and restriction are of the essence of the commercial strategy that informs the MPEA's management of the pier. These features mark it as a nonpublic facility within the meaning of the

---

[4] On the other end of the spectrum from the Park, the hotel portion of the MBICC is indisputably a nonpublic forum, open only to paying guests and their invitees; it is largely equivalent to a privately owned hotel. The government operates the inn, not in its capacity as policy- or law-maker, but as a proprietor seeking to maximize profitability. The plaintiffs do not contend that the hotel side of the operation has been designated as a venue available for the expression of protected speech.

First Amendment precedents." *Id.* (citations omitted)).

The court notes that the Navy Pier meeting rooms—and the conference center at the MBICC—appear on the surface to be very similar to the meeting rooms in libraries and community centers that were recognized as designated public fora in the cases cited above. The critical difference between these venues and those at the MBICC and Navy Pier is that libraries and community centers, are typically open to the public and are not run as business operations. Because the conference center here has all the hallmarks of a private venue—it is only open to paying customers, who may invite and exclude whomever they choose—the court finds that the conference center, like the Navy Pier meeting rooms, is a nonpublic forum.

But that conclusion does not end the analysis of the type of forum at issue here. Importantly, the defendant testified that his past and anticipated future practice is to designate a specific "zone" for protestors. It is unclear from the evidence before the court whether this zone is somewhere within the Park itself or, instead, on the grounds of the MBICC. Even assuming that this zone is located in that part of the Park dedicated to the MBICC, it must still be considered a designated public forum, given the government's intention to allow the general public to use it as a space in which to engage in protected speech.

In other words, although the plaintiffs themselves seek to reserve space in a nonpublic forum, the actual cost of doing so is related to the use of designated public space by third parties who are not actually invited to attend their event. And, of course, the plaintiffs do not contend that the defendant seeks to exclude them altogether from holding their conference at the MBICC based on their viewpoint or the political content of their speech. Nor are any protesters complaining about being deprived of the ability to stage a protest at the Park to express their opposition to the plaintiffs' viewpoint. Instead, the plaintiffs contend that the contract offered by the defendant,

insofar as it requires them to incur additional security and other costs *because of the public's reaction to their lawful presence at the MBICC*, constitutes a content-based prior restraint on their speech, in the form of an invidious "heckler's veto" and, as such, that it violates their rights under the First Amendment.

2.      **The Applicable Standard of Review in the Context of a Heckler's Veto**

In *Chicago Acorn*, *supra*, the plaintiffs, consisting of various political organizations advocating an increase in the minimum wage, sought to engage in "leafletting, soliciting signatures on petitions, carrying signs and banners, wearing clothing festooned with symbols and slogans, chanting, speechifying" throughout the Navy Pier during the 1996 Democratic National Convention, when the MPEA had rented the entire pier to the Democratic Party for $1 for a party. The MPEA refused to allow the plaintiffs to enter the area, and they brought suit. The district court, for the most part, granted the injunctive relief sought by the plaintiffs. On appeal, the Seventh Circuit took note that the entire pier, although owned by a governmental entity, was a commercial area. The MPEA defrayed the costs of running it entirely from the lease rentals received from shops and concessions that rented space on the pier and from the fees it received from renting out the meeting rooms in the conference center. *Id.* at 698. "The act of largesse that set off this suit— the rental of the entire pier to the Democratic Party for $1—was motivated . . . by the enormous and on the whole favorable publicity that the event was expected to generate for the pier." *Id.* The MPEA stated that it would not have been willing to rent the pier to the American Nazi Party, for example, for $1, because of the enormous amount of negative publicity such an act would generate. In addition, the MPEA refused to waive fees for the plaintiffs, who held a rally in the Grand Ballroom in support of their proposal for a higher minimum wage. *Id.* at 699.

