1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF TENNESSEE
2                   NASHVILLE DIVISION

3

4  NEW CENTURY FOUNDATION      )
   and SAMUEL JARED TAYLOR    )
5                          )
   VS                     )  No. 3:18-cv-0839
6                          )
   MICHAEL ROBERTSON, IN HIS    )
7  OFFICIAL CAPACITY AS DIRECTOR)
   OF TENNESSEE DEPARTMENT OF  )
8  ENVIRONMENT AND CONSERVATION )
   _____
9

10  BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

11              TRANSCRIPT OF PROCEEDINGS

12                October 4, 2018

13   _____

14  **APPEARANCES:**

15  For the Plaintiff:     VAN R. IRION
                       Law Office of Van R. Irion
16                     800 South Gay Street
                     Suite 700
17                     Knoxville, TN 37929

18  For the Defendant:     DAWN MARIE JORDAN
                       JAY C. BALLARD
19                     SARAH OHLMAN
                     PEAKO JENKINS
20                     Tennessee Attorney General's
                       Office
21                     PO Box 20207
                     Nashville, TN 37202
22   _____

23  **Roxann Harkins, RPR, CRR**
   Official Court Reporter
24  801 Broadway, Suite A837
   Nashville, TN 37203
25  615.403.8314
   roxann_harkins@tnmd.uscourts.gov

1                        **I N D E X**

2   <u>Defense witness</u>

3   **MICHAEL ROBERTSON**

4   Direct Examination By Ms. Jordan ....................5
    Cross-Examination By Mr. Irion ....................43

5

6

7                      **E X H I B I T S**

8    Defense No. 1....Affidavit of Mr. Robertson ........5
     Defense No. 2....New contract to plaintiff ........23
9    Defense No. 3....Photos of Montgomery Bell State ..13
               Park
10   Defense No. 4....Emails, 5-1-18 and 5-3-18 ........22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    The above-styled cause came to be heard

3          on October 4, 2018, before the Hon. Aleta A. Trauger,

4          District Judge, when the following proceedings were

5          had at 3:09 p.m. to-wit:

6

7                    THE COURT:  Good afternoon.  We're here

8          on a preliminary injunction application in *New Century*

9          *Foundation and Samuel Taylor versus Michael Robertson*

10         *in his official capacity as director of Tennessee*

11         *Department of Environment and Conservation*.

12                    We have Van Irion for the plaintiff.

13         Hello.

14                    MR. IRION:  Yes, Your Honor.  Hello.

15                    THE COURT:  Nice to meet you.  We have

16         for the defendant Dawn Jordan.

17                    MS. JORDAN:  Yes, Your Honor.

18                    THE COURT:  And Jay Ballard.

19                    MS. JORDAN:  Yes, Your Honor.

20                    THE COURT:  And Sara Ohlman?

21                    MS. OHLMAN:  Yes, Your Honor.

22                    THE COURT:  From the Attorney General's

23         office.  And Peako Jenkins also from the Attorney

24         General's Office.  And Mr. Robertson is over there.

25         Okay, very good.

1          Do you have any testimony to present,

2     Mr. Irion?

3          MR. IRION:  No, Your Honor.  I believe

4     that the facts that are already established would

5     support the motion.

6          THE COURT:  Okay.  Does the defense have

7     any testimony?

8          MS. JORDAN:  Yes.  We would call

9     Mr. Robertson.

10         THE COURT:  Let's go ahead and have the

11    testimony first, then.

12         MR. IRION:  Okay.  Your Honor, if I could

13    correct myself, Mr. Tyler, who is the signer of the

14    affidavit in support of our motion, just showed up.  I

15    wasn't sure if he was going to be here.  He might be

16    called if there's necessity to support certain facts.

17         THE COURT:  Okay.  You don't wish to call

18    him initially, just as rebuttal.

19         MR. IRION:  Just as rebuttal, Your Honor.

20         THE COURT:  Okay, that's fine.  Come over

21    here.

22                    **MICHAEL ROBERTSON**

23    called as a witness, after having been first duly

24    sworn, testified as follows:

25         MS. JORDAN:  At a point of order, we also

1    would like to present the affidavit of Mr. Robertson.

2                   THE COURT:  Okay.  You want to make it an

3    exhibit, that's fine.

4                   MS. JORDAN:  Yes.  And I've spoken with

5    Mr. Irion beforehand.

6                   THE COURT:  Okay.  We'll mark that as

7    Exhibit 1.

8                   (Defense Exhibit No. 1 was admitted.)

9                          **DIRECT EXAMINATION**

10   BY MS. JORDAN:

11        Q.    Mr. Robertson, if you would start off

12   just telling us your name, introducing yourself.

13        A.    I'm Michael Robertson.  I'm the director

14   of operations for Tennessee State Parks in the

15   division -- in the Department of Environment and

16   Conservation.

17        Q.    And you have been employed with the State

18   for 34 years?

19        A.    I have 34 years of service with the

20   State, with Tennessee State Parks.

21        Q.    And would you briefly take us through

22   your various positions starting with as when you were

23   a park ranger.

24        A.    Yeah.  I hired on in '86 as a park

25   ranger.  I'd worked seasonally with state parks prior

1    to that.  But '86 as a park ranger.  Worked as a park

2    ranger in several parks across the state.  In 2001 I

3    became a park manager.  Then in 2010 became a park

4    area manager.  And then was promoted to the director

5    of operations in 2012.

6             Q.    So you've been the park director for

7    about six years now?

8             A.    Yes, ma'am.

9             Q.    And as a park ranger -- I see you have

10   the park ranger uniform on.

11            A.    Yes, ma'am.

12            Q.    Are you POST certified?

13            A.    Yes, ma'am.  We're commissioned law

14   enforcement officers for the state of Tennessee.

15            Q.    And does that mean that you have been

16   through various law enforcement training and that you

17   have annual trainings that you attend?

18            A.    Yes, I do.

19            Q.    To maintain your POST certification?

20            A.    Yes.

21            Q.    Have you had experience with handling

22   large groups of people at various parks?

23            A.    Yes.

24            Q.    And can you briefly describe what rangers

25   do?  What are their duties?

1      A.    Rangers are tasked with a lot of

2   different duties.  Of course, one of them is law

3   enforcement within the parks that we manage, but we're

4   also operation managers for the different functions

5   that are available within parks.  So campground

6   operations, picnic shelter operations, retail

7   operations such as gift shops and other things.

8          They oversee the staff that work with

9   those different operations and lead in those efforts

10  there.  They're also involved in interpretation and

11  education efforts that -- to share the story of our

12  parks and to educate people about the natural culture

13  of resources found within each of our parks.

14         They also are involved in resource

15  management activities within all of our parks, dealing

16  with the protection and preservation of those natural

17  and cultural resources to include removal of exotic

18  evasives or to do restoration efforts of protected

19  species that we're trying to ensure are there for

20  future generations to enjoy.

21      Q.    So it's more than a law enforcement

22  position?

23      A.    Yes, it is.

24      Q.    Okay.  And can you briefly describe your

25  duties as director of park operations?

1          A.    As the director of park operations, I'm

2     directly responsible for the overall budget for

3     Tennessee State Parks, all 56 state parks, and all the

4     staff that carry out the day-to-day operations within

5     those state parks.

6          Q.    Let's talk about the Montgomery County --

7     Montgomery Bell State Park including the inn and the

8     conference center.  Let's talk about that for a

9     minute.  Can you describe for the Court the park and

10    the amenities?  What kind of park is it, what kind of

11    amenities does it have?

12         A.    Montgomery Bell Park is one of our six

13    resort parks.  So it has most, if not all, the

14    different types of amenities that we would offer

15    within a state park, to include managing over

16    4,000 acres of property, three lakes within that

17    property.

18              Has other water resources within the

19    property that we manage to ensure that they're kept

20    clean and available for people to enjoy.  And within

21    those areas there's hiking trails, public access to

22    picnic shelters and picnic grounds.  There's

23    campground, 52-site campground.  Then there is a group

24    lodge, a group camp.  There are cabins.  There is a

25    golf course.  There is the inn and conference center.

1          Q.     Some of those amenities are

2     revenue-generating?

3          A.     Yeah.  Most of the overnight

4     accommodations such as campgrounds, the inns and

5     conference centers, the cabin operations that we have

6     are all revenue generation.  Some of the day-use

7     facilities are revenue generating also, also.

8     Shelters through shelter rentals.

9               And then the retail operations that we

10    offer within those, at the inn and conference center

11    we have a restaurant, serves food every day.  So that

12    generates revenue.  We have gift shop operations

13    within the inn and conference center and also within

14    the park visitor center.  So those generate revenue.

15              MS. JORDAN:  Your Honor, I'm going to

16    show Mr. Robertson some pictures.  I've handed these

17    and we've marked them as Exhibit No. 2 -- 3, sorry.

18    We've marked them as collective exhibit number, and

19    I'll just show them to Mr. Robertson and have him

20    define them.

21              THE COURT:  Have you shown them --

22              MR. IRION:  No objection.  We've seen

23    them.

24              THE COURT:  Okay.  Collective 3, they'll

25    be admitted.

1          MS. JORDAN:  We actually kind of talked

2     beforehand.  So we've worked it all out.

3          THE COURT:  Good, thank you.

4          MS. JORDAN:  It's kind of faded out.

5          THE WITNESS:  There you go.

6          MS. JORDAN:  This is part of collective

7     No. 2.  I guess we could probably mark that as

8     Exhibit 3A.

9          THE COURT:  Wait, now I'm confused is

10    this Exhibit 2 or Exhibit 3?

11         MS. JORDAN:  They're collective 3.  So

12    maybe what we should do is mark it 3A, 3B --

13         THE COURT:  That would be -- that would

14    be -- yes.

15         MS. JORDAN:  Probably preferable.  I

16    should have done that, I'm sorry about that.

17         THE COURT:  That's okay.

18    BY MS. JORDAN:

19         Q.    So we will mark this as 3A.  Can you

20    describe what we see here in this picture?

21         A.    Currently looking at a portion of

22    Montgomery Bell State Park that includes the inn and

23    conference center.  That's Acorn Lake there in front

24    of it to the -- and the inn and conference center is

25    on that center point.  Then you see two bridge

1    walkways that connect to other areas of the park.  You

2    go to the right, that takes you over to the cabin

3    area.  If you go to the left, it takes you to a

4    day-use area and swim beach and boat rental operation

5    that is in that area.

6         Q.    Just so we understand, the inn and

7    conference center are in the foreground surrounded by

8    the water?  Is that --

9         A.    Yeah, it's on the middle point surrounded

10   by the water on three sides.  And you're actually --

11   if you look at that building, you're looking in at the

12   restaurant area, and some of the room areas and the

13   conference center is on the backside of the building,

14   if you could make that out.

15        Q.    Okay.  Now we'll take a look at -- now

16   we'll take a look at what we'll mark as Exhibit 3B.

17   Can you describe what we see in this picture?

18        A.    So that's just a closer-up view of the

19   view we just left where you can see the top portion of

20   the inn and conference area, the front part here

21   that's slanted is the restaurant area.  The lower part

22   is part of the rooms.

23             You also see up at the top left a

24   building that extends out towards the top of the

25   picture.  That is a whole wing of rooms with six

1    floors of rooms involved there.  And then over to the

2    right you see a big square area, that's the conference

3    center that's tied to the rest of the main portion of

4    the inn there.

5        Q.    And what we see in Exhibits 3A and 3B, is

6    that what New Century Foundation is seeking to

7    reserve?

8        A.    They reserved this component -- they

9    reserved the inn and conference center.  So the rooms

10   within the whole inn, the conference center and food

11   and beverage services within that conference center.

12       Q.    Here we have what we're going to mark as

13   Exhibit 3C.  Can you tell us what we see in this

14   picture?

15       A.    Yeah, this is the front entry into

16   Montgomery Bell Inn.  This is the -- if you just -- if

17   you imagine the last picture, you're looking from the

18   180 direction from that.  So you're looking down at

19   the front of the inn.  So this is the entryway in.

20            This walkway is the inn rooms with the

21   six floors of rooms involved in it that's coming out

22   towards you.  And to your left is the -- what would

23   take you over to the conference center area.

24       Q.    And then finally Exhibit 3D?

25       A.    Yes.  So this is just right down from the

1    picture that we just had on the left.  This is the

2    conference center itself.  That's attached to the inn

3    component.

4              MS. JORDAN:  Your Honor, I will get these

5    marked appropriately and we would ask that these be

6    introduced into evidence.

7              THE COURT:  Yes, they'll be received.

8              (Defense Exhibits Nos. 3A-D were

9    admitted.)

10   BY MS. JORDAN:

11        Q.    How many hospitality staff are there at

12   the park?

13        A.    It varies from season to season, but we

14   have a total of around 90 positions that are within

15   the inn and conference center at Montgomery Bell.

16        Q.    And can you tell us what is the overall

17   occupancy rate of the inn and conference center during

18   the year?

19        A.    It has an average occupancy of about

20   31 percent for year-round occupation.  Most of its

21   occupancy is on weekends, especially throughout the

22   summer season and early spring -- spring through fall,

23   high park visitation time periods.

24        Q.    Did I interrupt you getting some water?

25        A.    Yeah, I was trying to, but I can't figure

1    out how to get the water out.

2              THE COURT:  Maybe the CSO can help you.

3    You have to unscrew the top a little bit.

4              THE WITNESS:  I just didn't do it far

5    enough.  Go ahead.

6    BY MS. JORDAN:

7         Q.    Is there a higher occupancy over the

8    weekends generally?

9         A.    Yeah.  Yeah, we're probably about

10   80 percent occupied for the weekend periods if you --

11   especially during April through October.

12             THE COURT:  I'm surprised it's not

13   100 percent.

14             THE WITNESS:  We're trying to get there.

15   BY MS. JORDAN:

16        Q.    So what about -- let's take May, for

17   example.  Is that a busy month for you?

