# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **NEW CENTURY FOUNDATION and**<br>**SAMUEL JARED TAYLOR,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-00839** |
| | ) | **Judge Aleta A. Trauger** |
| **MICHAEL ROBERTSON, in his** | ) | |
| **official capacity as director of** | ) | |
| **Tennessee Department of** | ) | |
| **Environment and Conservation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Before the court are a Motion for Summary Judgment filed by plaintiffs New Century

Foundation ("NCF") and Samuel Jared Taylor (Doc. No. 59) and a Motion for Summary

Judgment filed by defendant Michael Robertson (Doc. No. 66). For the reasons set forth herein,

each motion will be granted in part and denied in part.

## I. PROCEDURAL BACKGROUND

NCF is an organization that publishes "materials about European heritage, culture, and

interests." (Doc. No. 1 ¶ 3.) Its president, Samuel Jared Taylor, is a frequent speaker at public

and private events about "issues concerning European heritage, culture, and interests." (*Id.* ¶ 1.)

In September 2018, the plaintiffs filed a Verified Complaint (Doc. No. 1) seeking declaratory

and preliminary and permanent injunctive relief against the defendant, Michael Robertson, in his

official capacity as the director of the Tennessee State Park Operations ("Parks Division"), a

division of the Tennessee Department of Environment and Conservation ("TDEC"), under 42

U.S.C. § 1983. The plaintiffs alleged that the defendant's policy of requiring the plaintiffs to pay the cost of hiring law enforcement officers to ensure public safety and of repairing damages caused by protesters, if plaintiffs elect to host a conference at a facility owned and operated by the State of Tennessee (the Montgomery Bell Inn and Conference Center, located within Montgomery Bell State Park), violates their rights under the First Amendment.

After conducting an evidentiary hearing in October 2018, the court denied the defendant's Motion to Dismiss and granted the plaintiffs' Motion for Preliminary Injunction. The defendant was preliminarily enjoined from requiring the plaintiffs, as a condition of contracting to reserve lodging and meeting rooms at the MBICC, to agree to pay "damage repair costs or ancillary fees and charges" arising from damage to MBICC or Montgomery Bell State Park facilities caused by persons not affiliated with the plaintiffs, the cost of "security to ensure public safety" arising from the presence of protesters at the Park, or "any other costs above normal operating expenses reasonably resulting from the group's use of or attendance at the state park" (*see* Doc. No. 1-1, at 3), to the extent such charges arise from the activities of protesters and third parties over whom the plaintiffs have no control. (*See* Doc. No. 29.)

The plaintiffs filed an Amended Complaint in January 2019, which added claims against Robertson in his individual capacity. The plaintiffs now assert that the defendant, in his individual capacity, acted with actual malice, is not entitled to qualified immunity, and may be personally liable both for "general and special" damages directly caused by his violation of the plaintiffs' right to free speech and for punitive damages. (*See* Doc. No. 39 ¶¶ 17–19.) Otherwise, the plaintiffs continue to maintain that the defendant violated the plaintiffs' constitutional right to free speech by "requiring Plaintiffs to pay an unconstitutional security fee to ensure public safety and [requiring them] to pay for damage caused by protesters if Plaintiffs elect to rent publicly

available rooms at MBICC to host a conference at which attendees and speakers would discuss matters concerning European heritage, culture, and interests." (Doc. No. 39 ¶ 22.)

The plaintiffs filed their Motion for Summary Judgment and incorporated Brief in Support thereof (Doc. No. 59), on May 1, 2019, along with a document that purports to be a Statement of Undisputed Material Facts (Doc. No. 59-1). The defendant filed a timely Response (Doc. No. 64), Response to Plaintiffs' Statement of Undisputed Material Facts (Doc. No. 64-1), Statement of Undisputed Additional Material Facts (Doc. No. 64-2), and various deposition excerpts and other exhibits. The plaintiff filed a Reply and Response to the Statement of Additional Facts. (Doc. Nos. 65, 65-1.)

Following the completion of briefing on the plaintiffs' motion, the defendant filed his own Motion for Summary Judgment (Doc. No. 66), Memorandum in Support thereof (Doc. No. 68), Concise Statement of Undisputed Material Facts (Doc. No. 67), and more evidentiary materials. The plaintiff filed an "Answer" to the defendant's motion and incorporated Brief (Doc. No. 70), and a Response to the Statement of Facts (Doc. No. 70-1). The defendant filed a Reply as well as a Reply to the plaintiffs' Response to his Statement of Facts. (Doc. Nos. 71, 72.)

## II.     STANDARD OF REVIEW

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to

support the non-moving party's case. *Id.* Accordingly, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to any of the essential elements of its claims.

Once the moving party makes its initial showing, the burden shifts to the non-moving party to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citations omitted).

## III.    STATEMENT OF FACTS

The facts set forth herein are drawn from the defendant's Statement of Undisputed Material Facts (Doc. No. 67), the plaintiff's Response thereto (Doc. No. 70), defendant's Reply to the Response (Doc. No. 72), the First Amended Verified Complaint (Doc. No. 39) and Answer (Doc. No. 53), and various exhibits provided by both parties.[1] The *material* facts are undisputed—the parties dispute how the law should be applied to those facts.

Michael Robertson is the Director of TDEC's Parks Division. In that position, he is directly responsible for the overall budget for fifty-six Tennessee state parks and all of the staff who carry on the day-to-day operations of the parks.

---

[1] The plaintiffs' Statement of Undisputed Material Facts consists of five statements, four of which are supported only by reference to legal citations—including a broad reference to all "legal authorities set forth within the Court's Memorandum of November 5, 2018." (Doc. No. 59-1, at 1 n.1.) The only statement supported with reference to the factual record, paragraph 4, asserts that the "Defendant acted under the color of state law when Defendant engaged in illegal viewpoint-based or content-based discrimination against Plaintiffs by charging Plaintiffs non-*de minimis* fees—which were based in whole or in part upon the community's hostile reaction to Plaintiffs' ideas—for Plaintiffs to rent the facilities of the [MBICC] in order to host a conference." (*Id.* at 2 ¶ 4.) In support of this statement, the plaintiffs cite to virtually every exhibit filed in support of their Motion for Summary Judgment. (*Id.* at 2 n.4.) This is not a statement of fact; it is a set of conclusions the plaintiffs draw from many sources, both legal and factual.