The court noted that, if the MPEA had been a private entity, "it would have a free hand in

deciding whom to admit to its property and on what terms." *Id.* at 699.[5] As a government entity, however, it was subject to the constraints imposed by the First Amendment. "Clearly, [the MPEA] is not entitled to pick and choose among the users of its facilities on political grounds: to waive fees for the Democratic Party because the mayor of Chicago is a Democrat and . . . not to waive fees for Chicago Acorn and the other plaintiffs because the mayor opposes the increase in the minimum wage that they advocate." *Id.* In addition, however, even though the MPEA insisted that its decisions were economically, rather than politically, motivated and that its policy was to waive fees for users that generate favorable publicity, the court found that "[a] policy so motivated is likely . . . to favor the political establishment. As applied to *political* applicants for fee waivers, a favorable-publicity criterion is especially likely to have political consequences, since the only political users of the pier who will generate large amounts of favorable publicity are respectable, popular politicians and respected, well-established political groups; pariahs need not apply." *Id.*

The court determined that the MPEA would have the ability to adopt a blanket rule excluding all political events at its meeting rooms, as nonpublic fora, "if it reasonably believed that such events, because of their controversiality, would drive customers from the pier and reduce the MPEA's revenues." *Id.* at 700. Further, because the court determined that the conference center was a nonpublic forum, it also found that, if the MPEA did choose to allow political events, it had no obligation to waive its fee for entities that could not afford them. Notwithstanding, the MPEA was not permitted, under the First Amendment, "to employ political criteria to determine who may use its facilities and on what terms, even if they are not public forums in even the most limited sense." *Id.* (citing *Cornelius*, 473 U.S. at 806, among others).

---

[5] Subject to compliance with antidiscrimination laws that were not at issue in *Chicago Acorn*. 150 F.3d at 699.

Based on that premise, the court concluded that

> the MPEA may not discriminate in the terms of access to these facilities in favor of established parties and popular politicians on the ground that, being established, being popular, they generate favorable publicity. Such a policy would be a form of the heckler's veto; *it would be the equivalent of charging a higher permit fee for a march or other demonstration by an unpopular group on the ground that the onlookers are likely to be hostile, thus necessitating increased security; and that is forbidden. The motive is innocent, but the discriminatory effect too great to be permitted.*

*Id.* at 701 (citing *Forsyth Cty.*, 505 U.S. at 133–35) (emphasis added). In other words, the Seventh Circuit concluded that a practice of waiving a fee for popular political groups but declining to waive the fee for groups not likely to generate favorable publicity would amount to an impermissible "heckler's veto," regardless of whether the forum in question was public or nonpublic and regardless of what standard of review applied. It also suggested that the practice was equivalent to imposing a higher fee on an applicant for a parade permit based on the possibility of a hostile response to the applicant's message.

Applying *Forsyth County*, numerous courts have held, in the context of fees imposed on applicants seeking parade or assembly permits, that city ordinances are unconstitutional if they require an administrator to examine the content of the message conveyed by the parade or assembly and grant the administrator essentially unfettered discretion in determining the cost of necessary police protective services (and thus, the cost of the permit) on that basis. The discretion to impose increased security costs on an entity seeking a permit based on the possibility of a hostile response to the group's message is particularly problematic.

For example, in *Invisible Empire Knights of Ku Klux Klan v. City of West Haven*, 600 F. Supp. 1427, 1435 (D. Conn. 1985), the district court considered an ordinance requiring, among other things, that a parade permit applicant post "a bond for the city's costs of police protection and maintenance" or "substitute . . . an individual guarantee of an acceptable person having

sufficient financial means to cover such expenses," and giving police the discretion to vary the cost of the permit based on the Chief of Police's estimate as to crowd size. The court found that the effect of this aspect of the ordinance was

> to make the cost of a permit greater for groups that will attract a large audience. This is true whether the audience is one welcomed by the speaker, or one which is hostile to the speaker's point of view. The result is that, by threatening loud and numerous opposition, an opposing group can make the amount of the bond (and the actual cost of police protection born by the speaker) prohibitive, effectively nullifying the right to free expression of an unpopular idea.

> The ability of an opposing group to exercise such a "hecklers' veto" is contrary to the very nature of the First Amendment. . . .

> The challenged section of the Ordinance in question similarly allows a hostile group effectively to deny a speaker's constitutional rights by making the exercise of those rights prohibitively expensive.

*Id.* at 1434–35.

In *Stonewall Union v. City of Columbus*, 931 F.2d 1130, 1136 (6th Cir. 1991), cited by the defendant here, the Sixth Circuit found that the parade permit ordinance in question "contain[ed] objective standards related to traffic control and not related to speculation about the potential for disturbances based on the parade's content," and therefore was not unconstitutional. The court expressly distinguished the facts before it from those of *Invisible Empire* and similar cases on the grounds that the fees assessed in those cases "depended on the administrator's assessment of the amount of hostility likely to be created by the parade based on its content." *Id.* The court noted that "[t]he Supreme Court has repeatedly rejected the restriction of expression protected by the First Amendment based on a fear of violence." *Id.* (citations omitted).