18        A.    Weekends would be about 100 percent

19   occupied on the weekends in May.  It's a prime season

20   for people to get out and -- they've been couped up

21   all winter long, and they're ready to get out and

22   enjoy the parks.  We have a good occupancy rate during

23   that time.

24        Q.    If you could, the last New Century

25   Foundation meeting was held at the inn and conference.

1   What was going on that weekend?

2           A.      That was a very busy weekend at the park.

3                   THE COURT:  When was this?

4                   THE WITNESS:  That was April -- it was a

5   weekend in April.  I don't remember.

6                   THE COURT:  April of 2018?

7                   THE WITNESS:  Yes.  And we had -- if you

8   remember the picture of the -- so we had all the

9   campground sites booked for the weekend.  It was 100

10  percent occupied for the weekend.  We had all picnic

11  shelters rented within the park, and there's six

12  picnic shelters within that park.

13                  We had our group camp rented with 250

14  Girls Club members in that group camp.  We had a golf

15  tournament going on, Tennessee Seniors Tournament

16  going on at the golf course for that weekend.  We had

17  a triathlon that was going on at the swim beach area,

18  which is just on the other side from the inn and

19  conference center during that time.

20  BY MS. JORDAN:

21          Q.      Let's talk about just the inn and

22  conference center for a moment.  Once the rooms at the

23  conference center and the inn are reserved, who sets

24  the parameters for who is allowed into those spaces?

25  Is it the reserving party?

1          A.     It's the reserving party.  I mean,

2     they -- if they -- once they reserve the rooms or

3     facility, it's theirs to use and it's not open to just

4     anybody else to come in.

5          Q.     And how often have you had a group

6     reserve the entire inn and conference center?

7          A.     That's pretty rare that they do it --

8     they reserve it all, but we've been working with New

9     Century Foundation and some other groups to

10    accommodate their conferences and working with them to

11    reserve the whole facility.

12         Q.     Are those private meetings?

13         A.     They're private meetings from my

14    understanding, relative to you have to pay to come to

15    the conference.  You have to be credentialed through

16    them to attend their meetings.

17         Q.     Have you ever rejected anyone at their

18    request?

19         A.     We have -- if they've had people that

20    have come -- come to the inn that weren't credentialed

21    and were not approved to come in, we made sure they

22    leave the area.

23         Q.     Okay.  Can you describe for us what the

24    New Century Foundation does in terms of making sure

25    that only those people who are approved are allowed

1    into this space?  What measures do they take?

2          A.    I know that they keep a list of those

3    that have registered for the conference.  They set up

4    a check-in station as you come into the foyer of the

5    entry to the inn, and they verify all attendees to

6    ensure that they're paid conference attendees.  And,

7    you know, verify them from that standpoint.  If

8    they're not paid or not part -- on their list, then

9    they're not allowed to come into the conference, from

10   my understanding.

11         Q.    Are there any measures that park staff

12   takes to make sure that nobody comes into the inn and

13   conference center that is not supposed to be there for

14   that private meeting?

15         A.    We work with them, if they identify

16   anybody that's not supposed to be there, to escort

17   them off of the premises.  As I mentioned earlier, the

18   only other things that we've done with this particular

19   group is implement security measures where we ensure

20   that nobody's carrying any illegal weapons or anything

21   into the conference center.

22              THE COURT:  Is that at their request?

23              THE WITNESS:  It's at their -- at a

24   request for the issues associated with this event.

25              THE COURT:  Well, do they request that

1  you make sure weapons do not come in?

2  THE WITNESS:  It's part of the security

3  measures that we've set down and agreed upon

4  associated with their event that they're having.

5  THE COURT:  So they agree that you should

6  be doing that.

7  THE WITNESS:  Yes.  Yes.

8  BY MS. JORDAN:

9  Q.  And are there any measures taken with

10  respect to the parking lot at the inn and the

11  conference center?  Can just anybody come into the

12  parking lot is what I'm basically asking.

13  A.  For this conference we -- because there

14  had been intel relative to protests associated with

15  this conference, we did set up measures to ensure the

16  safety of the conference attendees and our staff that

17  worked within the inn and conference center.

18  And we did establish that certain parking

19  areas were for conference attendees and others were

20  restricted to support staff for the security of the

21  event.

22  Q.  And the Judge's question would apply to

23  that, that same security measure.  Is that something

24  that was agreed upon with the group?

25  A.  Yeah.  We talked with them about the

1    security measures and what we had in place.  So they

2    were aware of what we were doing.

3         Q.    So does New Century Foundation allow

4    everyone into the facilities or just certain people?

5         A.    Only people that they allowed into their

6    conference center and their meetings and the facility

7    that they rented are those that have been registered

8    to attend the conference or have been credentialed by

9    them to be there.

10        Q.    And what about media for the event?  How

11   does New Century Foundation handle that?

12        A.    They have some media that they've

13   credentialed to come in and conduct interviews with

14   them.  We've worked with them on media requests that

15   have come to our department.  And it's up to them to

16   determine whether they want to meet with them or not.

17   But if they credentialed them to come in, they can

18   come in.  If they don't, they don't come in.

19        Q.    And what is your strategy for handling

20   the event in terms of the protesters that come to the

21   event?

22        A.    Well, the strength -- so are we talking

23   about the event for this last event?  Because we've

24   been -- we've been working with New Century Foundation

25   for -- since 2011 relative to conferences at

1  Montgomery Bell.  And our response to that has changed

2  over the years based off of the protests that have

3  developed relative to their conference coming to

4  Montgomery Bell.

5          This last year we set up clear zones

6  within the park at the -- at the inn and conference

7  center.  Zones that were for the conference attendees

8  to be in and, you know, free to do whatever they

9  wanted to do in those areas.

10          And then we set up a zone for protest

11  groups to come in and, you know, express their First

12  Amendment rights relative to the conference being at

13  the park.

14          And then we also set up a neutral zone

15  that was just for security that was there for the

16  event to assure that the conference was held and we

17  met our obligations to provide a safe and secure place

18  for the conference.  We met our obligations to provide

19  a safe and secure place for the public to come in and

20  share their opinion about the event that was happening

21  at the park.

22      Q.    And did that work fairly well last time?

23      A.    Yeah, we had no -- no major incidents

24  associated with that.  We had -- we did make some

25  arrests out of the protest area relative to some items

1    that were being brought in that were illegal to the

2    protest area.  Arrests were made and those people were

3    transported off the property.

4              THE COURT:  What kind of items?

5              THE WITNESS:  Drugs.

6              THE COURT:  What?  Drugs?

7              THE WITNESS:  Yeah.  Mostly marijuana.

8    BY MS. JORDAN:

9         Q.   Has New Century Foundation expressed

10   gratitude to the park department?

11        A.   We've heard from them in appreciation for

12   our efforts.  They expressed that appreciation and the

13   desire to continue to use our facilities for their

14   conference.

15             MS. JORDAN:  Your Honor, we've

16   appropriately marked Exhibits 3A through 3D.  So we'd

17   ask that those be admitted.

18             THE COURT:  We'll give those to

19   Ms. Beasley.  Those will be in evidence.  Okay.

20             MS. JORDAN:  And then as Exhibit 4 -- and

21   I have shown these to Mr. Irion.  Am I pronouncing

22   that correctly?

23             MR. IRION:  Irion.  That's okay.

24             MS. JORDAN:  Irion, I'm sorry.  And he

25   has agreed that these can be admitted as evidence and

1   this will be Exhibit No. 4.

2               THE COURT:  That's fine.  What is

3   Exhibit 4?

4               MS. JORDAN:  It is -- it's a couple of

5   emails that Mr. Taylor sent to the park department

6   expressing his gratitude for what the park department

7   did for their event.

8               THE COURT:  Okay, let me just read these.

9   These are dated May 1 and May 3.  We'll mark this as

10  Exhibit 4.

11              (Defense Exhibit No. 4 was admitted.)

12  BY MS. JORDAN:

13      Q.    So now let's talk about the new contract

14  and the new provisions that are at issue here.

15              MS. JORDAN:  Your Honor has seen a copy

16  of the contract?

17              THE COURT:  Yes, it was attached to the

18  complaint or was attached to something.  I have it.

19  Attached to the complaint, I believe.

20              MS. JORDAN:  Yes.  And for Exhibit 2 I

21  just have a copy of the form contract.  And I've shown

22  it to Mr. Irion, and he agrees it's going to be

23  admitted into evidence.

24              THE COURT:  Is this the contract that was

25  attached to Mr. Ryan's declaration, the earlier

```
1    contract?
2              MR. IRION:  This was attached to the
3    complaint, Your Honor.
4              THE COURT:  So you're talking about the
5    new contract.
6              MS. JORDAN:  Yes, Your Honor.
7              THE COURT:  And that's going to be
8    exhibit what?
9              MS. JORDAN:  2.
10             THE COURT:  Exhibit 2 is the new
11   contract, okay.  And that comes in without objection.
12   So we'll mark that.  Okay.
13             (Defense Exhibit No. 2 was admitted.)
14   BY MS. JORDAN:
15        Q.    That's all the exhibits that I have, but
16   let's just kind of go through the contract overall.
17   Why has the contract changed to have a security
18   deposit and a cost recovery measure added to it this
19   year?
20        A.    There's several things that kind of roll
21   into this.  As the director of operations I'm
22   responsible for making sure that Tennessee State Parks
23   operates within the budget that is established for it.
24   And our budget is established off the State
25   appropriations and revenues that we generate.
```

1            THE COURT:  Can you raise your voice a

2    little bit?  Having a little trouble hearing.  That

3    chair doesn't move, but the mic moves.  You can move

4    the mic closer to you.

5            THE WITNESS:  Do I need to repeat

6    anything?

7            THE COURT:  You're responsible for

8    staying within the budget.

9            THE WITNESS:  Budget and generating the

10   revenues that we're required to do.  We also have

11   legislative mandate to TCA 11-3-305, which requires us

12   to operate our retail hospitality operations, which

13   includes inn, conference centers, cabins, campgrounds,

14   gift shops and other things as self-sufficient

15   operations.

16            So as the director of operations, I have

17   to review those operations every year, see that we're

18   operating within the budget, that we're meeting our

19   requirements legislatively to be self-sufficient and

20   look at our ability to recover costs associated with

21   operations that have -- we're having issues meeting

22   those goals.

23            We -- in the last several years Tennessee

24   State Parks has become a popular place to come and

25   hold group events and activities within our parks.  In

1    review of our group contract we found that the

2    language associated with those group contracts was not

3    strong enough to help us in our cost recovery efforts

4    for providing events and activities at our parks to

5    ensure we met our legislative mandate to be

6    self-sufficient.

7              So we looked at that and determined that

8    we needed to implement measures to strengthen our cost

9    recovery language within those contracts.

10   BY MS. JORDAN:

11        Q.    Was it an attempt to keep New Century

12   Foundation from coming to the park?

13        A.    It's only an attempt to recover costs

14   associated with events that come on.  We had had

15   several events at some of our other parks.  We've got

16   the Bicentennial Mall State Capitol Park, which is in

17   downtown Nashville, and the Nashville community has

18   expressed an interest in using that as a venue.

19              In that, we've had the New Year's Eve

20   come in with additional costs associated with that, an

21   expense to us where we had to implement cost recovery

22   language within those contracts and agreements.  And

23   we have part of the efforts of driving revenues

24   associated with managing our state parks and

25   legislative intent for us to become less and less

1  dependent upon tax dollars to support our state parks

2  and more dependent upon our ability to generate our

3  own revenues.

4        We've looked at all kinds of measures to

5  implement cost recovery to ensure that we're not doing

6  things only as a service, but also as a -- you know,

7  from a business standpoint, actually covering our

8  costs for providing those services.

9        Q.    Is the contract only applicable at

10  Montgomery Bell State Park?

11        A.    No, it's across the system.

12        Q.    Do you know how many of these new

13  contracts that you have entered into this year?

14        A.    We've entered into about 61 to 65.  I

15  think we have 61 and we had some in the works the last

16  that I looked at that, of the new contracts that are

17  in place.

18        Q.    And let's talk about what is actually

19  charged to the group that reserves the place.  Now, is

20  the group charged for any damages that are caused by

21  other people who are using park facilities?

22        A.    No, the language within those contracts

23  are associated with the particular group that we're

24  entering into the contract.  They would only be

25  charged for any damages or additional security fees or

1    anything associated with helping, you know, to carry

2    out their event.

3                So if their attendees created damage,

4    they would be charged for those damages to recover our

5    costs associated with them.  If their event needed

6    additional security or other measures in excess of

7    what we normally provide, then those would be charged

8    as cost recovery measures associated with that.

9         Q.    And, for example, would the New Century

10   Foundation be charged for any damage that the

11   protesters cause?

12        A.    No, we would -- we would pursue that

13   through other means relative to recoup costs

14   associated with their activities.

15        Q.    And let's talk about this -- New Century

16   Foundation.  In addition to park staff, are there

17   other -- are there other state resources that are

18   called upon to provide security and other measures?

19        A.    For the last -- the last year we have had

20   to reach out to additional state agencies to provide

21   additional security associated with the event because

22   the attention of their event has brought more interest

23   in protesting, and social media and intel associated

24   with that that indicated that a need to increase our

25   ability to respond.

1          It's also in -- was also in response to

2    the relationship that we've had with New Century

3    Foundation and the American Renaissance Conference

4    that they've had there for years.  Our initial

5    response with them was limited security associated

6    with their events over the years because that was all

7    that was needed.

8          In 2015, I believe was the first time

9    that we really had a significant protest group that

10   showed up, and we managed that solely with our staff

11   at the park and staff resources that we pulled from

12   within Tennessee State Parks.

13         And the protest efforts there were

14   significant to the point that we were concerned about

15   our ability to be able to ensure conference attendees

16   and our staff's security.  Plus dealing with the

17   security of those that came to protest the event.

18         It ended with an incident of a conflict

19   between one of the protesters and one of the

20   conference attendees where they engaged in a

21   fistfight.  And in that arrests were made on both

22   sides associated with that encounter.