In other words, the plaintiffs' Statement Undisputed Material Facts does not comply with either the letter or spirit of Local Rule 56.01, which requires that each motion for summary judgment be accompanied by a "separate, concise statement of the material facts as to which the moving party contends there is no genuine issue for trial." L.R. 56.01(b). The rule requires a statement of *facts*, not argument, conclusions, or legal principles. It also requires that each fact set forth in the statement "be supported by specific citation to the record." *Id.* Because the plaintiffs' Statement does not actually contain any facts, it is of no utility to the court in reviewing the plaintiffs' motion or determining whether a material factual dispute exists. However, because other documents in the record establish that the material facts in this case are undisputed, the plaintiffs' failure to comply with Local Rule 56.01 does not prevent the court from reaching the merits of their motion.

Montgomery Bell State Park ("Montgomery Bell" or the "Park") is one of Tennessee's resort parks. The Park has an Inn and Conference Center (collectively, "ICC"), which are consolidated in one building. Under state law, resort facilities such as the ICC are required to be revenue-generating and self-sustaining. Tenn. Code Ann. § 11-3-305.

Every year since 2012, NCF has held an annual conference or meeting at the ICC, at which attendees and speakers "discuss matters concerning European heritage, culture, and interests." (Doc. No. 39 ¶ 8; Doc. No. 53 ¶ 8.) Every year for the preceding five years, the plaintiffs have reserved, not only the conference and meeting rooms at the Conference Center portion of the ICC, but also all of the sleeping rooms available at the Inn portion of the ICC. They make reservations well in advance of the date of their conference with the specific intent of securing the entire facility.

In the past, people who disagree with the content and viewpoint of the NCF conferences have gathered to protest during the NCF conferences. (Doc. No. 39 ¶ 10; Doc. No. 53 ¶ 10.) In recent years, TDEC has provided security for conference attendees, sometimes in coordination with other state agencies, and has also provided a zone within the park for protesters to gather, with a "neutral buffer zone between the [event venue] and the crowds/protesters" in which only law enforcement officers are permitted. (Doc. No. 64-3 ¶ 7.)

In his Supplemental Affidavit, Robertson testified that, each year, prior to the event, TDEC employees discuss the security measures that will be implemented and the rules TDEC expects the attendees to follow. (Robertson Supp. Aff., Doc. No. 64-3 ¶ 3.) If a group provides Robertson with information related to potential threats to a group and its safety, as NCF has done, Robertson will factor that information into his analysis of the staffing needs. Robertson stated, "We also do our own research into all groups to determine the potential for crowds or

protesters." (Doc. No. 54-3 ¶ 3.) "One of the issues for cost-recovery purposes is the likelihood of protesters/crowds that may get rowdy or destructive such that increased security/staffing is necessary to protect the nonpublic forum, the attendees of the event, and the staff at the event." (Doc. No. 54-3 ¶ 3.) In an email dated May 1, 2018, following NCF's 2018 conference, from plaintiff Jared Taylor to Pat Wright, a member of Robertson's staff, Taylor expressed his appreciation for the "thorough, courteous, and very professional services" of the staff engaged in providing security. (Doc. No. 64-6, at 2.) Taylor continued: "Everyone I spoke to at the conference was grateful for the protection you provided us. . . . I know it must have been very expensive to mobilize a force of that size. . . ." (*Id.*)

When the plaintiffs attempted to reserve the ICC for their May 2019 conference, a proposed group contract ("Contract") containing slightly different language from that used in previous years was provided to them, specifically, language related to cost recovery. On the third page of the Contract the following paragraphs appear:

> Refundable Security Deposit: in addition to the reservation deposit, a cash, check, or credit card deposit equal to 10% of the expected balance, including any anticipated catering costs and fees, is required for group reservations. This deposit is due at least 30 days prior to the reservation arrival date and is intended to cover expenses that TDEC may reasonably incur because of the group's reservation and use of or attendance at the state park. The park will hold this deposit as a security deposit to be applied toward: 1) *any damage-repair costs* or ancillary fees and charges assessed to the group or its members or affiliates due to issues related to the use of the park or its equipment and/or facilities, *including park restoration following the group's use*; 2) reasonably required state staff expenses that exceed typical staffing expenses for the facility, including event monitoring, set-up, takedown, or *security to ensure public safety*; 3) use of additional facilities; and/or 4) *any other costs above normal operating expenses* reasonably resulting from the group's use of or attendance at the state park.
>
> The parties agree that the Park may assess reasonable fees or charges above the security deposit, should the security deposit be insufficient to cover the expenses listed above.

(Contract, Doc. No. 1-1, at 3 (emphasis added); *see also* Robertson Supp. Aff. Doc. No. 64-3 ¶ 2 ("The contract that we provided to NCF was the one that was being used at that point and is still in use today for all groups. . . .").)

Leading up to the implementation of the revised group Contract, around 2013, TDEC began to consider cost recovery measures for group events at the revenue-generating facilities in the state parks, such as the ICC, so that the facilities could continue to be self-sufficient. TDEC determined that, because group events sometimes lead to increased need for security and personnel above the norm, the contract that had been used by various groups to reserve state park facilities, such as the ICC, needed to be modified to allow for cost recovery measures.

In deciding whether to provide for cost recovery and, if so, what language should be used, the defendant and TDEC's office of General Counsel looked at National Park Service materials. Robertson ascertained that National Park Service materials contained cost recovery language for national park facilities to use. After several iterations, TDEC settled upon a revised group contract in 2018 that contained the cost recovery language quoted above. The contract is intended to be used for reservations at all revenue-generating facilities at Tennessee state parks that are subject to the statutory mandate that they be self-sufficient.