The plaintiffs argue, in essence, that this case is more like *Forsyth County* and *Invisible Empire* than *Stonewall Union*, as the new contract terms proposed by the defendant impose upon them a higher fee than it would charge other, less controversial groups, in order to cover the costs

of security caused by the possible presence of hostile protesters. (*See* Doc. No. 1 ¶ 13 (asserting that the requirement that they pay for security to ensure public safety at their own conference—because of the threat posed by protesters not affiliated with their organization—constitutes "unconstitutional viewpoint and/or content discrimination in the form of a heckler's veto, because it authorizes Defendant to 'examine the content of the message conveyed, estimate the public response to that content, and judge the number of police necessary to meet that response.'" (quoting *Forsyth Cty.*, 505 U.S. at 123–24 (1992)).) They point out that, if they rented a conference center in a private hotel in downtown Nashville, Metro police would be required to keep order, and the plaintiffs would not have to pay for it.

The terms of the Proposed Contract as offered by the defendant call for a security deposit in the amount of "10% of the expected balance, including any anticipated catering costs and fees." (Doc. No. 1-1, at 3.) Any portion of the security deposit that is actually unused is refundable, but, if the costs identified in the proposal exceed the deposit, the group will be billed the excess. The plaintiffs do not appear to contest the security deposit *per se* as unreasonable or as a prior restraint on their speech, and the court agrees that the security deposit requirement appears to be an entirely neutral and permissible time, place, and manner restriction.

The plaintiffs' objection arises, instead, from the fact that the contract anticipates that the plaintiffs will be responsible, ultimately, for paying the cost of repairing any damages (plus unspecified "ancillary fees and charges") "related to the use of the park . . . including park restoration following the group's use," the cost of "required state staff expenses" necessary to "ensure public safety," and "any other costs above normal operating expenses reasonably resulting

from the group's use of or attendance at the state park." (Doc. No. 1-1, at 3.)[6]

The defendant argues, first, that shifting the cost of security from the State to the plaintiffs neither amounts to a heckler's veto nor implicates the First Amendment at all, because the conference center is a nonpublic forum, distinct from the public fora at issue in the heckler's veto cases cited by the plaintiffs. Indeed, while this case concerns, on the surface, a conference center in a nonpublic forum, the ultimate total cost to the plaintiffs of renting the conference center is at least partially contingent on the estimated cost of security related to maintaining order in the designated public forum where protesters are expected to gather. Security may also be needed on the margins between the public and nonpublic areas, since that is where it is most likely that members of the plaintiffs' group and protesters might come into contact with each other. The only form of "security" the defendant identifies as needed at the actual site of the plaintiffs' event is to cover situations in which a security officer may be required to escort off the premises any individual who seeks to gain entry into the conference center without having been invited by the plaintiffs. The defendant does not suggest, however, that these apparently isolated incidents would require the involvement of more than the ordinary number of security staff that would be on site for any group event.

Thus, the fact that the conference center itself is nonpublic is largely immaterial, given that most of the security costs anticipated by the parties would arise from the need to maintain order in

---

[6] The court refers to the Proposed Contract (attached to the Verified Complaint) and accepts that its terms are intended to govern the parties relationship because, as noted above, the defendant failed to acknowledge the difference between the form Group Contract (introduced by the defendant at the hearing) and the Proposed Contract, to explain why they are different, or to contest the plaintiff's assertion that the terms of the Proposed Contract are those that would govern the parties' relationship. However, regardless of which document applies, Robertson expressly testified that the State's intention in amending the Group Contract was to enable the State to recover the cost of security to ensure public safety and damages resulting from a group's use of a park's facilities, regardless of whether those terms are spelled out in the form Group Contract.

the zone of the MBICC designated for protesters or, potentially, on the margins between the public and nonpublic spaces. Moreover, the anticipated costs of security necessary for responding to any political gathering, including the plaintiffs', will vary widely depending on projections as to the size and hostility of protesters within the designated public forum. "The result is that, [merely] by threatening loud and numerous opposition, an opposing group can make . . . the actual cost of police protection born by the [plaintiffs] prohibitive, effectively nullifying the right to free expression of an unpopular idea." *Invisible Empire*, 600 F. Supp. at 1435. This is true regardless of whether the plaintiffs' event is taking place in a nonpublic forum, since they are being called upon to foot the bill for the cost of security related to a gathering of protesters in a designated public forum.