23         And weapons were retrieved from that

24   event, which raised and heightened our concern about,

25   you know, the measures that were being taken to ensure

1   the safety of those in attendance.

2              THE COURT:  So who do you get these

3   additional resources from?

4              THE WITNESS:  So we reached out through

5   our other state agencies within the State of

6   Tennessee.  So we had help from the Tennessee Highway

7   Patrol, Tennessee Bureau of Investigation, Tennessee

8   Department of Corrections.  We also had some intel

9   help from the Federal Bureau of Investigation

10  associated with this event.  So in that -- in response

11  to this last -- do you want the numbers associated

12  with what type of response we had?

13  BY MS. JORDAN:

14       Q.    No, just general I think is pretty much

15  what the Court needs.  So we're talking -- we're

16  talking troopers, TBI agents?

17       A.    We also had Tennessee Wildlife Resource,

18  some of their agency.  Since we had the lake around

19  it, they provided some boats and security.  We'd had

20  some issues in previous years with protesters probing

21  around the inn and getting into areas that they

22  weren't permitted to be in.  And that was part of the

23  case associated with the fight that happened.  So we

24  had TWRA, Department of Corrections, THP and TBI.

25       Q.    And will the Parks Department charge New

1  Century Foundation for those resources, the troopers,

2  the TBI, the TWRA, those other things that you

3  mentioned?

4      A.    So the language associated in the

5  contract relative to cost recovery is only associated

6  with the cost associated to Tennessee State Parks.  So

7  the cost for us to help facilitate and carry out their

8  event.

9          So when we look at those costs recovery,

10 it's not associated with any additional resources that

11 have to be called in because of protests associated

12 with that event.  Those resources are covered by their

13 own departments.  And it's part of the State's

14 response to the activities that are happening at the

15 park during that day.

16          THE COURT:  I'm not -- I'm not sure I

17 understand.  You're saying that highway patrol, they

18 just cover that.  That's -- if they want to bill New

19 Century, that's not any of your business; right?

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  But -- and the Tennessee

22 Department of Correction and all these other agencies,

23 you have called them in because you felt you needed to

24 have them there, but the only cost recovery that will

25 come out of this security deposit will be expenses

1   incurred by your department.  Yes?

2                    THE WITNESS:  That is correct.

3                    THE COURT:  Okay, thank you.

4                    MS. JORDAN:  Thank you, Your Honor.

5                    THE COURT:  So that would be, for

6   instance, you would bring in more park rangers?

7                    THE WITNESS:  In this particular case we

8   had to bring in about 25 additional park rangers from

9   across the state, so that pulls resources from the

10  other parks and their day-to-day activities.  So we

11  bring them in to help to support the existing -- we

12  only have five uniformed staff at Montgomery Bell.

13                    THE COURT:  Okay.

14                    MS. JORDAN:  So we have to bring that in

15  to support them in that effort.

16                    THE COURT:  Okay.

17  BY MS. JORDAN:

18      Q.    And prior to the event, in terms of

19  criteria for determining the resources that you will

20  need to cover the event -- may I see Exhibit No. 1 so

21  we can go over the...

22                    THE COURT:  What are you looking for?

23                    MS. JORDAN:  Mr. Robertson's affidavit.

24                    THE COURT:  Oh, I have it up here.

25                    MS. JORDAN:  Do you still need it,

1    Your Honor?

2            THE COURT:  No, no, that's okay.

3    BY MS. JORDAN:

4        Q.    I'll just read them to you and then we'll

5    kind of go over the -- would that help you?

6        A.    Sure.

7        Q.    Now, the criteria that are used to

8    determine the amount of staffing -- and you have seven

9    of them, so let's talk about them one at a time.

10   No. 1 is the facility or facilities reserved.  Can you

11   go into a little bit more of that, please?

12       A.    So the facilities reserved could depend

13   upon what staff and resources are available at the

14   park associated with those facilities and resources.

15   So are we going to need to bring additional staff in

16   and additional support in to help carry out this

17   event.  So we look at that to determine are we going

18   to be able to accommodate that.

19       Q.    You mentioned the time of the year of the

20   reservation, which takes into account the probable

21   weather and other considerations of the year.  For

22   example, high traffic times of the year?

23       A.    Yeah.

24       Q.    Can you explain that?

25       A.    So is the event inside, outside, what

1    time of the year is it going to happen.  Are we going

2    to have to deal with weather conditions or whatever

3    associated with the event.  Is that going to require

4    us to bring in additional resources to help

5    accommodate that.  The time of the year is going to --

6    we have to look at what does that mean relative to an

7    impact to the system, if we need to bring additional

8    resources from other areas.  And we still have

9    obligations that we need to meet in those areas, can

10   we do that to accommodate the event and help with the

11   event.

12         Q.    I didn't mean to interrupt you, I'm

13   sorry.

14         A.    That's all right.

15         Q.    For example, you mentioned earlier that

16   May is a busy month --

17         A.    Right.

18         Q.    -- for the park?

19         A.    Yeah.  We're opening up for the summer

20   season.  Kids are getting out of school.

21         Q.    And you have golf tournaments and

22   triathlons and campgrounds are full and that kind of

23   thing --

24         A.    Yes, ma'am.

25         Q.    -- during the time that New Century

1    Foundation proposes to hold their event?

2         A.    Yes, ma'am.

3         Q.    That's what we're talking about.  Okay.

4    And 3, the time of day that the event is to take

5    place, including evaluation of events which are to

6    occur over multiple days.  Can you flesh that out for

7    us a little bit?

8         A.    So when we talk about time -- so what

9    time of the day when events would occur, do we have

10   existing staff there to accommodate that or -- it's

11   similar to the staffing and resources needed to carry

12   out the event.  If it's going to extend -- be extended

13   over a long period of time within a day, then do we

14   have enough staff to cover those hours associated or

15   are we going to have to come in and supplement those

16   hours.

17        If it's extended over several days, you

18   know, the same philosophy there.  Tennessee State

19   Parks are not open 24/7.  We do not staff it the same

20   all 24/7.  We adjust our staffing based off of what's

21   happening within the park.

22        So we would make -- have to make staffing

23   adjustments associated with an event based off the

24   time of day, extent of time, length of the event and

25   how long it's going to run.  So we would be looking at

1    all of that.

2          Q.    And then No. 4, the revenue-generating

3    impact of the group's reservation on the use of other

4    park facilities.  Can you describe that for us a

5    little bit.

6          A.    So as a group rents -- one thing you look

7    at the revenues associated with the costs for putting

8    on the event.  Are we generating enough revenue to

9    cover the costs.  If we're going -- if the event

10   requires us to close other areas to help accommodate

11   the event, we've got to determine whether the revenues

12   for that event offset the closure of a park area that

13   might have other revenue-generating opportunities

14   there.

15          So we have to look at what are they

16   asking for, what are the impacts based off of what

17   they're asking for.  Is it going to have an impact on

18   our ability to generate revenues in other areas and is

19   the revenue that we're generating off of that event

20   worth shutting other things down that typically would

21   be open to the public or whether, you know, we can

22   keep that open and still accommodate that event.  So

23   we have to look at all those factors.

24          Q.    And then No. 5 is the security of park

25   staff inside the reserved facilities that are

1  reasonably required to protect the facilities from

2  harm and who are required to work the event under the

3  group reservation.

4          A.    Yeah.  So we need to understand the

5  nature of the event and what does that mean to -- to

6  the safe work environment for our staff associated in

7  the event.  Helping to carry out the event.

8              So we look at those factors.  One to make

9  sure we have enough staff there to be able to do it

10  safely and to accommodate the event and meet the event

11  needs.  And otherwise implementing measures to ensure

12  that we ensured our staff safety and the public that's

13  attending the event, their safety.

14         Q.    And No. 6, the estimated number of

15  participants in the group making the reservation, can

16  you describe that a little bit?

17         A.    So we need to have an understanding of

18  the number of people that are coming in.  1, does the

19  event actually accommodate that many people.  How many

20  parking areas are we going to need, how many

21  conference space or room space we'll need.

22              Or in the case of some events like the

23  New Year's Eve party which is a hundred thousand, you

24  know, can we accommodate that within the Bicentennial

25  Mall.  And if we are, what does it mean to you.  Do

1    you rent part of it or do you get the whole thing?

2            So we have to, you know, have those

3    discussions about how we're going to accommodate the

4    event and understanding the numbers and how many's

5    coming helps us prepare for that.

6        Q.    The 7, the estimated number of viewers,

7    including media?

8        A.    That's relative to understanding the

9    total impact of visitation that's going to be brought

10   in by the event and how do we respond to that.

11       Q.    And in terms of -- you mentioned

12   intelligence earlier with respect to deciding how to

13   handle the protests and the other aspects to it.  Does

14   Mr. Taylor provide any support or in any --

15       A.    Mr. Taylor has worked with us well in

16   providing us updates on information that he's received

17   about potential protest groups that will be coming

18   into the event.  Sharing with us social media posts

19   that they've received relative to different protest

20   groups and estimates on numbers of people that have

21   said that they were interested in attending those

22   protests or whatever.

23            So he's worked with that.  We've also

24   worked with TBI and the FBI on intel relative to these

25   events so that we have an understanding of the numbers

1   that we may have to be dealing with.

2          Q.    And so the discussions that you have with

3   Mr. Taylor, in particular, that's part of the

4   dialogue --

5          A.    Yes.

6          Q.    -- that you have with respect to

7   determining what to do about this event?

8          A.    Mr. Taylor has worked very closely with

9   our park manager at Montgomery Bell in sharing

10  information about their event.  Park manager's worked

11  well with Mr. Taylor about trying to accommodate their

12  needs to ensure that we meet our obligations

13  associated with their rental of the facility and

14  holding their conference.  And our ability to ensure

15  their safety while they're there and the general

16  public's safety while the event is going on.

17         Q.    Now, let's say that if it becomes

18  apparent that the response to the event will not be as

19  great as expected.  Let's say you expected 2,000

20  protesters and 200 showed up, something like that.

21  Would you send some of the people home that you have

22  brought to the event?

23         A.    So all this is relative to the discussion

24  that we've had earlier about my responsibilities in

25  managing a budget.  So bringing resources in and out

1   are initially my expense.  So I have to be able to

2   justify all those expenses.  So we do monitor the

3   events and based off of the intel that we receive from

4   wherever we receive it from, if we feel that resources

5   are not needed, we will send those back because I need

6   them to carry out their work at the parks where we

7   borrowed them from for this event.  So we send them

8   back --

9            THE COURT:  Would you send park rangers

10  back before you tell the Tennessee Highway Patrol that

11  they can leave?  Who would go back first?

12           THE WITNESS:  It's -- it's a discussion

13  with those agencies about our overall response to the

14  event.  So it really depends on what event you're

15  talking about and what resources are involved.  If

16  it's -- part of it is it is a Tennessee State Park

17  event.  So we do feel some responsibility to carry out

18  our portion of the response associated with the event.

19           But we also -- if the event's big enough,

20  we also understand that we need resources outside of

21  our capabilities to come in and support us.  So

22  depending on what we -- what we get from the intel

23  about this event is not going to be as big as it needs

24  to be or maybe it's moving in some different

25  directions, then resources be reallocated in different

1  directions or sent back to their normal shifts or

2  normal responsibilities.

3          THE COURT:  But the park rangers would be

4  perhaps the last ones to be sent back to Henry Horton

5  or Fall Creek Falls.

6          THE WITNESS:  They would be in the last

7  group to be considered relative to that, but if they

8  were needed to help -- so we would also look at the

9  staff that we brought in and with an understanding of

10  what's happening in the parks that we borrowed them

11  from, we may determine that we're going to let some of

12  these go and make the request to THP or whatever that

13  they can keep some of their staff in to help them.

14          THE COURT:  Okay.  So it's a real fluid

15  situation?

16          THE WITNESS:  It's fluid.  You really

17  have to look at what's going on at the time that

18  things are happening across the state.

19  BY MS. JORDAN:

20     Q.    And then when the charges come after the

21  event or they're determined after the event, the

22  charges would be for what was actually incurred or

23  what you anticipated?

24     A.    Only for what was actually incurred.

25     Q.    Now, the criteria that we just fleshed

1    out, do those apply to any assessment of needs for

2    group reservations to all group --

3         A.    Yes.

4         Q.    Let's take an example that Taylor Swift

5    planned to hold her birthday party at the inn and

6    conference center and she expected 300 attendees.

7         A.    Right.

8         Q.    Would you expect increased costs

9    associated with that event?

10        A.    There would be some.  Depending on the

11   nature of what all they wanted to do at the event

12   would determine what those might be.

13              THE COURT:  And how much publicity there

14   was --

15              THE WITNESS:  Right.

16              THE COURT:  -- or social media there was.

17              THE WITNESS:  That could all change it.

18   BY MS. JORDAN:

19        Q.    Or a Taylor Swift concert or any concert,

20   would you anticipate an increased cost?

21        A.    Oh, yeah.  Oh, yeah.

22        Q.    And what about something like a poker

23   tournament or a euchre tournament that's held 24/7

24   over a weekend and that's 250 to 300 attendees, ESPN

25   is expected to cover the event.  Would you expect

1   increased costs from that?

2          A.    Oh, yes.

3                THE COURT:  Really?  A euchre tournament?

4                THE WITNESS:  I don't know what a euchre

5   tournament is.  I figure if it's bringing additional

6   people in, it's going to have additional cost.  We

7   would seek costs recovery associated with that.

8                MS. JORDAN:  To be fair, I said ESPN

9   would be involved in it.

10               THE COURT:  Okay.

11               MS. JORDAN:  I just had to bring that in.

12  BY MS. JORDAN:

13        Q.    Now, when you apply the criteria to

14  determine what will be needed, does it matter what

15  kind of group it is?

16        A.    No.

17        Q.    Okay.  And Mr. Robertson, do you care

18  about this group and their speech?  Does that have a

19  bearing on any of this?