The plaintiffs' claims in this lawsuit are based on their reading of the requirements imposed by this new contractual language. Specifically, they object to the Contract insofar as it manifests a policy to make the plaintiffs financially responsible for the cost of security to "ensure public safety"—which the plaintiffs interpret as including the safety of the protesters assembled in the public areas of Park as well as their own safety from the protesters—and for the repair of all damages to park facilities—which the plaintiffs interpret to include damages caused by protesters, as suggested by the Contract's reference to "damage-repair costs . . . due to issues

related to the use of the park or its . . . facilities, including park restoration following the group's use." (*See* Doc. No. 39 ¶ 12.) The plaintiffs do not argue that the imposition of a security deposit, *per se*, constitutes an unconstitutional prior restraint on speech. Rather, they contend that the requirement that they agree to cover future costs that they are not able to estimate in advance and that are based on factors outside their control constitutes an unconstitutional prior restraint on their speech in the form of a so-called "heckler's veto."

The defendant has maintained at least since the October 4, 2018 hearing that the Parks Division has no intention to charge the plaintiffs for any damages caused by protesters. (Hr'g Tr., Doc. No. 47, at 26–27 (explaining that the group could be charged for damages caused by attendees but not for any damages caused by "other people who are using park facilities"); Robertson Aff., Doc. No. 19-1 ¶ 12; Robertson Supp. Aff., Doc. No. 64-3 ¶ 10.) Robertson also insists that the purpose of the group contract is to "recover for the greater than normal Tennessee Parks-incurred costs . . . related to the protection of the revenue-generating facilities" and those "related to the security of the attendees of and staff present for the event at the facility." (Doc. No. 64-3 ¶ 4.) Robertson construes the scope of the term "public safety" to mean the safety of the ICC staff and event attendees, not the safety of the general public, including that of any protesters. (*Id.; see id.* ¶ 8 ("My interpretation of the contract's provision for a security/personnel fee to 'ensure public safety' meant security provided by the Tennessee Parks Department necessary to protect the users of the facility, in this case, the users of the [ICC]. The 'public' that is referenced means the persons using the facility pursuant to the group contract.").) The task of policing the area occupied by protesters falls, to some extent, upon park rangers but is undertaken "primarily [by] other State agencies such as the Department of Safety, Tennessee Bureau of Investigation, and the Department of Correction, among others." (*Id.* ¶ 4.) Robertson

asserts that "[t]he costs associated with the handling of the protesters, security to ensure the safety of the general public, and the use of the public part of the park are not borne by NCF." (*Id.* ¶ 4.) The cost of posting park rangers at any "entrances that provide ingress/egress" to the ICC from the buffer zone is the only charge arising from the posting of park personnel outside the strict confines of the ICC that would be passed on to NCF. (*Id.* ¶ 7.) Robertson specifically represents that, if a group's event "needed additional security or other measures in excess of what we normally provide, then those would be charged as cost recovery measures." (Doc. No. 47, at 27.)

Robertson has been employed by the Parks Division for more than thirty years and began his tenure as a park ranger. He was promoted through the ranks over the years and attained his current position in 2012. As part of his training, education, and experience in his various positions with the Parks Division, Robertson learned how to assess the needs for law enforcement, staffing, and other resources for events, "including needs for protection of park property and users of park property." (Doc. No. 70-1 ¶ 9.)

Robertson testified that the criteria generally used to determine the amount of staffing required for any particular group event include:

> (1) the facility or facilities reserved; (2) the time of year of the reservation, which takes into account the probable weather and other considerations of the year, for example high-traffic times of the year; (3) the time of day that the event is to take place, including evaluation of events which are to occur over multiple days; (4) the revenue-generating impact of the group's reservation on the use of other park facilities; (5) the security of park staff inside the reserved facilities that are reasonably required to protect the facilities from harm and who are required to work the event under the group reservation; (6) the estimated number of participants in the group making the reservation; and (7) the estimated number of viewers, including media.

(Robertson Aff., Doc. No. 19-1 ¶ 11 (cited in Statement of Undisputed Facts, Doc. No. 67 ¶ 10).) He avers that these criteria apply to every group reservation (*id.* ¶ 10) and that he has used the

above-referenced factors to determine the needs for events for many years (Robertson Supp. Aff., Doc. No. 64-3 ¶ 1). Robertson expressly acknowledges that "the presence of protesters/crowds in the [public areas of the park] may have an impact on the fee to be charged," but he insists that the fees "are not related to the actual activities of the protesters, the use of the public park forums, or the security to ensure the safety of the general public—those activities are handled primarily by other State agencies." (Doc. No. 64-3 ¶ 4.) The defendant concedes, however, that "part of the consideration" of the security measures taken and the fee ultimately charged to the group "is the content of the speech and the speaker." (Reply to Resp. to Def.'s Statement of Facts, Doc. No. 72 ¶ 10.)

The stated purpose of the cost recovery language in the Contract is to permit revenue-generating resort facilities such as the ICC to remain attractive and available to all and to comply with the statutory mandate that they be self-sufficient. (Robertson Aff., Doc. No. 19-1 ¶ 10; *see also* Hr'g Tr., Doc. No. 47, at 24–25, 44–45.) The plaintiffs insist that, regardless of the defendant's intention, the "[e]vidence submitted with Plaintiff's Motion for Summary Judgment evinces that Defendant is cognizant of the viewpoints of the Plaintiffs and likeminded organizations which have similarly rented facilities at Montgomery Bell State Park." (Doc. No. 72 ¶ 31 (citing Doc. No. 59-18, at 4).)

While the plaintiffs do not actually identify or discuss this evidence, the exhibit to which they point consists of a comprehensive written "Operations Plan" formulated by the Parks Division in anticipation of the Joint Conference of the American Freedom Party and Counsel of Conservative Citizens, held June 15–17, 2018. (Doc. No. 59-18, at 1.) The Plan notes that this Conference was the first event these groups had held at a Tennessee state park and that the groups are "self-described white nationalist organizations," one of which has historical ties to the

Ku Klux Klan. (*Id.* at 4.) The Plan recognizes that the "controversial speakers for this conference as well as the group's general rhetoric is likely to draw protest activity." (*Id.*) The thirty-page Operations Plan describes the security planned for the event, noting that the Parks Division anticipated additional support from TBI, THP, TDOC, and the Rutherford County Sheriff's Office, with the Dickson County Sheriff's Department and EMS on stand-by. (*Id.* at 10–11.) Preparations for the event included such matters as pre-event staging with detailed foot patrol to look for planted weapons and contraband, the installation of cameras at the event and protest sites, fencing to contain the protesters, portable toilets for the protesters to use, and signage highlighting the rules that pertained within the protest areas. (*Id.* at 11–12.)