Next, the defendant suggests that, unlike an administrator called upon to estimate a parade permit fee based on the anticipated cost of providing security, Robertson does not have unfettered discretion in determining the scope of security to be provided or, consequently, the cost, because the plaintiffs are invited to collaborate in advance in planning the security response. With regard to this argument, it does appear that, in the past, the parties have collaborated shortly in advance of the plaintiffs' event and reached an agreement as to the number of law enforcement personnel to be present, based on intelligence from various sources regarding the possible number of protesters. The defendant implies that the plaintiffs' acquiescence in the decision regarding the number of security officers to be on duty removes some of the discretion accorded to the defendant, thus obviating any First Amendment concerns.[7] Michael Robertson also indicated at the hearing that the plaintiffs could decline to collaborate with the defendant and decline additional security

---

[7] In the past, of course, the plaintiffs agreed on the amount of security to be provided, but they did not, in the process, agree to cover the cost of such security.

over that "normally" provided by the park rangers on staff at Montgomery Bell. In that event, the appropriate number of park rangers necessary to provide security for the plaintiffs' event might not be available.

The court, however, does not find credible Robertson's suggestion that he and his staff would acquiesce to a refusal by the plaintiffs to agree to additional security or that, because the security plan is drawn up in collaboration with the plaintiffs, Robertson does not have unfettered discretion in establishing the number of park rangers to have on duty or in setting the costs to be imposed on the plaintiffs for security. Giving up that discretion, or acquiescing to the plaintiffs' refusal either to collaborate or to agree to additional security, would require Robertson to abrogate his responsibility to protect the MBICC and the Park itself, as well as the public safety generally. It seems more likely that, regardless of whether the plaintiffs agree, the defendant would be required to provide a level of security commensurate with the anticipated needs of the Park and the public—and that the plaintiffs would be responsible for those costs. The court finds, based on the evidence presented, that Robertson retains absolute discretion to determine the amount of security needed for the plaintiffs' event, regardless of whether the plaintiffs collaborate.[8]

The defendant also suggests that this case is distinct from a typical heckler's veto case, insofar as the security deposit itself is a neutral time, place, and manner restriction, and the total cost of security is not assessed until after the event. As such, he argues, it does not constitute a prior restraint on speech. The court is not persuaded by this argument either. At the time they are called upon to enter into the contract, months in advance of the event, the plaintiffs know that, by signing the contract, they agree to be responsible for security costs incurred by the Park that are in

---

[8] Even if fewer protesters show up than anticipated, the plaintiffs would still be on the hook for the actual number of park rangers called in to provide security, for however long the defendant, in his sole discretion, chooses to keep them on duty.

excess of whatever the "typical staffing expenses for the facility" may be, even if such costs have no connection to the behavior of the plaintiffs' group. (Doc. No. 1-1, at 3.) At the time of contracting, the plaintiffs have no way of estimating how much those costs will be, whether $3,000 or $30,000. The uncertainty of the amount to be assessed and the plaintiffs' lack of control over it only exacerbate the degree to which the requirement imposes a "prior restraint." The evidence in the record indicates that the parties would be able to estimate what the security costs might be shortly before the event takes place, based upon intelligence gathered from various sources, but, by that time, the plaintiffs would have already entered into the contract. They might still have the ability to cancel their reservation and recover some or all of the reservation deposit, depending upon when they cancel,[9] but by then they will likely have foregone their opportunity to hold their conference elsewhere on the same date.

The defendant insists that the same security costs would be imposed on a group that wants to stage a concert at the park, celebrate a birthday, or sponsor a sporting event. The problem with these comparisons is that none of the referenced alternatives would be expected to generate significant negative publicity, and the Park would not be called upon to set up a separate zone dedicated to the use of protesters. Any security involved would be largely, if not exclusively, dependent on the scope of the event itself and the number of anticipated attendees, rather than on events outside the control of the event planners.[10]

---

[9] The Proposed Contract provides that, if a group reserves 50% or more of the inn's rooms, the reservation must be cancelled at least 90 days prior to the arrival date in order to receive a 100% refund of the reservation deposit, which is due at the time of booking. (Doc. No. 1-1, at 3.) The security deposit is not due until 30 days prior to the reservation arrival date (*id.*), and it appears that the security deposit would be fully refunded if the group reservation is cancelled.