20        A.    It has no bearing to me.  Our state parks

21  are open to everybody, and we want everybody to have

22  an opportunity to come in and enjoy them.  We've had a

23  pretty good relationship with the New Century

24  Foundation associated with this conference.

25               And there have been no issues with their

```
1    conference being at the park, other than the one
2    conflict.  And we don't blame that on New Century
3    Foundation.  It was just an incident that occurred
4    that raised our attention to whether or not we're able
5    to provide adequate security for the event.
6                 MS. JORDAN:  May I have a moment to
7    discuss with my colleagues.
8                 (Pause in proceedings.)
9                 MS. JORDAN:  That's all we have for
10   Mr. Robertson at this moment.
11                THE COURT:  All right.  Mr. Irion,
12   cross-examination?
13                MR. IRION:  Yes, Your Honor.  Thank you.
14                     CROSS-EXAMINATION
15   BY MR. IRION:
16        Q.   Now, your name's Mike Robertson.  I don't
17   know what -- I know you're the director of --
18        A.   Operations.
19        Q.   Operations.  Do you prefer Ranger
20   Robertson, Officer Robertson, Mr. Robertson?
21        A.   Mike.
22        Q.   Mike.
23                THE COURT:  Well, he can't call you Mike
24   in my courtroom, sorry.
25                THE WITNESS:  You can call me Director if
```

1  you wanted to.

2  BY MR. IRION:

3      Q.    Okay, great.  Director Robertson, my name

4  is Van Irion.  I represent the plaintiffs in this

5  case.  Thank you for being here today.

6            Now, the new contract that you have, that

7  came into effect when?

8      A.    It came into effect May the 8th.

9      Q.    Of this year?

10     A.    Of 2018.  Of this year.

11     Q.    And that was directly after the new --

12 previous New Century Foundation event; correct?

13     A.    It was shortly thereafter.  It wasn't

14 directly.  The New Century Foundation event was in

15 April.  And this was the first of May.

16     Q.    Sure.  And that was because of what

17 happened at the New Century Foundation event; correct?

18     A.    No, it was something that we'd been

19 looking at relevant to cost recovery.  We'd

20 implemented a -- we'd looked at the National Park

21 Service as far as a special use event language that

22 they have due to the demand for groups that are coming

23 in to use our parks as venues.  And in it it had some

24 cost recovery language associated with it.

25            And as I said before, we'd been reviewing

1   our group contract and realized that we had some

2   language in there -- or there wasn't strong enough

3   language in there that we felt that we could pursue

4   cost recovery associated with other group events that

5   we've had within state parks, which had prevented

6   Tennessee State Parks in the past for seeking cost

7   recovery efforts associated with the groups that had

8   come in.

9           Q.    I understand, but, now, you're not trying

10  to testify -- or you're not testifying that the fact

11  that New Century Foundation event happened in April

12  and the new policy was in effect in May is a complete

13  coincidence, are you?

14          A.    I would tell you that, you know, the

15  events associated with the New Century Foundation

16  conference, the American Renaissance Conference and

17  the number of protests associated with that and the

18  resources that come in brought -- opened our eyes

19  relative to the costs associated with the conference

20  and how do we ensure that we're meeting our

21  self-sufficiency requirements and have -- do we have

22  measures in place to, you know, implement cost

23  recovery so that we ensure that we meet those

24  self-sufficiency requirements.

25          Q.    So would it be safe to say that the

1       new -- previous New Century Foundation event was at

2       least a factor that caused the new policy?  I'm just

3       trying to understand what you're saying here.  I'm

4       trying to simplify it.

5              A.    I will say that the previous New Century

6       conferences, specifically one where we had to arrest

7       people relative to the conflict, brought into question

8       our security abilities and did generate the need to

9       update security measures associated with the

10      conference which, in turn, resulted in additional cost

11      to the department.

12             Q.    Sure.  Okay.  Now, you said several times

13      during your testimony that sometimes you have to bring

14      in more security than -- for certain events than for

15      other events; correct?

16             A.    Yes.

17             Q.    Who decides how much security is

18      required?

19             A.    We -- that is decided by those that are

20      involved in setting up the security measures

21      associated with the event.  Sometimes it involves the

22      event planners.  Sometimes it involves the resources

23      that we have available within the State to determine

24      what is a proper response.

25                   But it's difficult to assess actual

 1    needs, you know, on -- you know, on kind of an
 2    across-the-board standard of what we're going to do.
 3    You have to assess each event individually and
 4    determine what you need to do.
 5         Q.    Sure.  So is it safe to say that the
 6    likelihood that the event is going to be protested
 7    would certainly be a factor in how many officers you
 8    would have available?
 9         A.    Sure.
10         Q.    And exactly -- at the end of the day -- I
11    know you discussed it with other people -- who is the
12    government official that makes the decision to have
13    additional officers there or not?  Would that be you?
14         A.    We work in conjunction with -- I make the
15    determination relative to the state park resources
16    that are associated to the event.
17         Q.    Okay.
18         A.    We work in conjunction with our
19    departments about their ability to assist with those
20    resources.
21         Q.    Uh-huh (affirmative).  And once you have
22    that information -- I mean, obviously it's not New
23    Century Foundation that's calling the park rangers and
24    saying, hey come out.  That would be your department;
25    correct?

1          A.     We work in conjunction with New Century

2     Foundation relative to their event and the security

3     measures that need to be put in place to ensure their

4     safety for the event.  We've sit at the table with

5     Mr. Taylor in discussions about how we're going to

6     ensure the conference attendees' safety and what do we

7     need to do to implement measures associated with that.

8          Q.     Sure.  I understand that.  I think

9     everybody in the room understands that.  Let me try it

10    another way.  Who has the authority to say, let's get

11    10 extra law enforcement officers out here?  Would

12    that be your department?

13         A.     I have the authority, as the director of

14    operations for Tennessee State Parks, to determine

15    what state park resources can be utilized to support

16    an event.  I can reach out through my commissioner's

17    office to ask for additional assistance from other

18    state agencies, and it's up to those state agencies to

19    determine what resources they can allocate to help

20    assist with that event.

21         Q.     Okay.  And you obviously are a State

22    employee; correct?

23         A.     Yes, sir.

24         Q.     Now, you used the term -- this is -- this

25    area that is being reserved, it includes an inn and

1    also the conference center at that inn; correct?

2            A.    Yes.

3            Q.    And that's what you're referring it as

4    several times, correct, as the conference center?

5            A.    Inn and conference center, yes.

6            Q.    Okay.  And how many years ago was the

7    conference center made available to the public?

8            A.    Before I started working with Tennessee

9    State Parks there's been an inn at Montgomery Bell, so

10   over 30 years or more.

11           Q.    Okay.

12           A.    I think the initial inn was in the late

13   '40s or early '50s.

14           Q.    And can anybody rent the conference

15   center?

16           A.    Yes.

17           Q.    All right.  And, in fact, lots of

18   different groups have used the conference center, I

19   would assume; is that right?

20           A.    Yes.

21           Q.    All right.  And if someone rents the

22   conference center, they can allow the general public

23   in free of charge if they wanted to; correct?

24           A.    Yes.

25           Q.    All right.

1          A.     Yes.  I mean, it's their decision on who

2    comes into the areas that they rent, yes.  Yeah.

3          Q.     And there's no restrictions on what they

4    can talk about; right?

5          A.     That's correct.

6          Q.     Right.  Now, the American Freedom Party

7    had an event in May of this year; correct?

8          A.     Yes, they did.

9          Q.     And -- you recall that?

10         A.     Yes.

11         Q.     And the American Freedom Party signed the

12   new contract; correct?

13         A.     They signed -- yes, a newer version of

14   the contract, yes.

15         Q.     That would be the contract that's under

16   dispute today; correct?

17         A.     Yes.

18         Q.     And that contract basically has

19   open-ended costs for security for the guests -- or for

20   the person who rents the facility?

21         A.     Cost recovery, yes.

22         Q.     Okay.  And the American Freedom Party was

23   assessed -- well, let me back up.  You may not

24   remember, but do you recall a general ballpark amount

25   of how much American Freedom Party paid for the rooms

1    and the inn and the food and all that?

2              THE COURT:  Can we hold on just a minute?

3    Is the American Freedom Party Mr. Tyler's

4    organization?

5              MR. IRION:  Yes, Your Honor.

6              THE COURT:  And you have filed an

7    affidavit in the record, which is 13-2, and you've

8    attached the contract that he signed.  And I've looked

9    at that contract.  It is not the same contract.

10   It's -- it doesn't have this provision in it.  At

11   least what's in my court file as the contract

12   attached.

13             MR. IRION:  It's not the form contract,

14   but can I ask the witness a question about -- and

15   maybe clarify this, Your Honor?

16             THE COURT:  Sure.

17   BY MR. IRION:

18        Q.    The policy that is at issue regarding the

19   open-ended recovery of security costs was in place

20   when the American Freedom Party held their event,

21   correct, in May?

22        A.    Yes, it was.

23        Q.    Okay.  And now the American Freedom Party

24   actually --

25             MR. IRION:  May I show the witness,

1   Your Honor, the contract that the American Freedom

2   Party used in May?

3                THE COURT:  Sure.

4   BY MR. IRION:

5        Q.   I'll just show you the contract.  It's

6   already in evidence.

7        A.   This was handled at the park

8   specifically, but I'm aware of the contract, yes.

9        Q.   All right.  And what was the total amount

10  that the American Freedom Party paid for the use of

11  the facilities and the associated costs initially?

12               THE COURT:  Is that the 32,000 figure?

13  Anticipated room, catering, all that?

14               MR. IRION:  Your Honor might be looking

15  at the other contract, which was the New Century

16  Foundation contract.

17               THE WITNESS:  It's 22,606.

18               MR. IRION:  That sounds correct.

19               THE COURT:  Okay.  I think you filed the

20  wrong contract, but that's okay.  How much was it,

21  22,000 what?

22               THE WITNESS:  606.

23  BY MR. IRION:

24       Q.   And that was for the rooms and the

25  conference center; correct?

1          A.     That is for the rooms and the suites.

2          Q.     And that also included some food catering

3     and some other services; correct?

4          A.     There's an additional 3,374 for meeting

5     space that was included in that contract.  Total room

6     and meeting charges were 24,857.  Additional charges

7     associated with food and beverage and catering was

8     $7,263 for a total of $32,120 and some change.

9          Q.     Now, did the American Freedom Party

10    guests cause any damage to the facilities at that

11    event?

12         A.     No.

13         Q.     No?

14         A.     No.

15         Q.     They were assessed a $21,000 fee

16    assessment afterward; correct?

17         A.     Yes.

18         Q.     And that was in addition to the 22,000

19    plus that they paid for the rooms; correct?

20         A.     Yes.

21         Q.     So that was for security; correct?

22         A.     Associated with their event, yes.

23         Q.     Yes.  And that was -- those security fees

24    were assessed because of the protests that occurred at

25    their event; correct?

1          A.    It was assessed due to the additional

2     staff and resources that had to be brought in to

3     support that event, associated with the activities

4     that were happening as a result of the event, yes.

5          Q.    In other words, the protesters being

6     there caused those additional costs; correct?

7          A.    That intel helped -- the intel associated

8     with protesters coming in to ensure the safety of our

9     conference attendees and the safety of our staff that

10     worked that event resulted in us needing to bring in

11     additional resources to ensure that the event went off

12     as -- as we had planned.

13          Q.    Sure.  So if there hadn't been any

14     protesters, the additional security wouldn't have been

15     necessary; correct?

16          A.    In our discussions with Mr. -- this is

17     the American Freedom and that's Rick Tyler.  He

18     indicated in our discussions with him he wanted the

19     same security that we provided for the American

20     Renaissance Conference.  These are the same measures

21     that we put in place associated with that conference.

22          Q.    Okay.  That's great.  However, my

23     question was:  If protesters hadn't showed up, the

24     assessment would have been less; correct?

25          A.    We would assess based off of the intel of

1    the event and what kind of measures were needed, yes.

2         Q.    All right.

3              THE COURT:  Did Mr. Tyler request

4    security?

5              THE WITNESS:  He indicated that he wanted

6    the same security measures that we had implemented for

7    the American Renaissance Conference or the New Century

8    Foundation Conference that he attended.  And he was

9    aware of the security measures that we had put in

10   place relative to that conference.

11             THE COURT:  Because he wanted everybody

12   to be safe.

13             THE WITNESS:  Yes.

14   BY MR. IRION:

15        Q.    Sure.  And if he hadn't requested that

16   security, would you have had absolutely no officers in

17   the area that day or those days?

18        A.    No, we would still have officers in the

19   area that are associated with the normal operations of

20   the inn and conference center.

21        Q.    Sure.

22        A.    And so these are charges associated with

23   the additional resources that we had to bring in.

24        Q.    Sure.  And if Mr. Tyler hadn't asked for

25   additional resources but protesters showed up and

1    started causing problems, you would still have brought

2    in additional law enforcement to take care of that;

3    correct?

4            A.    Depending on the intel that we received,

5    we'd brought in the additional resources needed to be

6    able to respond to those.

7            Q.    Sure.  Your attorney asked you a lot of

8    hypothetical questions and I didn't object because you

9    know about -- you're the one that makes these

10   decisions.

11           A.    Sure.

12           Q.    Let me give you a hypothetical.  American

13   Century Foundation says we don't need any security,

14   but a thousand protesters show up and they're looking

15   like they're going to burn the place down.  What are

16   you going to do?

17           A.    We're going to respond to that as we need

18   to --

19           Q.    Sure.

20           A.    -- to ensure public safety.

21           Q.    Regardless of whether or not American

22   Freedom asked for security; correct?

23           A.    And they're going to get five rangers

24   that show up because that's all we would have

25   available at that time to respond to that event.

1    Q.    You wouldn't call in extras if there was

2    a riot?

3    A.    We would try to, but it would be -- it'd

4    take time.  We are across the state of Tennessee.