Although there is no similar "operations plan" for the plaintiffs' conference in the record, other documents and evidence, including Robertson's own testimony as referenced above, establish that the Parks Division is aware of the plaintiffs' organization's viewpoint, as well as that of the "likeminded organizations" to which the plaintiffs refer. The defendant does not dispute this inference. A scrap-booking conference is unlikely to incite the interest of protesters or to call for the deployment of bomb-detecting dogs prior to the event.

The plaintiffs also contend that the defendant's "newly created policies have a disparately adverse impact against Plaintiffs and likeminded organizations. . . . [T]he new group contract has the effect of imposing cost-prohibitive fees against Plaintiffs and likeminded organizations due to their controversial viewpoints." (Doc. No. 72 ¶ 31 (citing Doc. No. 59-3).) The document referenced in support of this statement is the Affidavit of Rick Tyler, who is "involved with the American Freedom Party," one of the "likeminded organizations" to which the plaintiffs refer. In his Affidavit, Tyler attests that, following his group's conference at Montgomery Bell in June 2018, the group received an invoice for $21,057.69 for charges, according to the invoice, "for

reasonably required state park staff expenses that exceeded the typical staffing expenses for Montgomery Bell State Park's Inn and conference center related to your group's use of the park facilities June 15-17, 2018." (Doc. No. 59-3, at 3 (affidavit), 7 (invoice).) According to Tyler, these charges and the excess staff were needed "due to the hostile community's reaction to our First Amendment-protected political ideas. (*Id.* at 3.) The charges are so significant that they will "have a chilling effect on the American Freedom Party's ability to have future conferences at the Montgomery Bell State Park." (*Id.*)

## IV.    ANALYSIS

The plaintiffs bring suit under 42 U.S.C. § 1983, which creates a private cause of action to vindicate the violation of federal constitutional rights by a state actor. *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014). The rights at issue here arise under the First Amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech." Through the Fourteenth Amendment, this prohibition applies to state and local governments as well. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940); *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005).

There is no dispute in this case that Robertson, in both his individual and official capacities, is a state actor. The questions the plaintiffs raise are whether the Parks Division's new policy of incorporating a cost shifting provision in the standard group Contract is an unconstitutional restriction on the plaintiffs' speech and, if so, whether Robertson can be individually liable. The defendant further raises the question of whether, even assuming a constitutional violation has occurred, declaratory relief is appropriate in this case.

The plaintiffs specifically object to two clauses in the Contract: (1) the provision requiring the contracting group to agree to cover "any damage-repair costs . . . assessed to the

group . . . due to issues related to the use of the park or its equipment and/or facilities, including park restoration following the group's use" (the "damage repair clause"); and (2) the cost of ensuring the "public safety," including both the safety of conference attendees and the protesters gathered in the areas of the park open to the public (the "public safety clause"). (Doc. No. 1-1, at 3.)

### A.    The Public Safety Clause

In support of the public safety clause, the defendant argues that (1) the forum in question here, the ICC, is a non-public forum; (2) the state may exercise "control over access to a nonpublic forum . . . based on subject matter and speaker identity[,] so long as the distinctions are reasonable in light of the purpose served by the forum and are viewpoint neutral" (Doc. No. 68, at 8 (quoting *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 806 (1985)); (3) the security fee assessed in this case is viewpoint neutral; (4) the fee is reasonable in light of the State's requirement that the ICC remain fiscally self-sustaining and the Parks Division's mission to keep ICC and other resort facilities "intact, attractive, and readily usable by all persons" (Doc. No. 68, at 10–11); and (5) the Parks Division does not engage in "unbridled discretion" in staffing an event but, instead, is guided by well established factors in deciding how much staff to deploy for an event, including the language of the Contract itself and the criteria identified by Robertson. The defendant maintains that the security fee is viewpoint neutral and does not amount to a "heckler's veto." (Doc. No. 68, at 19.) He also argues that, because the plaintiffs' "entire case centers around the allegations that Defendant is seeking to charge for 'security to ensure public safety,'" including the cost of policing the protesters in the public areas of the park, and it is, according to the defendant, undisputed that the defendant has not charged and does not intend to charge NCF for those costs, the case should be dismissed.

In response, and in support of their own Motion for Summary Judgment, the plaintiffs argue that, regardless of how Robertson himself construes the Contract, it appears on its face to permit the defendant to calculate security costs to be imposed on the plaintiffs to secure "public safety," including that of the protesters over whom the plaintiffs have no control. Even insofar as the "public" only includes ICC staff and conference attendees, the plaintiffs contend that (1) the ICC is "generally open" to the public and is, therefore, a designated public forum rather than a nonpublic forum; (2) any content-based discrimination imposed on the users of a "generally open" forum is subject to strict scrutiny; (3) the defendant "is engaged in content-based discrimination against Plaintiffs' speech because Defendant charges Plaintiffs security fees based in part upon the number of protesters who demonstrate against Plaintiffs' conferences" (Doc. No. 70, at 22); (4) the fact that the fee imposed upon the plaintiffs is based on "what Defendant expects may happen . . . at the public forum that is the park" shows that it constitutes both viewpoint and content discrimination and meets "the textbook definition of a heckler's veto" (Doc. No. 70, at 22); (5) the security fee has "already had a chilling effect at Defendant's park insofar as the security fees caused by the community's hostile reaction to controversial speech is cost-prohibitive for organizations [that] espouse controversial views" (Doc. No. 70, at 22–23); and (6) the defendant's use of subjective discretion to determine the amount of security that will be necessary at an event further establishes the unconstitutional nature of the shifting the security costs to the plaintiffs.