[10] In addition, the fact that the Proposed Contract offered to the plaintiffs, unlike the form Group Contract submitted by the defendant at the hearing, contains an express provision for the

The defendant also contends that the plaintiffs would not be responsible for the cost of repairing damages to the facility caused by protesters rather than by members of the plaintiffs' organization. The Proposed Contract, however, would make the plaintiffs responsible for all "expenses that TDEC may reasonably incur because of the group's reservation and use of or attendance at the state park" and for the "damage-repair costs . . . due to issues related to the use of the park . . . , including park restoration following the group's use" and "any other costs above normal operating expenses." (Doc. No. 1-1, at 3.) This language is broad enough to cover, for example, the cost of damages to the turf in the designated protest area and the cost of cleaning up trash in that area. The plaintiffs allege that they requested assurance that they would not be required to pay the cost of repairing damages caused by protesters and that the defendant refused to provide it. (Doc. No. 1 ¶ 15.) The court therefore rejects the defendant's claim that the Proposed Contract does not require the plaintiffs to be responsible for damages caused by others and finds that this provision, as drafted, also constitutes a type of heckler's veto, subject to the same analysis as the security costs generally. The defendant would arguably be estopped from imposing such costs on the plaintiffs based on Robertson's testimony and counsel's affirmation in closing arguments, but the wording of the contract itself does not support the defendant's position.[11]

As the Sixth Circuit has made clear, "[l]isteners' reaction to speech is not a content-neutral

---

recovery of security costs suggests that the defendant may not always choose to shift security costs to the reserving group.

[11] The form Group Contract submitted by the defendant during the hearing fares little better, as it broadly requires the deposit to be applied to "any damage costs . . . assessed to the group or its members or affiliates due to issues related to the stay . . . and/or damage reasonably related to the group's use of the park or its facilities." (Def.'s Ex. 2.) Because the protesters would not be there if the plaintiffs were not holding their conference at the MBICC, any damages caused by the protesters could be considered "reasonably related to the group's use of the park or its facilities."

basis for regulation." *Bible Believers*, 805 F.3d at 247. The court finds that, regardless of whether the forum in question is a designated public forum or a nonpublic forum—or the intersection between the two—the variation in the price of renting the defendant's conference center based on the expected number of protesters and the attendant security costs, as well as the cost of cleaning up the mess and repairing any damages caused by such protesters, amounts to a heckler's veto. It amounts to employing political criteria to determine the terms on which a group may use the MBICC's facilities. *Accord Chicago Acorn*, 150 F.3d at 700. As such, it is not content neutral, and it is unconstitutional under a reasonableness standard or under strict scrutiny.

Under the circumstances presented here, the plaintiffs have established a strong likelihood of success on the merits of their claim that the terms of the proposed contract violate their rights under the First Amendment and that they are entitled to the requested relief. Specifically, requiring the plaintiffs, in order to be permitted to rent the lodge and conference center at the MBICC, to agree in advance to be responsible for the security costs incurred by the Parks Department as a result of the actions of others in protesting the plaintiffs' viewpoint, and for the cost of repairing any damages caused by such protesters, amounts to an unreasonable prior restraint on the plaintiffs' speech, regardless of what level of scrutiny is applied to the defendant's action.

### B.    Irreparable Harm

As indicated above, the likelihood of success on the merits is typically determinative of the outcome in the context of a motion for preliminary injunction in a First Amendment case. The defendant nonetheless insists that the plaintiffs cannot establish irreparable harm in this particular case, both because the defendant can cancel any reservations by third parties and allow the plaintiffs to rent those rooms and the meeting space, up until shortly before the conference, and because money damages would be sufficient to make the plaintiffs whole. More specifically, the

defendant argues that if, after the conference, the plaintiffs believe they are entitled to a refund of their security deposit, they can file suit to recover such sums. Likewise, if they are assessed an additional amount, they can refuse to pay it and seek relief at that time. The defendant also suggests that the plaintiffs could simply use a different venue for their conference. Finally, the defendant argues that the court cannot "compel a contract." That is, it claims, the plaintiffs do not have a right to enter into a contract with the MBICC on their own terms, particularly where the terms the plaintiffs are insisting upon would threaten the MBICC's ability to comply with the mandate that it be financially self-sufficient.