5    We're not next door.

6    Q.    Sure.  But I'm not asking about the time.

7    I'm trying to establish a fact that you wouldn't not

8    call in extra security simply because they didn't ask

9    for it; right?  You'd call in security if there was a

10   protest riot; correct?

11   A.    We would call in additional resources for

12   local other agencies and other law enforcement because

13   we wouldn't be able to respond in time based off of

14   that.

15   Q.    Sure.  And you would call in additional

16   rangers as well; correct?

17   A.    Only if we had them available to come in

18   that direction.

19   Q.    Sure.  So with that caveat, assuming

20   they're available, you would call them in; right?

21   A.    We would try to respond as best we could

22   to the situation.

23   Q.    That would cost extra money that would be

24   assessed to American Freedom Party in this

25   hypothetical; right?

1          A.     We would have to look at that particular

2     situation to determine what we know of in advance,

3     relative to the conference and whether those -- where

4     those expenses should apply.

5          Q.     Okay.

6          A.     It wouldn't be a guarantee that it would

7     be applied to any event holder for those additional

8     charges.  But if we have intel associated with an

9     event in advance of known cost associated with that

10    and known resources that have to be brought in to

11    support that event, we should seek our ability to

12    recover some of those costs.

13         Q.     Okay.

14         A.     Those are knowns.

15         Q.     Sure.

16         A.     You're talking about unknowns.

17         Q.     Right.  And in this hypothetical, which I

18    think has gone a little bit out -- your answer's kind

19    of thrown out some more hypothetical situations, but

20    at the end of the day whether or not to call in more

21    rangers would be your decision or someone in your

22    department's decision; correct?

23         A.     Yes.

24         Q.     All right.  Have any other groups been

25    assessed a 20,000-plus-dollar law enforcement

1    assessment after an event?

2         A.    We have assessed other groups

3    considerable charges for cost recovery associated with

4    events, things that include security measures that we

5    provided, damage charges associated with their events

6    that we recouped those costs from.  Examples of that

7    would be the Food and Music Festival at the

8    Bicentennial Mall, the New Year's Eve event at the

9    Bicentennial Mall.  And then other smaller, you know,

10   measures across the state that we've dealt with.

11        Q.    But you've already testified that all of

12   those additional things like catering is included in

13   the first bill and that New Century Foundation didn't

14   cause any damages in the past.  So what I'm asking you

15   is:  Have there been any other groups who have had

16   over $20,000 assessed to them for security fees?

17        A.    So far relative in Tennessee State Parks

18   we haven't had groups that have required as much

19   security measures associated with their events as we

20   have with New Century Foundation or the American

21   Freedom Party.

22        Q.    Okay, that's fair.  I just need to

23   establish the answers to these questions for the

24   Court.  That's all.

25              Is the conference center still available

1   for rental for next May?

2        A.    I'd have to go check the availability.

3        Q.    Okay.  But it could be rented out in

4   whole today or tomorrow?

5        A.    If it's available, it could be rented

6   out, yes.

7        Q.    So because New Century hasn't signed the

8   new contract, they could lose the ability to have

9   their scheduled event; correct?

10        A.    We would work with them on any time

11   that's available for them to be able to hold a

12   conference at our facility.

13        Q.    Okay.  Now, your attorneys in their

14   response to New Century's motion for preliminary

15   injunction asserted -- and I believe you testified

16   about this as well -- that damage caused by parties

17   other than the people who rented the facilities would

18   not be assessed to the people who rented the

19   facilities; correct?

20        A.    The damages would be assessed to those

21   that caused the damage.

22        Q.    Okay.  How would you know who caused the

23   damage?

24        A.    If we couldn't verify who caused the

25   damage, we wouldn't charge those against anybody.

1      Q.   Okay.  Now, I noticed in your testimony

2  and in your affidavit you specifically made the

3  distinction between damages assessments and law

4  enforcement assessments.  Now, isn't it true that

5  whoever caused or whatever causes the need for extra

6  law enforcement, the group organizing the event would

7  be assessed the cost of the additional law

8  enforcement; is that correct?

9      A.   I'm trying to understand exactly what

10  you're asking, but that -- that would be a

11  case-by-case and an understanding of how the law

12  enforcement was being used on what would be assessed.

13      Q.   All right.  Well, you've testified

14  several times that more protesters show up for an

15  event, you need more law enforcement that costs money,

16  you're going to assess the event organizers for that;

17  correct?

18      A.   Still trying to understand exactly --

19  how -- relative to state park resources associated

20  with help to help facilitate the event, we would look

21  at those resources and costs associated with that, and

22  we would charge those fees associated to help that

23  event occur as cost recovery associated with the

24  event.

25      Q.   Okay.

1          A.    Now, we pulled in law enforcement

2    resources from across the state and we did not bill

3    anybody for additional law enforcement resources to

4    help accommodate the concerns relative to additional

5    protests coming in and those type of things.

6                THE COURT:  You didn't charge for Highway

7    Patrol, Department of Corrections?

8                THE WITNESS:  Right.

9                THE COURT:  All these other agencies --

10               THE WITNESS:  Right.

11               THE COURT:  -- TBI.

12   BY MR. IRION:

13        Q.    But you did charge for additional law

14   enforcement -- or, excuse me, rangers?

15        A.    Yes.

16        Q.    And they are POST certified law

17   enforcement?

18        A.    Yes.

19        Q.    Okay.  And --

20        A.    I guess that's where it --

21        Q.    My question, then --

22               MS. JORDAN:  Your Honor, may he finish

23   the answer?

24               THE COURT:  Let him finish.

25               THE WITNESS:  When you say law

1    enforcement or security measures, that includes

2    everybody.  So I was trying to understand what you

3    were asking specifically.

4    BY MR. IRION:

5         Q.    Okay.  There was a $21,000 bill for

6    additional law enforcement.

7         A.    Yup.

8         Q.    That was for the rangers alone; correct?

9         A.    That was for three days of 24-hour

10   support for that event.

11        Q.    And those rangers were brought in because

12   of the activities of the protesters, not the members

13   of the American -- guests of the American Freedom

14   Party; correct?

15        A.    Brought in to support the event and

16   ensure the safety of those attending the conference

17   and our park employees that were working the

18   conference.

19        Q.    Okay.  Is that a yes or a no?  This is a

20   yes-or-no question.

21        A.    Well --

22              THE COURT:  I think it's a legal

23   conclusion.  It's a legal conclusion.

24              MR. IRION:  I'll move on.

25              THE COURT:  Move on to something else.

1          MR. IRION:  I'll move on.  I apologize.

2    BY MR. IRION:

3          Q.    So what started this whole line of

4    questioning was my wanting to clarify your testimony

5    and your affidavit where you tell the Court that costs

6    associated with the activities of other people, not

7    the organizers of an event, would not be assessed.

8    That is not inclusive of additional law enforcement;

9    correct?

10          THE COURT:  You mean that just with

11    regard to damages to property.

12          THE WITNESS:  Damages, yeah.  I mean, we

13    wouldn't charge anybody for the damages associated --

14    created by somebody else.  But if we needed to bring

15    in additional resources to ensure that an event

16    happens as the people that rent our facility expect it

17    to happen, to have security and protection against

18    whatever factors that are out there to ensure the

19    safety of our employees that are working that event,

20    we would bring in the resources necessary to ensure

21    that event goes off as planned and as expected by the

22    person -- you know, the people that were working

23    there.

24    BY MR. IRION:

25          Q.    And would charge the event organizers for

1  that; correct?

2      A.    It's associated with the event that's

3  being held.

4      Q.    Simply -- can you answer the question,

5  please?  I'm simply saying:  And you would charge

6  them; correct?

7      A.    We would assess a fair charge associated

8  with that event, yes.

9      Q.    I'm simply trying to make clear for the

10  Court that the assertions that activities of other

11  people aren't assessed to the organizers is simply not

12  true in the case of law enforcement needed for

13  protesters, which are not members of the organization?

14          THE COURT:  That's argument, Mr. Irion.

15  That's argument.

16          MR. IRION:  I apologize.

17          THE WITNESS:  From the standpoint if we

18  had a birthday party and they needed additional

19  resources available to them, they would be charged

20  those -- the costs associated with those additional

21  resources.

22          So if the papp- -- the media and all that

23  wanted to come and take pictures of some celebrity

24  that was holding an event in our park and we needed

25  additional resources to ensure the security of that

1    event, that would be charged to recover the costs

2    associated with the people holding that event.

3    BY MR. IRION:

4        Q.    After you decided that those additional

5    resources were necessary --

6        A.    Yes.

7        Q.    -- under the circumstances?

8        A.    Yes.

9             MR. IRION:  Okay.  I believe I'm almost

10   done.

11             I believe that's all I have, Your Honor.

12             THE COURT:  Okay.  Any redirect?

13             MS. JORDAN:  No, Your Honor.

14             THE COURT:  Mr. Robertson, I want to talk

15   about the Bicentennial New Year's Eve party -- and I

16   realize that the last one, your new contract wasn't

17   formally in place for that, but who books the

18   Bicentennial Mall for that party?

19             THE WITNESS:  It's the --

20             THE COURT:  Is it a radio station?

21             THE WITNESS:  No, it's the Nashville

22   Convention and Events Group.

23             THE COURT:  Okay.  So it's the Nashville

24   Convention Center group that books the Bicentennial

25   Mall.

1          THE WITNESS:  Yeah, they book it for the

2    New Year's Eve event.

3          THE COURT:  Okay.  So do you discuss with

4    them ahead of time how much security is going to be

5    needed?

6          THE WITNESS:  They have a -- they have a

7    multiyear contract with us.  So that's in the contract

8    negotiations associated with the event.  So it's --

9    it's a little bit outside of that, but we also have

10   cost recovery language within those contracts, which

11   results in fees associated with additional security,

12   fees associated with damages or cost recovery language

13   associated with those.

14         THE COURT:  Okay.  And that would

15   reimburse only for park rangers --

16         THE WITNESS:  Right.

17         THE COURT:  -- and damages?

18         THE WITNESS:  Right.

19         THE COURT:  And they probably pay a lot

20   of Metro cops to be there.

21         THE WITNESS:  Yeah.  They pay some

22   additional security.

23         THE COURT:  And if the ACLU decided that

24   they wanted to have a national conference at

25   Montgomery Bell State Park and they got word that some

1   Right Wing groups were going to protest their national

2   conference there, how would you handle that?  What

3   would you do?

4               THE WITNESS:  We would assess the

5   situation, determine if additional resources were

6   needed to come in to ensure their safety and we would

7   implement those measures.  And any costs associated

8   with helping to carry out that event that were a

9   result of a cost to Tennessee State Parks, we would

10  seek reasonable measures of cost recovery from that.

11              THE COURT:  And the -- the example given

12  by your counsel of a Taylor Swift birthday party, a

13  conference of the ACLU and the American -- the

14  plaintiff here, the New Century Foundation and the

15  American Freedom Party, are these discussions about

16  what security measures are necessary, are these

17  discussions that you always have or someone from your

18  department has with whoever's booking the space to

19  figure it out?

20              THE WITNESS:  Yeah, we sit down with the

21  groups in advance and talk about what their intents --

22  criteria that we went through, we assess that with

23  them, talk about their event and determine what kind

24  of security measures are needed.  And they agree upon

25  those measures and that's how we move forward.

```
1                THE COURT:  Then you figure out where
2       those resources are coming from.
3                THE WITNESS:  Right.
4                THE COURT:  You figure out how many park
5       rangers you're going to devote and does highway patrol
6       have people available.
7                THE WITNESS:  Yeah.
8                THE COURT:  Your park rangers, what are
9       they doing in their home parks and whether they can
10      come.
11               THE WITNESS:  Yeah.
12               THE COURT:  And you do not assess any
13      amount of money in advance.  This is all after the
14      fact that you -- I mean, you get the security deposit
15      of 10 percent.
16               THE WITNESS:  Right.
17               THE COURT:  Of whatever their fees are
18      going to be for the rooms and the catering and all
19      that?
20               THE WITNESS:  That's correct.
21               THE COURT:  That's the security deposit.
22               THE WITNESS:  Yes.
23               THE COURT:  And then you bill these --
24      after the fact you bill these charges against this
25      security deposit.
```

1          THE WITNESS:  Yes.

2          THE COURT:  And you might keep all of it

3     or some of it or none of it.

4          THE WITNESS:  Right.

5          THE COURT:  And you also might have to

6     bill more than that --

7          THE WITNESS:  Right.

8          THE COURT:  -- depending on the

9     situation.

10         THE WITNESS:  Yes, ma'am.

11         THE COURT:  And if somebody -- if you sat

12    down with an organization that wanted to do this and

13    they basically said we really don't want any security,

14    period paragraph, and it was your information from

15    other sources that they needed security, what would

16    happen?

17         THE WITNESS:  We would talk with -- talk

18    with them about that and provide them our advice on

19    how they would want to look at providing that.  If

20    they insisted that they didn't need any security, then

21    we would not provide any additional security.

22         THE COURT:  So you would let them go

23    ahead and rent the space.

24         THE WITNESS:  Yes.

25         THE COURT:  And then if some terrible

1  thing happened, hopefully you would not be on the hook

2  because they told you they didn't want any security.

3          THE WITNESS:  Well, we would definitely

4  document that they didn't want any security associated

5  with that.  We would provide normal security.  If we

6  felt the threat was significant enough that we want to

7  ensure the general public's safety and our staff

8  safety, we would implement what measures we need

9  that's appropriate to do that.  But --

10          THE COURT:  Okay.

11          THE WITNESS:  -- I mean, we're going to

12  take safety over other things, but, you know, we would

13  weigh all that to determine how we want to respond to

14  the situation.

15          THE COURT:  Okay.  Anything else as a

16  result of my questions?

17          Okay, you may step down.  Thank you.

18           *****WITNESS EXCUSED*****

19          THE COURT:  Any other proof from the

20  State?

21          MS. JORDAN:  No, Your Honor.

22          THE COURT:  Do you wish to put anybody

23  on?