### 1.    Type of Forum

Broadly, when a plaintiff alleges that government action has interfered with protected speech, to determine whether a First Amendment violation has occurred, the court must evaluate: (1) whether the speech at issue is protected; (2) the nature of the forum in which the speech

occurred; and (3) whether the government's action is justified under the requisite standard. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015). The level of scrutiny applied typically depends on the type of forum involved. *Cornelius*, 473 U.S. at 797.

The Supreme Court has identified three categories of government fora to "inform an evaluation of the First Amendment's mandates." *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1255 (3d Cir. 1992) (citations omitted). These are "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).

The "traditional public forum" includes public areas that have "by long tradition or by government fiat . . . been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). Parades, public assemblies, and such spaces as public sidewalks and city parks, municipal festivals, and so forth are typically considered public fora. *See, e.g.*, *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (characterizing parades and assemblies as "the archetype of a traditional public forum"). The government must respect the open character of these fora and can only impose speech restrictions within them that are "narrowly tailored to serve a significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Discrimination based on the content of the speech or the viewpoint of the speaker[2] within a public forum will almost never pass muster. *See Roseberger v.*

---

[2] Content-based discrimination means the government action "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Az.*, 135 S. Ct. 2218, 2227 (2015). Discrimination based on viewpoint is "a more blatant or egregious form of content discrimination." *Id.* (internal quotation marks and citations omitted). So, for example, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed." *Id.* at 2230. By contrast, a law that banned political speech

*Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.").

"Designated public fora . . . are created by purposeful governmental action." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). "Expressive activity in this type of forum may be restricted to particular speakers or purposes. *Oberwetter v. Hilliard*, 639 F.3d 545, 551 (D.C. Cir. 2011). However, "[i]f the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny," *Forbes*, 523 U.S. at 677, the same standard that applies in a traditional public forum.

Third is the "nonpublic forum," which encompasses government property that is "not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46. Generally, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* That is, government regulation of speech in a nonpublic forum does not have to be content neutral; it "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). This rule recognizes that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer v. Spock*, 424 U.S. 828, 836 (1976) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)) (internal quotation marks omitted).

In addition to these three venues, the "limited public forum" has been recognized as a subcategory of the designated public forum. *See Youkhanna v. City of Sterling Heights*, No. 18-

by one side of a controversy but not another would be both content- and viewpoint-based discrimination.

1874, —F.3d —, 2019 WL 3808509, at *6 (6th Cir. Aug. 14, 2019) (observing that a "City Council meeting is . . . a 'designated' and 'limited' public forum: 'designated' because the government has 'intentionally open[ed] it for public discourse,' and 'limited' because 'the State is not required to . . . allow persons to engage in every type of speech' in the forum" (quoting *Lowery v. Jefferson Cty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009))). These spaces, although their parameters are less well defined, are treated more like nonpublic fora than public, whether traditional or designated. *See, e.g.*, *Every Nation Campus Ministries at San Diego State Univ. v. Achtenberg*, 597 F. Supp. 2d 1075, 1092 (S.D. Cal. 2009) ("In these fora, as in non-public fora, the government violates the First Amendment only 'when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.' In a limited public forum, however, 'restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible.' (quoting *Cornelius*, 473 U.S. at 806; *DiLoreto v. Downey Unified Sch. Dist.*, 196 F.3d 958, 965 (9th Cir. 1999))). That is, in a limited public forum, as in a nonpublic forum, "the government can impose reasonable restrictions based on speech content, but it cannot engage in viewpoint discrimination." *Youkhanna*, 2019 WL 3808509, at *6.

In addressing the plaintiffs' preliminary injunction motion, this court determined that the ICC is a nonpublic forum. The plaintiffs have offered no new argument to challenge that prior determination. Like the meeting spaces at issue in *Chicago Acorn v. Metropolitan Pier & Exposition Authority*, the conference facilities of the ICC "are not traditional sites for public assembly, demonstrations, or debate." 150 F.3d 695, 699 (7th Cir. 1998). Although the meeting rooms "are sites usable and sometimes used for discussion and other expressive activities," they are typically "rented to organizations for use by their members and guests rather than by the

public at large unless the lessee decides to admit the public." *Id.* at 700. The court holds that the meeting space within the ICC is a nonpublic forum.

Moreover, even if the ICC could conceivably be deemed a limited public forum, the governing standard would remain the same. In either case, the government must show only that any restrictions on speech are "viewpoint neutral and reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806. Assuming the restrictions are, indeed, viewpoint neutral, then the reasonableness standard is not stringent. As the Third Circuit has explained:

> Unlike with strict scrutiny, this review does not require narrow tailoring or the absence of less restrictive alternatives. Indeed, the "Government's decision to restrict access . . . need only be reasonable; it need not be the most reasonable or the only reasonable limitation." Moreover, the government's asserted interest in drawing content-based distinctions must be valid, but it does not have to be compelling.

*NAACP*, 834 F.3d at 441 (quoting *Cornelius*, 473 U.S. at 808).

On the other hand, if the restrictions are not viewpoint neutral, they are presumptively unconstitutional. *See Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995) ("[C]ontent discrimination . . . may be permissible if it preserves the limited forum's purposes, [but] viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations.").

2.    Whether the Security Fee Is Viewpoint Neutral

The defendant readily concedes that the security fee requirement is not strictly content neutral, but he maintains that it is viewpoint neutral, as it pertains to every group seeking to reserve space at the ICC or any other revenue-generating state park facility. While he looks at the content of a group's speech—any group's speech—he argues that he only does so for the purpose of determining what type of response it might provoke from the general public and whether, consequently, enhanced security measures will be required. The plaintiffs, in response,

contend that requiring them to "pay for security to ensure public safety . . . constitutes unconstitutional viewpoint and/or content discrimination in the form of a heckler's veto," insofar as it authorizes the defendant to "examine the content of the message conveyed, estimate the public response to that content, and judge the number of police necessary to meet that response." (Doc. No. 70, at 23 (quoting *Forsyth Cty.*, 505 U.S. at 123–24).)