Regarding the defendant's claim that the plaintiffs can be fully compensated by monetary damages, the plaintiffs insist that the exercise of their First Amendment right to expression is chilled by being required, in advance, to agree as a matter of binding contract to bear financial responsibility for what other individuals—the protesters—do and for how the state decides to respond. They also contend that the defendant's argument that the court cannot compel a party to contract is beside the point and that the court clearly has the authority to strike contract provisions that are unconstitutional.

The court finds that this factor weighs in favor of granting a preliminary injunction. While the defendants are correct that the plaintiffs, if they choose to accept the defendant's proposed contract, would not actually be assessed the costs at issue until *after* they have engaged in all the free speech they desire, and they could litigate the constitutionality of the fees if and when they are actually assessed, the fact remains that the plaintiffs are being called upon to enter into a contract that, by its terms, makes them legally responsible for the cost of the defendant's response to events over which the plaintiffs have no control. Nor do they have control over the Parks Department's response itself. Robertson testified that, in the past, the Parks Department has

obtained assistance from other state agencies in addressing protesters at the plaintiffs' events. The Parks Department, however, incurs costs only for the additional Parks Department personnel on duty, particularly park rangers from other parks around the state. If a contracting entity has agreed to cover the costs of security, the Parks Department has less incentive to seek "free" help from other agencies and more incentive to engage more park rangers. Moreover, if the state overestimates the amount of the threat caused by protesters and calls in too many rangers, the plaintiffs would still be responsible for the cost of the excess personnel for as long as they are actually on site. Thus, even if the plaintiffs and the defendant collaborate in advance on the amount of security to be provided, and even if the plaintiffs are given an estimate of the expected costs, the actual costs may turn out either to be well in excess of, or substantially below, those actually incurred. The sheer financial uncertainty of the situation, coupled with the prospect of protracted litigation if the plaintiffs do choose to contract, would have a sufficiently chilling effect to cause the plaintiffs irreparable harm.

As for the defendant's suggestion that the plaintiffs can always go elsewhere, the admitted unpopularity of their views effectively guarantees that many private entities would refuse to contract with them, based on the fear of negative publicity. And if one government entity is permitted to pass along the security costs to the plaintiffs, others would have the ability to do so as well. The plaintiffs are not easily free to go elsewhere.

Finally, while the defendant is correct that the plaintiffs cannot dictate the terms of their contract with the defendant, it is the defendant who made available the lodging and meeting rooms at the MBICC without regard to the content or viewpoint of the individuals renting those spaces. Consequently, the defendant is not free, under the First Amendment, to vary the cost of renting that space based on the degree to which the public at large is expected to react negatively to the

message expressed by the group renting the space.

### C. Substantial Harm and the Public Interest

Indisputably, the government might suffer financial harm if an injunction is entered in favor of the plaintiffs, but that harm must be balanced against the government's obligation to honor the freedoms guaranteed by the United States Constitution. Any harm to the State's coffers caused in the process cannot be deemed substantial. "Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob." *Forsyth Cty.*, 505 U.S. at 134–35. While it is undoubtedly in the public interest for the Tennessee state parks to be financially self-sufficient, that interest is not commensurate with the public's interest in protecting rights guaranteed by the First Amendment. *See Christian Legal Soc. v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest.").

Both of these factors weigh in favor of granting an injunction as well.

## IV. Conclusion

Having found that each of the relevant factors weighs in favor of a preliminary injunction, the court will grant the plaintiffs' Emergency Motion for Preliminary Injunction (Doc. No. 13) as requested.

The court notes that the plaintiffs have not offered security to cover the payment of costs or damages sustained by the defendant in the event he is wrongfully enjoined. Fed. R. Civ. P. 65(c). Nor, however, has the defendant raised the issue of a bond or argued that a bond is necessary to protect the State's interests. Based on the particular facts of this case, the court will issue the requested injunction without requiring a bond. The defendant, however, may file a motion to require the posting of such a bond pending the resolution of any appeal.

The court's analysis herein establishes that the Verified Complaint states a colorable claim for relief. The defendant's Motion to Dismiss will therefore be denied without further discussion.

Finally, having concluded that the plaintiffs are entitled to the relief sought without reference to the supplemental Declaration of Rick Tyler submitted by the plaintiffs, the plaintiffs' Motion to File a Supplemental Declaration (Doc. No. 24) will be denied as moot.

An appropriate order is filed herewith.

ENTER this 5th day of November 2018.

ALETA A. TRAUGER
United States District Judge