24          MR. IRION:  No, Your Honor.

25          THE COURT:  Okay, I'll hear argument.

1          MR. IRION:  Your Honor, based on the

2    questions that the Court just asked, I want to clarify

3    the fact that the witness testified that the decision

4    to bring in additional law enforcement resources was

5    an assessment that would be made by the State

6    officials regardless of what the organizers asked for

7    or didn't ask for or said that they did or didn't

8    want.

9          At the end of the day he testified that

10   there's concern about the employees there, which is

11   natural, and that the function of the police officers

12   is to protect the public, and so that those resources

13   would be called in even if the organizers said we

14   don't want any law enforcement anywhere around this

15   event.

16         They're still going to be called in.  And

17   the organizers are still going to be assessed.  That

18   was his testimony over and over again.  I think that's

19   an established fact.

20         Your Honor, the Supreme Court has said

21   that regulations that require subjective assessment of

22   a fee to cover -- and this is a quote, the cost of

23   necessary and reasonable protections of persons

24   participating in or observing said activity must

25   necessarily examine the content of the message that is

1   conveyed.  The First Amendment prohibits the vesting

2   of such unbridled discretion in a government official.

3   This is from *Forsyth County versus Nationalist*

4   *Movement*, 505 US 123 at 134.

5               Your Honor, this is exactly what's

6   happening here.  The protests that -- whether or not

7   protests happen requires an assessment of the content

8   of what's going to be discussed.  Because whether or

9   not protests occur depends on how controversial or

10  perceived controversy there is in the content of

11  what's being discussed.

12              THE COURT:  Well, it's really dependent

13  on the Internet, it looks like to me.

14              MR. IRION:  Sure.  Sure.

15              THE COURT:  And how controversial, yes,

16  how controversial the group is, but it seems to me

17  that this whole issue has been wildly generated and

18  gotten much more serious because of the Internet.

19              And you can't tell me that if the ACLU

20  decided that they were going to have their conference

21  out there that there wouldn't be Right Wing groups

22  that would be generating Internet traffic to come out

23  there and protest against them too.

24              MR. IRION:  I completely agree,

25  Your Honor.  If a gay couple decided they wanted to

1     rent the facility for a wedding, there probably would

2     be protesters there too. And the couple would be

3     assessed the additional law enforcement that would be

4     required because of the protesters. And this is

5     basically -- I mean, they're trying to perform

6     their -- they're doing something that's protected by

7     the constitution.

8           And yet they're going to have to consider

9     the fact that if we do this here we might end up with

10     a $300,000 bill. There's no cap. It's whatever the

11     State decides is necessary based on what other people

12     do in response to our doing an event that is

13     essentially free speech.

14           THE COURT: Is Taylor Swift's birthday

15     party, is that based upon the content of speech? I

16     don't think so.

17           MR. IRION: Your Honor, the event is --

18     excuse me, the assessment of how much law enforcement

19     is necessary is going to be a subjective decision of

20     some State official, right or wrong. They might be

21     completely right. They might have too little.

22           But the point is according to the Supreme

23     Court -- and there's more cases that I'll cover here

24     in a second -- this is absolutely on point something

25     that can never happen. You cannot have a government

1    official of any kind, no matter how honest they are,

2    deciding that, well, this event is going to cost more

3    because there's going to be a heckler's veto, there's

4    going to be protests showing up there.  Or -- and this

5    event won't.  Because it leaves the government

6    official with too much authority.

7                 There's too much power there to say, I

8    don't like that so I'm going to charge more.  I'm

9    going to bring in more off-duty rangers and cost that

10   organization more.  I'm not saying that there's any

11   evidence that that happened here or it didn't happen.

12                We don't know at this point, but the

13   point is the Supreme Court has been very clear that

14   that's a heckler's veto.  A heckler's veto is,

15   according to the Supreme Court, viewpoint

16   discrimination, not just content discrimination.

17                And they say that specifically because

18   the danger is too high of governmental abuse of

19   charging one type of discussion because they disagree

20   with it than another type of discussion.  They simply

21   cannot have this type of an open-ended -- or for that

22   matter not open-ended.

23                There's case law that I'll cover here in

24   a second that specifically says it doesn't matter if

25   it's a $100 fee.  You simply cannot have a government

1    agent deciding, well, this group doesn't need to pay

2    the fee and this group does need to pay the fee.

3            THE COURT:  You know what, *Forsyth* was

4    decided in 1992.

5            MR. IRION:  Sure.

6            THE COURT:  Really, before the Internet.

7            MR. IRION:  Yes.

8            THE COURT:  And so at that time it could

9    be that the only kind of events like this that you

10   would have demonstrations and hecklers and things were

11   political events.

12           MR. IRION:  Sure.

13           THE COURT:  Now we have Taylor Swift

14   birthday parties that generate publicity, Internet

15   traffic and, therefore, hecklers of a different kind.

16   And I'm wondering if, in this day and age, the

17   decision might be different because it's not just

18   political groups that might generate protesters, but

19   it's celebrities that generate kooks and fans that get

20   out of control.

21           MR. IRION:  Your Honor, I have a Sixth

22   Circuit 2015 case, this is *Bible Believers*, happened

23   up in Michigan.  It was a protest against Muslim, an

24   annual Muslim fair that was being held every year and

25   some Right Wing Bible-believing people went up there

1    and protested and they were attacked.  And rather than

2    protect them, which by the Sixth Circuit said the

3    police department had an affirmative duty to protect

4    them, rather than stop their speech.  But rather than

5    protecting them, they made them leave.

6              And a lawsuit was filed and the officers

7    and the department were found -- summary judgment

8    on -- against the defendants because the Sixth Circuit

9    said in these circumstances the only time you can shut

10   someone down -- someone's speech down because of the

11   protests of others is when the officer's life is in

12   danger.

13             And they also said specifically if

14   there's more resources that could be called in that

15   are readily available and they're not to protect those

16   speakers and keep them speaking, then they're still

17   violating the constitution.  They have an affirmative

18   duty to protect unpopular speech.  I mean, Your Honor,

19   we --

20             THE COURT:  Well, that's what

21   Mr. Robertson said he's doing.

22             MR. IRION:  Exactly, Your Honor.

23             THE COURT:  He's not shutting down --

24   he's not refusing to rent to your clients.

25             MR. IRION:  Yes.

1          THE COURT:  He wants to provide them with

2   protection.

3          MR. IRION:  Yes, Your Honor, but he wants

4   to charge $20,000 in one instance already and it could

5   possibly go up there from, additional because of the

6   activities of other people.  That is a heckler's veto.

7          And the Supreme Court has said about a

8   heckler's veto -- heckler's veto is viewpoint

9   discrimination.  This is a *Police Department of*

10  *Chicago* 408 US at 98.  The Sixth Circuit said in *Bible*

11  *Believers versus Wayne County*, there can be no

12  legitimate dispute based on the record that the police

13  officers effectuated a heckler's veto by cutting off

14  *Bible Believers* protected speech in response to a

15  hostile crowd reaction.

16          THE COURT:  Now, I haven't read that case

17  yet.  The police were not parties to this; right?

18          MR. IRION:  Yes.

19          THE COURT:  To this case?

20          MR. IRION:  In Bible Believers the police

21  were the defendants.

22          THE COURT:  They were the defendants.

23          MR. IRION:  Yes.

24          THE COURT:  But they shut down the

25  speech.

1          MR. IRION:  Yes, Your Honor.

2          THE COURT:  And -- and the Sixth Circuit

3    said they had the responsibility to provide safety and

4    not shut down the speech, is that what you're saying?

5          MR. IRION:  That is part of the case,

6    Your Honor.

7          THE COURT:  Does it say anything about

8    paying the police in that case?

9          MR. IRION:  No, Your Honor, but I do have

10   a case from the Fifth Circuit that is dead-on point to

11   this case, and it's from 2010.  This is *Sonnier v*

12   *Crain*, Your Honor.  In that case we haven't -- I can't

13   believe I haven't gotten to discussion of forums

14   because obviously with free speech case, forum is

15   going to be an issue, but before -- and *Sonnier* talks

16   to that issue.

17          Before I even get to that, the *Sonnier*

18   case said that the university speech violates the

19   First Amendment because it gives the university sole

20   discretion in determining both the need for and the

21   strength of the security and assesses the cost of

22   additional security on the sponsoring individual or

23   organization.  That's *Sonnier v. Crain*, 613 F.3d 436

24   at 447.

25          THE COURT:  Is that in your brief?  Is

1     that cited in your brief?

2                 MR. IRION:  I believe so.  I can check if

3     you like.

4                 THE WITNESS:  That's okay.

5                 MR. IRION:  And the same court went on to

6     conclude, because of the unbridled -- because of the

7     unbridled discretion, the District Court abused its

8     discretion in denying a preliminary injunction with

9     regards to the security fee.

10                So, again, this is Fifth Circuit, but

11    it's almost exactly this situation.  The government

12    agency, the university, was essentially saying, well,

13    if we need extra security, you have to pay for it.

14    And the Supreme Court in *Forsyth* said you can't do

15    that.  The Fifth Circuit in 2010 said you still can't

16    do that.  *Forsyth* hasn't been overruled.

17                And in *Bible Believers* the Sixth Circuit

18    said maintenance of the peace should not be achieved

19    at the expense of free speech.  Again, discussing this

20    situation.

21                And just to get back to forum really

22    quickly so I don't completely miss a critical item,

23    Your Honor, in *Sonnier v Crain* the Fifth Circuit

24    applied *Forsyth* to a either public or designated

25    limited public forum.  The defendants in their brief

1    clearly incorrectly repeatedly called this a nonpublic

2    forum.  Well, nonpublic forum -- there's basically

3    three big categories.  One is a public forum.  At the

4    other end of the spectrum with lots of government

5    ability to censor is a nonpublic forum, and that

6    includes courthouses and post offices and, most

7    importantly, military bases.

8             These are places where the government has

9    never allowed free speech, and no one should have any

10   expectation of free speech.  And so the government in

11   a nonpublic forum -- that's, you know, nonpublic

12   forum.  It's a very short list.

13            In between public forum and nonpublic

14   forum is something that's called limited public forum

15   or designated public forum.  The Fifth Circuit in

16   *Sonnier* essentially said limited or designated are

17   essentially the same thing.

18            And they went on to analyze the facts of

19   this case.  They specifically said neither side argued

20   whether it was a public forum or a nonpublic forum,

21   but it doesn't matter here because you can't do these

22   things in either of those types of forums.  And

23   designated forum which is a situation where the

24   government owns the property, but it has opened it up

25   to the public to allow speech --

1          THE COURT:  That's what you think this

2  is.

3          MR. IRION:  That's a designated forum.

4  The park is obviously a public forum.  You could argue

5  that the conference center is a public forum.  After

6  all, the conference center, the definition of

7  conference center in *Merriam-Webster* is something to

8  the effect of a group of people -- I've actually got

9  the exact quote, but it's basically a conference

10  center is a center where a group of people come

11  together to discuss matters of public importance and

12  controversy.

13          They call it a conference center.  It's

14  open to the public.  Anybody can rent it and they can

15  allow anybody in.  And they specifically are there to

16  talk about political subject matter.  So I would argue

17  it's a public forum.  Even if it's not a public forum,

18  it is, at worst, a designated public forum because it

19  is owned by the government.

20          But the government long ago, according to

21  the testimony, decided that the public can come in and

22  they can talk about whatever they want.  He

23  specifically said there's no restrictions on what

24  anybody can talk about and anybody can come.  So it's

25  a designated public forum at worst.  And *Sonnier*

1    clearly said doesn't matter here because content

2    discrimination and viewpoint discrimination cannot

3    happen.  A subjective fee based on the content of the

4    speech is not only content discrimination, it is

5    viewpoint discrimination and it can't be done and they

6    cited *Forsyth* on that.  Which, like I said, was

7    essentially the case that said you simply can't do

8    what the State of Tennessee is doing right now.

9                The State also mentioned that there's no

10   irreparable harm.  They ironically cite *Elrod v Burns*,

11   which is a United States Supreme Court case from 1976.

12   It actually stands for the point that a denial of free

13   speech for even a short period of time, any period of

14   time, is absolutely irreparable harm without

15   exception.

16               It also says that injury not compensable

17   by money damages, denying speech, where the nature of

18   the loss made damages difficult to calculate is not

19   compensable in damages.  So, again, we're talking

20   about something that has to be decided in equity.

21   Essentially you have to -- if, indeed, the policy is

22   violating the constitution, the only remedy is

23   allowing the speech to happen.  And --

24               THE COURT:  Well, you're not really

25   talking about preventing the speech from happening.

1    You're talking about burdening the speech.  Isn't that

2    what you're talking about?

3            MR. IRION:  Yes, Your Honor.  And

4    obviously 20,000 -- I'm not going to rent a place

5    where the last group that was talking about the same

6    thing I was talking about got an additional $20,000

7    assessed to them.  No one is.  And there's no limit.

8            I mean, $200 million, $20 million,

9    there's really no -- they can call in the National

10   Guard and assess it to my clients.  It is just --

11   there's just -- there's no way you can justify this

12   under *Forsyth* and *Sonnier* and *Bible Believers*,

13   Your Honor.  Thank you.

14           I know I've probably rambled a bit.  Do

15   you have any questions for me, Your Honor?

16           THE COURT:  No.  Thank you.

17           MR. IRION:  Thank you very much.

18           THE COURT:  Let me hear from the

19   defendant.

20           MS. JORDAN:  Thank you, Your Honor.

21   Plaintiffs have not met their burden to show that they

22   are entitled to having this Court force the State to

23   contract with them on their own terms.

24           The fallacy of plaintiff's view is that

25   the inn and conference center, it's not a public forum

1    of any kind.  The inn and conference center are

2    commercial enterprises reservable for private

3    meetings, and New Century Foundation seeks to reserve

4    them as such.  They are revenue-generating venues,

5    commercial venues that by statute, according to

6    Mr. Robertson, must be self-sustaining.

7              As such it is reasonable for Tennessee

8    Department of Environment and Conservation to

9    institute cost recovery procedures such as this so

10   that the inn and conference center, which are

11   commercial enterprises can continue to be

12   self-sustaining.