On its face, the Contract language appears to be entirely content neutral, applying to all groups and imposing costs based on the group's use of the relevant state park's facilities. The defendant, however, admittedly looks at the particular group making the reservation—and its message—to determine how much and what type of security will be required in the specific case. So far, although the defendant has posited the hypothetical possibility that celebrities holding concerts at a state park might require a significant amount of security, the only evidence regarding the actual imposition of the security fee indicates that controversial groups similar to NCF (deemed, at least by watch groups, to be white nationalist or white supremacist groups) are the only groups that have been assessed a significant fee under the new contractual language.

"Pundits have recently used the term 'heckler's veto' to describe instances in which vocal audiences seek to silence offensive or controversial speech by putting pressure on institutions that control the private forums that host the speech." Brett G. Johnson, *The Heckler's Veto: Using First Amendment Theory & Jurisprudence to Understand Current Audience Reactions Against Controversial Speech*, 21 Comm. L. & Pol'y 175, 175 (2016). Recent instances of this type of heckler's veto have typically occurred on college campuses, where unruly student protests have led to the cancellation of appearances by speakers, often conservative, of whose message the students disapprove. *See, e.g.*, Julie Carrie Wong, *UC Berkeley cancels 'alt-right' speaker Milo Yiannopoulos as thousands protest*, The Guardian (Feb. 2, 2017),

https://www.theguardian.com/world/2017/feb/01/milo-yiannopoulos-uc-berkeley-event-cancelled.

Caselaw, however, has defined the heckler's veto more narrowly as "the suppression of speech by the government . . . because of the possibility of a violent reaction by hecklers." Johnson, *supra*, at 180 (citations omitted). "Heckler's veto case law can be interpreted as guaranteeing that 'local government must take action to protect [a] speaker against a hostile crowd.'" *Id.* at 206 (quoting Cheryl A. Leanza, *Heckler's Veto Case Law as a Resource for Democratic Discourse*, 35 Hofstra L. Rev. 1305, 1307 (2007)); *see also Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 234 (6th Cir. 2015) (en banc) ("The . . . 'heckler's veto' occurs when police silence a speaker to appease the crowd to stave off a potentially violent altercation.").

In *Bible Believers*, the Sixth Circuit was called upon

> to confirm the boundaries of free speech protections in relation to angry, hostile, or violent crowds that seek to silence a speaker with whom the crowd disagrees. Set against the constitutional right to freedom of speech, we must balance the state's interest in insuring public safety and preventing breaches of the peace.

*Id.* at 234. In that case, the plaintiffs, self-described Christian evangelists, attended the Arab International Festival in Wayne County, Michigan, a celebration of Arab culture and heritage that was free and open to the public, for the purpose of trying "to convert non-believers, and call sinners to repent." *Id.* at 236. "The quintessential attribute of the Bible Believers' message was intolerance, principally proclaiming that Mohammed was a false prophet who lied to them and that Muslims would be damned to hell if they failed to repent by rejecting Islam." *Id.* The crowd consisted of large numbers of Muslims, some of whom responded to this message by heckling the speakers and throwing trash and bottles. Rather than controlling the crowd or protecting the speakers, the police opted to remove the evangelists in order to restore peace.

Under the circumstances presented in that case, the Sixth Circuit found that the police officers' action constituted a heckler's veto and violated the Bible Believers' First Amendment rights "by cutting off [their] protected speech in response to a hostile crowd's reaction." *Id.* at 243. The court rejected Wayne County's argument that the police officers' action was content neutral because they were only concerned with maintaining public safety:

> This contention fails in the face of abundant evidence that the police have effectuated a heckler's veto. It is irrelevant whether the Operations Plan is content-neutral because the officers enforcing it are ordained with broad discretion to determine, based on listener reaction, that a particular expressive activity is creating a public danger.

*Id.* (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 97 (1972) ("[B]ecause of their potential use as instruments for selectively suppressing some points of view, this Court has condemned licensing schemes that lodge broad discretion in a public official to permit speech-related activity."); *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008) ("If the statute, as read by the police officers on the scene, would allow or disallow speech depending on the reaction of the audience, then the ordinance would run afoul of an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'")).

More importantly for its implications for the scenario presented in this court, the Sixth Circuit concluded that a heckler's veto constitutes "odious viewpoint discrimination," which it defined as "[a]n especially 'egregious' form of content-based discrimination . . . that which is designed to exclude a particular point of view from the marketplace of ideas." *Bible Believers*, 805 F.3d at 248; *see id.* ("Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" (quoting *Perry Educ. Ass'n*, 460 U.S. at 62 (Brennan, J., dissenting))).

The Supreme Court has applied the concept of a heckler's veto to a fee structure similar to the one at issue here. In *Forsyth County, Georgia v. Nationalist Movement*, 505 U.S. 123 (1992), the Supreme Court found facially unconstitutional a county ordinance that allowed a county administrator to vary the fee for assembling or parading based on the estimated cost of maintaining public order. *Id.* at 125. The Court noted that requiring a permit or any fee at all before authorizing public speeches, parades, or assemblies in a traditional public forum constitutes a "prior restraint on speech," *id.* at 130, but that requiring such fees and permits is permissible so long as the regulatory scheme does "not delegate overly broad licensing discretion to a government official," does not impose restrictions "based on the content of the message," is "narrowly tailored to serve a significant government interest," and "leaves open ample alternatives for communication." *Id.* at 130. The ordinance in *Forsyth County* was constitutionally infirm in two respects: (1) it granted the administrator essentially "unbridled discretion" in setting the permit fee, *id.* at 132; and (2) it permitted, and even required, the administrator to examine the content of the permit-seeker's message in order to estimate the potential public response and, thus, the cost of police services that would be necessitated by the parade or assembly. *See id.* at 134 ("In order to assess accurately the cost of security for parade participants, the administrator must necessarily examine the content of the message that is conveyed, estimate the response of others to that content, and judge the number of police necessary to meet that response. The fee assessed will depend on the administrator's measure of the amount of hostility likely to be created by the speech based on its content. Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit." (internal quotation marks and citations omitted)). In dismissing the county's argument that the consideration was actually content neutral because it was aimed only at the cost of

maintaining public order, the Court stated, "Listeners' reaction to speech is not a content-neutral basis for regulation." *Id.* at 134. As for the county's insistence that raising revenue to pay for police services was an important justification, the Court held that, while this government responsibility was "undoubtedly . . . important . . . , it does not justify a content-based permit fee." *Id.* at 136.