13             There has been no evidence of any

14   viewpoint discrimination at all.  Mr. Robertson

15   testified that these assessments are made for any

16   group, including a Taylor Swift concert, a large --

17   any large group that has 250 to 300 attendees, which

18   is similar to the New Century Foundation.

19             And also, Mr. Robertson testified for

20   this particular event, they sit down at the table and

21   they discuss what kind of security measures are going

22   to be provided for this event.

23             The Supreme Court in *Lehman versus City*

24   *of Shaker Heights* found that the use of advertising

25   spaces on public buses was a commercial enterprise and

1    was inconsistent with an intent to designate the car

2    cards, which is where the advertisement is placed as a

3    public forum.

4         The Supreme Court in *Cornelius* also noted

5    that the use of property as a commercial enterprise,

6    like the inn and conference center, is inconsistent

7    with the concept of a public forum.  And then we cite

8    the other cases in our brief of the *Atlanta*

9    *Constitution* case, the *Krishna* case, the *Chicago Acorn*

10   case.

11        I want to point out that plaintiffs

12   incorrectly defined public in their analysis.  In

13   their brief they seem to say that the forum is the

14   park, which is a public forum.  That's not entirely

15   accurate.  The forum here is the inn and the

16   conference center, which are commercial enterprises

17   which must be self-sustaining.

18        The decision in *Cornelius* supports this

19   argument.  In that case the Court stated, and I'm

20   quoting, In defining the forum we have focused on the

21   access sought by the speaker.  When speakers seek

22   general access to public property, the forum

23   encompasses that property.  In cases where limited

24   access is sought, our cases have taken a more tailored

25   approach to ascertaining the perimeters of a forum

1      within the confines of the government property.

2              And in *Cornelius* the Court found that the

3      forum at issue was a charity drive and not the federal

4      workplace because the speakers wanted only to access

5      the charity drive and not engage in face-to-face

6      conversation with the federal workers at workplace.

7              And it was -- it was deemed to be a

8      noncommercial -- a nonpublic forum, excuse me.  Here

9      New Century Foundation seeks to hold their private

10     meeting -- and it is private -- at the inn and

11     conference center and wish to exclude everyone else

12     except for those people they want to allow in.  The

13     forum is not the park, it is the inn and conference

14     center.

15             And they also say in their brief that

16     because the public can rent rooms, that must mean it

17     is a public forum.  But that position defies common

18     sense here.

19             True, the public can rent the rooms at

20     the inn and the conference center, but once they do --

21     and Mr. Robertson testified to this -- those rooms

22     that are rented are only accessible by the reserving

23     party and the people they decide to allow into the --

24     into the facilities.

25             The rooms are not open by the public at

all times like streets and sidewalks, that kind of
thing.  They are only open to reservation by
individuals and groups who then decides who gains
access to the facilities that have been rented.

THE COURT:  Plaintiff's counsel makes the
point that this would be a open forum, public forum --
this is a public forum because a group could rent the
whole inn and conference center and make it open to
the public.  I mean, that's not what they do, but
somebody could do that and could open it to the
public, there would be no restrictive -- no
restrictive access.  So what's your argument,
counter-argument to that?

MS. JORDAN:  And that would be a decision
for the reserving party, but we'll get to the *Chicago
Acorn* case.  In that case the Court said -- the
government did not intend for these spaces to be used
for the purposes of public expression.  And the spaces
were not open to the general public even though they
are sites usable and sometimes used for discussion and
other expressive activities.

So even in cases where maybe a reserving
party may open it to a public, that does not turn that
forum into a public forum for that one -- for that --
you know, for all time.  It is -- maybe for that one

1  event --

2         THE COURT:  So you determine what kind of

3  a forum it is in a general way, not based upon the --

4  not individual usage, is that what you're saying?

5         MS. JORDAN:  Yes, Your Honor.  It is

6  based on in a general sense, but -- but the inn and

7  conference center again are commercial enterprises.

8  We liken it to the airport terminal, to the news rack

9  in the *Atlanta Constitution* case, and to the Navy peer

10  in the *Chicago Acorn* case.

11         And the *Chicago Acorn* case is probably

12  the closest case on point there that there was -- that

13  that facility was rented for the Democratic National

14  Convention -- or Democratic convention and still it

15  was deemed to be a nonpublic forum.  Just because

16  there was that one event there and public was allowed

17  did not turn that into a public forum.

18         And in particular here what we're looking

19  at is a commercial -- this is a commercial facility,

20  which by statute must be self-sustainable.  That's

21  what Mr. Robertson testified to.  That's the statute.

22         THE COURT:  Yeah, but you've got a little

23  tension here.  You've got a Tennessee statute that

24  requires that the Parks Department be self-sustaining,

25  but if a Tennessee statute in requiring that makes the

1    Parks Department violate the First Amendment, seems to

2    me that the Tennessee statute goes the way of the dodo

3    bird.

4              MS. JORDAN:  And that would be true,

5    Your Honor, but we were saying that that's not the

6    case here.  That is not violating the constitution,

7    but I would agree with that, Your Honor.  It would

8    not -- the federal rights would overcome the state

9    statute.  I agree with that, but that's not -- we, of

10   course, are arguing that's not what is happening here.

11             And then going back to in their brief the

12   plaintiffs indicate that because the public can rent

13   rooms, they must mean it's a public forum.  The rooms

14   are not open.  They're only open to reservation, but

15   this is part of the commercial enterprise.  And plus

16   these places are, in fact, public forums.

17             As the plaintiff suggests, because the

18   public -- because the public can rent out these

19   spaces.  Then that would mean the defendant would not

20   be able to keep out the protesters.  They can separate

21   the protesters from -- from the event, from the

22   speakers, but they would have to allow the protesters

23   in if this is, in fact, a public forum as the

24   plaintiff suggests.

25             Taken to its logical extreme, someone

1    could enter a hotel room, which the plaintiffs are

2    suggesting is a public forum because the public can

3    rent it, and they can enter that hotel room and

4    express their views to whoever has rented that room.

5    That's just taken to its logical extreme.

6             Getting back to the fact that these are

7    commercial enterprises, they're revenue-generating

8    properties. It's inconsistent with the idea that

9    these are public forums. But that's, of course, not

10   what the plaintiffs want. They made it very clear.

11   They want to have their cake and eat it too.

12            They want to have a private, nonpublic

13   forum to the extent that they can have it all to

14   themselves, exclude members of the public, exclude

15   everybody, but then have it treated as a public forum

16   when it suits their purposes. It just does not work

17   that way.

18            In fact, in their -- in their motion, the

19   brief in support of the motion, they indicate that if

20   we don't -- don't provide the proper security, then

21   some member of the public can illicitly gain access to

22   the forum. So they want it private, they want -- they

23   want to exclude members of the public.

24            The emails from Mr. Taylor indicate that

25   New Century Foundation understands that the excess

1  staff are there for their protection.  If I may get --

2  I think the -- I think Exhibit 4 -- and do you have

3  all of the exhibits?

4            COURTROOM DEPUTY:  I don't.

5            THE COURT:  We have no Exhibit 1, is that

6  what you said?

7            COURTROOM DEPUTY:  I don't have an

8  Exhibit 1.

9            THE COURT:  Oh, the affidavit of

10  Mr. Robertson, I think.

11            MS. JORDAN:  It was up here.  Yes.

12            THE COURT:  Stealing exhibits.

13            MR. IRION:  Sorry.

14            MS. JORDAN:  I'm sure he didn't --

15            THE COURT:  Those Knoxville lawyers.

16            MS. JORDAN:  That's right.

17            This is a May 1 -- thank you.  The May 1,

18  2018, email.  And I'll see if I can do this, but what

19  Mr. Taylor is saying here is that he wants to thank

20  the park service for the thorough courteous and very

21  professional service of your men.  Everyone I spoke to

22  at the conference was grateful for the protection you

23  provided to us.  And they had a successful worry-free

24  conference in spite of the fears that they had.

25            And similar language was in the May 3

1 email.  I'll just read it, I don't need to put it up

2 there because that's just causing too much trouble.  I

3 wish I could convey my gratitude directly, but I

4 appreciate your letting people know how much we

5 appreciate the measures the State of Tennessee took to

6 ensure that we had a safe and productive conference.

7            So Mr. Taylor understands, particularly

8 since he is in conference with Mr. Robertson about the

9 event and the security for the event, that these

10 measures are taken for this event for them, for New

11 Century Foundation.

12            The idea that the heckler's veto, as

13 Your Honor pointed out, it's -- it's not just

14 political groups now.  It's celebrities, it's other

15 things.  It's not based on speech.  If it is a

16 heckler's veto, then we're heckling everybody, no

17 matter what it is, whether it be the -- as I

18 described -- Taylor Swift birthday party is a great

19 example, but the elder -- the euchre -- I don't want

20 to say elderly because Ms. Ohlman plays euchre and

21 she's still in her 20s, and since she's pretty good at

22 it --

23            THE COURT:  You can talk about the

24 Sweet Adelines, perhaps.

25            MS. JORDAN:  There you go.  Yes, there

1    you go.  There you go.  But the euchre tournament,

2    24/7, they play through the night, ESPN is there.

3    There's publicity.  Who knows, maybe there's a famous

4    euchre player, I don't know, but that would create the

5    same kind of issues -- not the same, but very similar

6    issues to New Century Foundation.

7            The cost recovery measures apply to

8    everyone and they are just simply in place to ensure

9    that the inn and conference center can be

10    self-sustaining.  They are commercial

11    revenue-generating enterprises.

12            Now, the cases that Mr. Irion was just

13    citing are inapposite.  *Forsythe County* and *Sonnier*,

14    which is in his brief --

15            THE COURT:  Okay, good.

16            MS. JORDAN:  -- by the way.

17            THE COURT:  I haven't been able to read

18    the cases as I would have wanted to.  You know, we're

19    short a judge and we have no senior judges and we're

20    dying over here.  Anyway, go ahead.

21            MS. JORDAN:  I know.  And maybe

22    Mr. Robertson can help.  He's been a great help.  But

23    in both of those cases they involved issues of

24    unbridled discretion involved in the permitting body

25    to charge fees in advance of the event.  And here, as

1    Michael Robertson testified, and quite extensively,

2    there are criteria that are applied to each

3    reservation to determine whether there would be or may

4    be excessive costs.

5            And the Sixth Circuit in *Stonewall Union*

6    *versus City of Columbus* -- and that is in our brief --

7    found that because there were criteria, even if there

8    has to be use of some discretion within those

9    criteria, there was not unbridled discretion.

10           Also in *Forsyth County* and *Sonnier*, as I

11   was alluding to, the charges were costs that had to be

12   paid up front and here that is not the case.  The

13   charges are not levied until after the event.

14   Your Honor alluded to that.  And the charges that are

15   actually given to the reserving party are those that

16   are actually incurred.

17           And Mr. Robertson testified if the

18   response to the event turns out not to be as big as

19   anticipated, then some of the staff will stand down

20   and they will not be charged for that event.

21           Now, the *Bible Believers* case is

22   inapposite because that involved issues of failing to

23   protect the *Bible Believers* who were trying to speak

24   in the middle of an Arab festival, but they were being

25   pelted with bottles and other materials.

1            But that's not what's happening here.  To

2      the contrary, we are and have always provided

3      protection to New Century Foundation.  So that

4      really -- that case does not apply here.

5            Plaintiffs assume that they are the only

6      group that would require additional staffing and law

7      enforcement, but we discussed that.  That's just not

8      the case.  So it's not a speech tax.  That is based on

9      the controversial nature of New Century Foundation's

10     speech.  It is simply intended to be a cost recovery

11     measure for costs associated with any groups -- any

12     groups's use of the facilities.

13            And that's part of the recognition that

14     these facilities are mandated to be self-sustaining

15     and are commercial enterprises.  Taking -- setting

16     aside the State statute would come, you know,

17     secondary to any First Amendment freedoms.  These cost

18     recovery measures are what helps to keep these

19     facilities self-sustaining.

20            And the fact that as Mr. Robertson

21     testified that the Department of Environment and

22     Conservation only charges for the actual park staff

23     for purposes of making sure the event is a success,

24     not the TBI, not the troopers, not the helicopters,

25     not the TWRA, all of that, proves that this is simply

1      a cost recovery measure for the commercial enterprise.

2      And it's not designed to burden plaintiffs with costs

3      associated with the State's management of the

4      protesters.

5                  And my -- Mr. Robertson testified that

6      those costs, the troopers, the TBI and so forth, is

7      the State's response, not the response of the inn and

8      conference center.  The costs of the park staff is for

9      the event and is a cost recovery measure for the

10     commercial enterprise.

11                 And plaintiffs are wrong, there is no

12     charge for damages caused by the protesters.  The

13     damage -- it would be only the damage, if any, that

14     New Century Foundation causes.  The inn and conference

15     center for private meetings, the public is not allowed

16     unless the group that reserves it allows the public

17     in.  We talked about that.

18                 The staff at the inn and conference

19     center help to ensure the safety of the group and, of

20     course, the safety of the inn and its staff.  And they

21     will eject people if so requested.  And as

22     Mr. Robertson testified, that has happened with New

23     Century Foundation.  New Century Foundation has asked

24     that some people be escorted out.

25                 It's a nonpublic forum.  That's -- it's

just -- it's just a nonpublic forum.  As such, all
that must be shown is that the contract along with the
security deposit and the cost recovery measures are
content neutral and reasonable.  The provisions apply
to everyone.

So they're content neutral and they are
reasonable to the commercial enterprise.  It is not
unusual in any respect for a hotel and conference
center to expect their attendees to pay for costs
associated with their event.  So plaintiffs cannot
show likelihood of success on the merits.

I want to briefly address the irreparable
harm without legal remedy.  That's not the case at
all.  The proposed conference is for May 17, 2019,
more than seven months away.  There's no present
imminent danger of plaintiffs being unable to reserve
the inn and conference center.