Considered together, *Bible Believers* and *Forsyth County* give rise to two premises relevant here. First, although the plaintiffs seek to gather and engage in protected activities within a nonpublic forum, *Forsyth County* dictates the conclusion that the security fee provision of the group Contract constitutes a heckler's veto. Just like the Forsyth County parade ordinance, the Contract grants authority to a government official to determine a security fee based on the anticipated hostile reaction to a group's gathering on park property and the attendant cost of providing law enforcement officers and implementing other measures to protect conference participants and ICC staff.

The second premise is that the security fee requirement is not viewpoint neutral. In fact, in *Bible Believers*, the Sixth Circuit indicated that a heckler's veto is never viewpoint neutral. *See Bible Believers*, 805 F.3d at 248 ("The heckler's veto is precisely that type of odious viewpoint discrimination."). While the *Forsyth County* Court used only the term "content based" rather than "viewpoint based," as noted above, viewpoint based discrimination is simply a "more egregious form" of content based discrimination. Because *Forsyth County* concerned speech within a traditional public forum, the Court had no reason to differentiate between the terms, as the same standard applied to both.

Moreover, even if the Sixth Circuit's pronouncement that a heckler's veto is never viewpoint neutral could be deemed hyperbole, the restriction at issue in this case clearly is not

viewpoint neutral, and the defendant's argument to the contrary is disingenuous. The defendant effectively admits that the security fee is based, not merely on the content of the speech (is it political speech?) but on the viewpoint (what position does the group espouse and will it generate hostility?). The defendant was aware that the NCF as well as the groups with which non-party Rick Tyler is affiliated—which were actually charged a security fee following their conference—are considered to be white nationalist or white supremacist groups, that their viewpoints are controversial, and that many people seek to protest at their conferences in order to express disagreement with their viewpoint. The security measures implemented by the defendant expressly took into account the speakers' viewpoint. The defendant described doing his own research on NCF to determine the type of response its conference might be expected to engender. The Operations Plan prepared in advance of the Joint Conference of the American Freedom Party and the Counsel of Conservative Citizens in June 2018 conference described the deployment of bomb-sniffing dogs. This is not viewpoint neutrality.

### 3. The Security Fee Is Unconstitutional

As discussed above, restrictions on speech at a nonpublic forum are permissible if they are *both* viewpoint neutral and reasonable. Restrictions that are not viewpoint neutral are subject to strict scrutiny. *See Youkhanna*, 2019 WL 3808509, at *6 (in the context of a limited public forum, noting that "viewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations" (quoting *Rosenberger*, 515 U.S. at 830). The defendant here makes no effort to argue that the restrictions would pass muster under that level of scrutiny, for good reason: while raising revenue to pay for security services and to maintain the ICC's financial self-sustainability is "undoubtedly . . . important . . . , it does not justify a [viewpoint]-based permit fee." *Forsyth Cty.*, 505 U.S. at 136.

Thus, insofar as the Contract permits the assessment of a security fee based on the cost of ensuring the safety of NCF members and park staff deployed at the ICC that admittedly takes into account the expected response by protesters in formulating the security plan, it constitutes an unconstitutional prior restraint on speech. Obviously, the broader construction of the Contract propounded by the plaintiffs would also be unconstitutional.

B.  **The Damage Repair Clause**

As indicated above, the plaintiffs also object to the damage repair clause of the Contract, which requires the contracting group to agree to pay "*any damage-repair costs . . . assessed to the group . . . due to issues related to the use of the park or its equipment and/or facilities, including park restoration following the group's use.*" (Doc. No. 1-1, at 3.) The plaintiffs object to this provision insofar as it appears to require them, as a condition of contracting for the use of the ICC facilities, to agree to cover the cost of repairing damages caused by protesters rather than strictly those caused by NCF members. Such a requirement would, like the security fee referenced above, constitute unconstitutional viewpoint discrimination, because it would permit a hostile mob to damage property for the purpose of imposing costs upon the plaintiffs as a consequence of their exercising their right to free speech. The Supreme Court has made it clear that a group cannot be financially burdened based upon the community's hostile reaction to the group's speech. *See Forsyth Cty.*, 505 U.S. at 134–35 ("Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."). The defendant insists that this provision clearly pertains only to damages caused by the contracting group and that he never sought to enforce it otherwise against the plaintiffs or any other group.

The situation presented here is unusual insofar is it concerns a policy embodied in a contract rather than an actual statute, regulation, or ordinance. However, in the context of analyzing challenges to ordinances on First Amendment grounds, the Sixth Circuit has defined a "vague" ordinance as one that

> denies fair notice of the standard of conduct to which a citizen is held accountable. At the same time an ordinance is void for vagueness if it is an unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement.

*Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183–84 (6th Cir. 1995) (citation omitted). Likewise, in the context of overbreadth challenges to actual laws, the doctrine of overbreadth permits a party with constitutional standing to raise First Amendment claims of non-parties whose speech may be chilled in the future if the law or regulation stands. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007); *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1367 (10th Cir. 2000). A statute may be void for vagueness if it would deter would-be speakers from speaking because they cannot tell whether their intended speech falls within the statute's prohibitions. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of [a content-based speech] regulation raises special First Amendment concerns because of its obvious chilling effect on free speech."); *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (noting that a vague statute "operates to inhibit the exercise of [First Amendment] freedoms" (citation omitted)). The court finds these principles to be instructive in the present case as well, as the plaintiffs' argument appears to be that the defendant could, in the future, enforce the damage repair clause strictly, against them or other groups, and that the fear of his doing so will have a chilling effect on speech.

The defendant's disclaimer notwithstanding, the damage repair clause, on its face, is clearly broad enough to cover damages caused by third parties that would not have occurred but for the group's use of the facilities. And, even if the clause might also be read more narrowly, it is certainly not unreasonable for the plaintiffs to read it broadly. Moreover, the language is sufficiently vague that it has a substantial likelihood of chilling others from speaking—or contracting with the state—for fear of incurring costs arising from damages caused by third parties. The defendant readily acknowledges that this "particular provision can easily be amended to more clearly reflect [his] practices," effectively conceding that the present wording does not clearly reflect his intentions.