THE COURT:  Well, but he said if somebody
showed up and wanted to rent it before these people
signed the contract, they would rent it to somebody
else.  He said that.

MS. JORDAN:  He did.  He did.  In his
affidavit, though, what -- what he points out -- and I
didn't bring it out again because I didn't want to be
duplicative.  Mr. Robertson testified in his

1  deposition, they can cancel any reservation for rooms
2  at the inn and conference center at any time before
3  the reserving party would incur any cancellation
4  costs.  So they can still change the reservations if
5  they need to do so.
6           THE COURT:  So if other people have
7  booked some of the rooms, you're saying they can
8  cancel those rooms and give it to the plaintiff.
9           MS. JORDAN:  Correct.
10           THE COURT:  Okay.
11           MS. JORDAN:  Yes, Your Honor.  Yes.
12           THE COURT:  All right.
13           MS. JORDAN:  All that's happened so far
14  is that plaintiffs have been presented with the
15  contract that contains provisions that every group
16  must agree to regardless of the purpose, the size,
17  whatever, every group has to agree to it.  And the
18  security deposit is the same.  It's 10 percent.
19           And there is a potential for a legal
20  remedy, money damages if there is an issue.  The
21  amounts for security damage are assessed after the
22  event is over.
23           At that time if plaintiffs believe that
24  they are entitled to a refund of their security
25  deposit, then they can file a lawsuit for money

1    damages for a refund.  If they are charged additional

2    amounts for excessive security and damages over and

3    above the security deposit after the event, they can

4    just not pay those or file a lawsuit based on that.

5              There would be substantial harm to the

6    State.  Plaintiffs in their motion and in their

7    complaint specifically seek to rent the inn and

8    conference center on their own terms and ask this

9    Court to compel the State to enter into that contract.

10             That's not relief that this Court can

11   compel.  This Court cannot compel a contract.  And

12   compelling the State to enter into a contract on the

13   plaintiff's terms would mean that the facilities would

14   not be self-sustaining necessarily.

15             Further, and I might point out, even if

16   this Court were to find that the inn and conference

17   center are, in fact, limited public forums or --

18   public forums as plaintiff suggests, then the State

19   can limit the groups that are allowed at the inn and

20   conference center, as long as it's not viewpoint

21   discriminatory.  That the State could, for example,

22   decide to limit the use of the facilities to groups no

23   larger than 100 or prohibit all groups that have a

24   political message.

25             And an injunction would be harmful to the

1   general public.  The Tennessee legislature has

2   determined that it is in the public's interest for

3   these commercial enterprises to be self-sustaining,

4   and an injunction would be inconsistent with that

5   public policy.

6           So, Your Honor, we just ask that you find

7   that the inn and conference center are nonpublic

8   forums, that the group reservation contract is content

9   neutral and reasonable and ask that you deny the

10  preliminary injunction.

11          THE COURT:  Thank you.

12          MS. JORDAN:  Do you have any questions

13  for me?

14          THE COURT:  No.

15          Any brief response?

16          MR. IRION:  Yes, Your Honor.  Thank you.

17          Your Honor, the Tennessee statute

18  requiring government commercial entities to make money

19  is not the problem.  The problem is the fact that the

20  State now wants to do that in violation of the law.

21  And just like any other business, they can't do that.

22          What we're asking the Court to do is not

23  find that statute void, but simply to strike an

24  illegal term from a contract that the State is putting

25  out.  This is what courts do all the time.  If a term

1    in a contract is illegal, they strike it.

2              And I'm so glad that the discussion of

3    hotels versus this particular facility came up because

4    if a -- if my clients were to rent a hotel in downtown

5    Nashville and 50,000 people came, showed up and

6    rioted, my clients would not be responsible for the

7    police efforts to quell other people's criminal

8    activities.

9              The State of Tennessee is a government

10   entity.  It's not a private entity.  And if we were

11   going with a private entity, then the private entity

12   would never have a term in there that says, well,

13   the -- if the police show up, we're going to charge

14   you $20,000 for the police having to show up.

15             Because it's the State, the State seems

16   to think that normal police activities, which they,

17   according to the Sixth Circuit, have an affirmative

18   duty to protect the public in these circumstances and

19   according to the Supreme Court can never use a

20   heckler's veto protesters to stop First Amendment

21   rights, they think that the bringing out extra law

22   enforcement somehow should be assessed to the

23   organizers.  And that's just wrong.

24             A government entity has to follow the

25   constitution.  Private entities do as well; however,

1    as we all know the first element in any constitutional

2    claim is that the defendant is a government entity

3    acting under governmental authority.  Just because

4    they're doing commercial activities doesn't -- they

5    still have to follow the constitution, as Your Honor

6    pointed out.

7         They have different requirements,

8    unfortunately, based on the fact that they are the

9    government.  They have a lot of authority that private

10    entities simply don't have.  Private entities, private

11    hotel couldn't call up and say, hey, send out a

12    hundred police officers.

13         They might send them out, but they

14    certainly don't have the authority to force them to

15    and then assess them a fee.  The government does.  The

16    fact that it's assessed afterward instead of ahead of

17    time is worse.  That is a prior -- to the event

18    burdening on speech that's much worse than -- they're

19    saying ahead of time you have to pay the -- you have

20    to agree on a contract to be assessable for what other

21    individuals do and what we do in response to it and

22    it -- it's been made very clear it doesn't matter

23    whether or not they sit down ahead of time and discuss

24    how much security is necessary and the State agrees to

25    provide extra security.

```
 1              That's all great, and I think that's a --
 2      that's a fabulous thing that happens.  And I think the
 3      witness made it clear that my clients and the State
 4      have had a good relationship and hopefully they will
 5      continue to, to do those things.
 6              But that doesn't remedy the fact that the
 7      State is now asking my clients to open themselves up
 8      contractually to an open-ended amount of assessment
 9      ahead of time based on the activities of other people
10      and they have no authority to say whether or not the
11      response should happen at all.
12              Sorry, Your Honor.  Now, regardless of
13      whether or not this is -- the case about the DNC.  The
14      DNC convention happened in that case at a military
15      base.  It was a naval port.  That has never been a
16      public or a designated public forum.  It's always been
17      a nonpublic forum.  It's one of the three classic
18      nonpublic forums.  So that case is completely --
19              THE COURT:  You've probably never been to
20      the Navy peer in Chicago if you're making this
21      argument.  Have you ever been there?
22              MR. IRION:  I was in the Air Force,
23      Your Honor, but I've never been to that peer.
24              THE COURT:  Well, okay.  It's not what
25      you're saying.  It is not a base.  Not anymore.
```

1          MR. IRION:  All right.  Well, assuming

2     that this is a limited public forum or let's just say

3     from their own brief the defendants say the standard

4     that they're asserting is that it must not -- the

5     policy must not discriminate based on viewpoint and

6     must be reasonable in light of the purposes served, I

7     strongly disagree with that.

8               But even with that, we have a Supreme

9     Court case that says heckler's veto is viewpoint

10     discrimination.  Viewpoint discrimination can -- it

11     just simply isn't allowed, according to the

12     defendant's own brief.  And I agree, it's not allowed.

13               And heckler's veto -- if this is, in

14     fact, a heckler's veto, and what we've got here is the

15     State reacting to what they perceive is a danger based

16     on other people's activities, that's the definition of

17     a heckler's veto, Your Honor.  They're wanting to

18     assess my clients a fee they wouldn't get anywhere

19     else based on the activities of other people.

20               Please give me a moment to go through my

21     list.

22               THE COURT:  You're getting a little

23     bit -- you're getting a little bit repetitive.  It is

24     5:30.

25               MR. IRION:  I will wrap up.  I also

1    apologize for getting a little animated.

2                    THE COURT:  That's quite all right.

3                    MR. IRION:  I get emotionally involved in

4    these kind of things.  I've done several

5    First Amendment cases.

6                    THE COURT:  That's quite all right.

7                    MR. IRION:  I just wanted to mention

8    based on basic fairness, Your Honor.  Essentially the

9    State is saying you can't speak unless you pay this

10   fee because your speech is offensive to other people.

11   And if I want to go and speak and it's not offensive,

12   it's not a problem.

13                    As Your Honor well knows, the First

14   Amendment is intended to protect offensive speech,

15   unpopular speech, because unoffensive speech doesn't

16   need protection.  The Supreme Court has made this

17   point --

18                    THE COURT:  Do we have any unoffensive

19   speech anymore in this country?  I'm not sure we do.

20                    MR. IRION:  That's depends on who you're

21   talking to, I'm sure.

22                    THE COURT:  Well, I'm not sure it depends

23   on who you're talking to.

24                    MR. IRION:  Well, I think that the people

25   in this country need to be able to allow themselves to

1  be offended and still act legally and not criminally.

2  But, again, this is the problem is the criminal

3  activity of other people is preventing free speech.

4  The only reason I brought up -- not the only reason.

5  The *Bible Believers* case was a case that established

6  what should have already been pretty clear that the

7  police department has to protect people who are saying

8  things that are unpopular.  They have an affirmative

9  duty to that.

10  We shouldn't -- we can't charge citizens

11  what -- for what the government pays to do its job.

12  That it has -- primarily the reason for existence is

13  to protect citizens and protect them to be able to

14  exercise their rights.  And what we're seeing here is

15  a -- is a test where -- where the State of Tennessee

16  is trying to say, if you want to exercise those

17  rights, you have to pay for them.

18  THE COURT:  Well, you know what?  If they

19  just called in outside sources and didn't use park

20  rangers, we wouldn't even have this lawsuit, would we?

21  MR. IRION:  Sure, but it's up to their

22  discretion, not my clients.  My clients are having to

23  agree to allow them to decide, the State officials,

24  what resources they'll use, how much they're going to

25  cost.  And that is clearly not allowed under *Forsyth*.

1          THE COURT:  But if they -- if

2    Mr. Robertson didn't feel so strongly that it was his

3    obligation because it's his park, that he was the

4    first line, he had the first line responsibility for

5    security and simply when there was going to be a

6    security issue, if he just called in the highway

7    patrol, the TBI, all these outside groups that

8    basically can't charge your client for their security,

9    then we wouldn't have this lawsuit, would we?

10         MR. IRION:  Well, actually, Your Honor,

11   this brings me to my last issue, which is the

12   subjective nature of the assessment.  The problem with

13   the assessment is that a government official gets to

14   decide whether or not -- you know, how much and when

15   the resources are needed.

16              And in this case there's nothing in the

17   contract.  The contract is very vague and open-ended

18   such that they could make the argument under the

19   language of the contract that any damage to the park

20   whatsoever done by anybody is a contractual obligation

21   of my client's.  It actually reads that way.

22         THE COURT:  So you're moving now to

23   damage, not to security costs.  You're talking about

24   damage assessment.

25              MR. IRION:  What I'm -- the assertions

1   that the State made, even if true, about damages not

2   being assessed, is not in the contract at all.  And,

3   in fact, the first time I saw it raised at all was in

4   their opposition brief.  I actually went back and

5   looked at the contract.  I was very surprised.

6          And when I looked at the contract and the

7   affidavit very carefully, I was able to recognize what

8   they were saying was, well, damages by other people

9   are not assessed, even though you could make the

10   argument that they are under the language.  What they

11   were really saying was, well, the law enforcement

12   requirements, the security requirements that were

13   performed by the rangers are assessed to my client.

14          So -- in any case, the contract terms are

15   illegal under the constitution.  The Court certainly

16   has the authority to strike illegal contract terms.

17   And the last item was remedies.  They were saying,

18   well, you know, the -- oh, I can't remember exactly.

19          THE COURT:  No irreparable harm, is that

20   what you want to --

21          MR. IRION:  Not the irreparable harm.

22   The fact that if my clients were to enter into this

23   contract, absolutely they have the right not to pay

24   when they are assessed and the State would then sue

25   them and they would have to incur legal fees, that

1     even if they won, they wouldn't be able to recover

2     under a contract.

3               They would probably -- it would probably

4     hurt their credit and that's just not the -- I mean,

5     this clearly is a situation that has to be remedied in

6     this court through equity, hopefully today or this

7     week.

8               Did Your Honor have any more questions?

9               THE COURT:  No, I don't.

10              MR. IRION:  Thank you very much.  My last

11    comment is if the Court needs more judges, I think

12    there's lots of volunteers in the room that would

13    certainly take the job.  I know I would.  Thank you,

14    Your Honor.

15              THE COURT:  Well, we have a nominee.  He

16    just needs a vote of the Senate.  That's our problem.

17    We have someone who's actually gotten through the

18    Judiciary Committee, but he's awaiting a vote of the

19    Senate.

20              MR. IRION:  And they're kind of tied up

21    right now.

22              THE COURT:  They're kind of tied up right

23    now.

24              This is a very interesting case, and I

25    will take it under advisement.  And you may have a

1   very optimistic view of how quickly I can get an

2   opinion out, but I do feel I need to write an opinion

3   about this case.  So I will be taking it under

4   advisement and getting to it as quickly as we can.

5   Thank you.

6               (Which were all of the proceedings had in

7   the above-captioned cause on the above-captioned

8   date.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>REPORTER'S CERTIFICATE PAGE</u>

1

2

3        I, Roxann Harkins, Official Court Reporter

4    for the United States District Court for the Middle

5    District of Tennessee, in Nashville, do hereby

6    certify:

7            That I reported on the stenographic machine

8    the proceedings held in open court on October 4, 2018,

9    in the matter of NEW CENTURY FOUNDATION, ET AL v.

10   MICHAEL ROBERTSON, Case No. 3:18-cv-0839; that said

11   proceedings were reduced to typewritten form by me;

12   and that the foregoing transcript is a true and

13   accurate transcript of said proceedings.

14

15           This is the 22nd day of January, 2019.

16

17                   s/ Roxann Harkins_____
                     ROXANN HARKINS, RPR, CRR
18                   Official Court Reporter

19

20

21

22

23

24

25