In sum, the court finds that the damage repair clause is unconstitutionally vague in violation of the First Amendment.

### C.      Qualified Immunity

The doctrine of qualified immunity "'shield[s]' public officials from money-damages liability if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Public officials are eligible for qualified immunity if "(1) they did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Citizens in Charge*, 810 F.3d at 440 (quoting *Pearson*, 555

U.S. at 232). The inquiry is objective, as it turns on "what the law is today and whether it was clearly established at the time of the challenged action." *Id.*

The court has found that the Contract implemented by the defendant, on behalf of TDEC and the Parks Division, violates the First Amendment. The question is whether the rights in question were clearly established at the time. Although the rights created by the First Amendment are, in a sense, clearly established, the Supreme Court has instructed that the district courts are "not to define clearly established law at a high level of generality, . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). On the more granular level,

> [a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Cavin v. Mich. Dep't of Corrs.*, 927 F.3d 455, 461 (6th Cir. 2019) ("[T]he Supreme Court has also told us not to do the qualified immunity analysis from 60,000 feet."); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("The 'clearly established law' must be particularized to the facts of the case." (citing *Anderson*, 483 U.S. at 640); *Lyons v. Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (finding that a police officer who tackled the plaintiff was entitled to qualified immunity on the plaintiff's excessive force claim, where, given the particular facts of that case, the violation was not obvious and no precedent "squarely govern[ed] the case here" (quoting *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004))).

In this case, although *Forsyth County* is similar, it is nonetheless distinguishable insofar as it involved a public forum, a parade, and essentially unfettered discretion on the part of the county clerk assessing the parade fee. 505 U.S. at 132. In the present case, the determination of the scope of the plaintiffs' rights has required the parsing of complex questions regarding the nature of the venue in question, the applicable standard of review, and whether the contractual language is viewpoint neutral. The answer to none of these questions is particularly obvious, and certainly not so obvious that any reasonable person in the defendant's position would have known the Contract language is unconstitutional. Moreover, the court is unaware of any case in which a state official has been held personally liable for a First Amendment violation under remotely similar circumstances.

Defendant Robertson is entitled to qualified immunity insofar as he is sued in his individual capacity for his involvement in the acts giving rise to this lawsuit.

### D. The Availability of Declaratory Relief

Having found that the Contract is unconstitutional, the court will issue an injunction prohibiting the implementation of the challenged clauses. The defendant argues that a declaratory judgment, which the plaintiffs also seek, would be duplicative and unnecessary and that the court should exercise its discretion to deny a declaration.

By statute, federal courts, "upon the filing of an appropriate pleading" in most cases within the courts' jurisdiction, "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Sixth Circuit has repeatedly articulated five factors to be considered in determining whether a court should render declaratory relief:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in

issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Savoie v. Martin*, 673 F.3d 488, 496 (6th Cir. 2012) (quoting *Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984)).

Both *Savoie* and *Grand Trunk* involved underlying state court proceedings and the distinct likelihood that the parties seeking declaratory relief did so for the purpose of "procedural fencing" or to avoid the effects of a state court judgment. These factors are not at issue here, and a declaratory judgment will have no effect on the relations between federal and state courts.

Regarding the other factors, while a declaration will not alone settle the controversy, a declaration goes somewhat hand-in-glove with an injunction, effectively articulating the legal grounds for the issuance of an injunction. It serves the useful purpose of clarifying the parties' legal relations. An injunction alone is not necessarily a better or more effective alternative remedy.

Weighing the applicable factors, the court will exercise its discretion to issue a declaration as requested by the plaintiff. In fact, it is unclear to the court why the defendant objects to its issuance, unless it is for the purpose of arguing that the plaintiffs should not be deemed the prevailing party or that their attorney's fees should be reduced on the grounds that they did not prevail on their demand for a declaration.

### E.     Attorney's Fees

In the Amended Complaint, the plaintiffs seek attorney's fees and costs under 42 U.S.C. § 1988. In their Motion for Summary Judgment, they do not include any argument regarding their entitlement to fees and costs under § 1988, but they include a request in their concluding

paragraph that the court "schedule a hearing to determine what amount of attorney's fees and costs should be paid by Defendant . . . pursuant to 42 U.S.C. § 1988(b)." (Doc. No. 59, at 25.)

Under § 1988, "[i]n any action or proceeding to enforce a provision of section . . . 1983 . . . , the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). To be a prevailing party under § 1988, a party must receive "at least some relief on the merits of at least some of his claims." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (quoting *Hewitt v. Helms*, 482 U.S. 755, 760 (1987)). A party prevails in his lawsuit when there has been a "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–9 (1989). That material alteration must affect the behavior of the defendant toward the plaintiff. *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988).

A prevailing party has no right to attorney's fees under § 1988; the statute's use of the term "may" makes such awards discretionary. *See Day v. James Marine, Inc.*, 518 F.3d 411, 419 (6th Cir. 2008) ("Statutes like § 1988 make fees permissible, not mandatory. . . ."). Absent special circumstances, however, prevailing plaintiffs generally are awarded § 1988 fees as a matter of course. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968)). In the Sixth Circuit, as elsewhere, "[i]t is extremely rare to deny fees based on special circumstances." *Hescott v. City of Saginaw*, 757 F.3d 518, 525 (6th Cir. 2014) (citations and internal quotation marks omitted),

The plaintiffs here are clearly the prevailing party. To be entitled to fees, however, they will be required to prepare and file a motion in accordance with Fed. R. Civ. P. 54(d) and Local Rule 54.01(b), specifying the amount of fees sought and supported by the appropriate affidavit of

counsel and supporting documents. The Order accompanying this Memorandum will establish a schedule for the filing and briefing of such a motion.

## V.   CONCLUSION

For the reasons set forth herein, the plaintiffs' Motion for Summary Judgment (Doc. No. 59) will be granted in part and denied in part, and the defendant's Motion for Summary Judgment (Doc. No. 66) will be granted in part and denied in part. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge